```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF WISCONSIN
 2  ------------------------------------------------------

 3  ESTATE OF RUTH FREIWALD BY
    PERSONAL REPRESENTATIVE
 4  CHARLES FREIWALD, et al.,

 5          Plaintiffs,

 6  DEAN HEALTH PLAN, INC.
    and PROGRESSIVE CASUALTY
 7  INSURANCE COMPANY,

 8          Involuntary Plaintiffs,

 9     -vs-                              Case No.:  18-CV-896

10  ADEYEMI FATOKI, M.D., et al.,

11          Defendants.

12  ------------------------------------------------------

13
            VIDEOTAPED
14          DEPOSITION OF:     EMILY J. BLOZINSKI, LPN

15
            DATE:              July 2, 2019
16

17          TIME:              9:54 a.m. - 4:53 p.m.

18
            LOCATION:          BAY REPORTING SERVICE, INC.
19                             414 South Jefferson Street
                               Green Bay, Wisconsin
20

21  REPORTED BY:
    CARRIE S. BOHRER, RPR, RMR, CRR
22  BAY REPORTING SERVICE, INC.
    www.bayreportingservice.com
23  920-432-5662/800-424-2224

24  VIDEOGRAPHERS:
    JOHN McMILLION
25  MIKE SCHMITT - 920-609-8406
```

EXHIBIT 15

1

1  Q  And how long have you been employed with Correct
2     Care?
3  A  2014.
4  Q  So since 2014 to today?
5  A  Correct.
6  Q  At any time did your employment stop for any
7     reason?
8  A  No.
9  Q  Can you describe what Correct Care Solutions is,
10    what type of company?
11 A  It's a company that is medical -- it's a medical
12    company that has contracts with different
13    facilities.
14 Q  Do you know if all the contracts that Correct
15    Care has are correctional facilities?
16 A  I do not know.
17 Q  Do you know if Correct Care Solutions is a
18    national company; in other words, it has
19    contracts with companies across the nation?
20       MR. ROTH:  Show my objection.
21    Foundation.  You can answer if you know.
22 A  I know they have contracts in different
23    facilities.  I don't know where in the
24    United States.
25 Q  And you know that they have a contract --

10

1     Correct Care Solutions has a contract with
2     Brown County Jail, correct?
3  A  Yes.
4  Q  And have you ever worked for any correctional
5     facility other than Brown County Jail while
6     you've been employed for Correct Care?
7  A  No.
8  Q  And is -- is Correct Care sometimes referred to
9     as CCS?
10 A  Yes.
11 Q  So if I use CCS today in the deposition, you'll
12    understand that to mean Correct Care?
13 A  Yes.
14 Q  So all of the lawsuits that you described that
15    you're aware of that are currently pending were
16    lawsuits in which you have been named based on
17    your employment with Correct Care while working
18    for Brown County Jail, correct?
19 A  Yes.
20 Q  Have you ever been a party to a lawsuit that
21    didn't relate to Correct Care or your employment?
22 A  No.
23 Q  Have you ever had a judgment entered against you
24    in any case?
25 A  No.

11

1  Q  And are you aware of any judgments entered
2     against Correct Care?
3  A  I don't know.
4  Q  Have you ever filed a claim or a grievance of
5     any type?
6  A  What do you mean?
7  Q  Have you ever been a claimant in an
8     administrative action or a lawsuit?
9  A  No.
10 Q  Are you part of a union?
11 A  No.
12 Q  Have you ever filed a complaint at work against
13    another employee or somebody who was working in
14    the same facility?
15 A  No.
16 Q  Have you ever filed anything that you would
17    consider a grievance of any kind?
18 A  On someone else?
19 Q  At all.
20 A  No.
21 Q  Have you ever given any testimony in court?
22 A  No.
23 Q  Are you taking any medications today?
24 A  No.
25 Q  Is there any reason why you might not have the

12

1     ability to answer my questions or understand
2     what I'm asking?
3  A  No.
4  Q  Have you ever been prescribed any medication for
5     anxiety?
6        MR. ROTH:  Show my objection to
7     relevance.  You can answer.
8  A  No.
9  Q  Have you ever been prescribed any medication for
10    depression?
11       MR. ROTH:  Same objection.
12 A  Yes.
13 Q  What about for posttraumatic stress disorder?
14 A  No.
15 Q  What about for panic attacks?
16 A  No.
17 Q  What about for OCD?
18 A  No.
19 Q  And have you been prescribed medication for any
20    other mental health issue that I have not
21    mentioned?
22 A  No.
23 Q  What medications were you prescribed for
24    depression?
25       MR. ROTH:  Show my objection.  I'm

13

4 (Pages 10 to 13)

**Page 166**

1  Q  So everybody in HSU could do it in their own
2     manner?
3  A  **Either writing it on the booking sheet or writing**
4     **a nurse's note.**
5  Q  But there was no consistency in terms of
6     conveying the information gleaned from the
7     pharmacy?
8  A  **I do not recall a form.**
9  Q  If the medications here were presented to
10    Dr. Fatoki by Nurse Jones, does that mean that
11    the medications were verified by the pharmacy
12    prior to that conversation with the doctor?
13       MR. ROTH: Objection. Calls for
14    speculation. Foundation. You can answer.
15 A  **This form would be the medications that were**
16    **brought in by the patient, patient with**
17    **medications.**
18 Q  So this form has nothing to do with whether or
19    not these medications were verified?
20 A  **Correct.**
21 Q  And so we just don't know from this form, at
22    least, whether or not the medications were
23    verified before Dr. Fatoki was made aware of
24    these, correct?
25 A  **From this form, no.**

**Page 167**

1  Q  And you're unaware of any other form that we
2     could look to to determine that information?
3  A  **For 2016, I don't recall a specific pharmacy**
4     **verification form, no.**
5  Q  Do you know if the outside physician who
6     prescribed these medications was ever contacted?
7  A  **Not to my knowledge.**
8       MS. SCHNEIDER: Objection to the form
9     of the question.
10 A  **Not to my knowledge.**
11 Q  And is there any document that we could look to
12    to see if an outside physician or psychiatrist
13    had been contacted?
14 A  **It would be in the patient's file, electric**
15    **MAR -- or electric patient file. Sorry.**
16 Q  So the ERMA?
17 A  **Yes, the ERMA.**
18 Q  So if someone had contacted the outside provider,
19    you would expect that interaction to be reflected
20    in the ERMA system in 2016?
21 A  **Yes.**
22       MS. AUERBACH: Let's mark this as
23    Exhibit 26. Sorry. 27.
24       (Exhibit 27 marked for identification.)
25       MS. AUERBACH: For the record, this

**Page 168**

1     bears Bates Number Brown County Sheriff
2     Department 40.
3  Q  Do you recognize this document?
4  A  **Yes. It's a medical slip that a patient can**
5     **send to HSU.**
6  Q  How does a patient get ahold of a medical slip,
7     if you know? Or an inmate. How does an inmate
8     get ahold of one of these?
9  A  **I don't know where they're housed at each**
10    **facility. They could ask the officer.**
11 Q  So you don't know how Ms. Freiwald got ahold of
12    this request form?
13 A  **I do not know.**
14 Q  Okay. And it's here -- because it's a copy,
15    it's in white. But as you look at this, is
16    there anything that would indicate to you what
17    color the -- the form was when you received it?
18 A  **No, I would not know by this.**
19 Q  Okay. Where -- first of all, is it just a
20    single copy, or are the medical request forms,
21    you know, duplicate or triplicate?
22 A  **Duplicate.**
23 Q  And so what color -- I think you said you didn't
24    recall which color the Huber facility was in
25    2016.

**Page 169**

1  A  **Yeah, I don't recall.**
2  Q  What were the options?
3  A  **The double -- or the duplicate, it's white and a**
4     **yellow, the carbon copy that we would send back**
5     **to the patients. I believe the color was blue**
6     **or a green-ish color for Huber.**
7  Q  And it was the top copy that was the different
8     color, correct?
9  A  **Yes.**
10 Q  Where were the originals that HSU had? Where
11    were those kept?
12 A  **After we answer them or --**
13 Q  Yeah.
14 A  **We would scan them in to their file.**
15 Q  And would you keep the actual hard copy?
16 A  **We would scan it in to their file and then we**
17    **shred it. We didn't keep a hard copy if it was**
18    **in their system -- in the system.**
19 Q  When you scanned, did you use a color scanner?
20 A  **No, I don't think it's colored. No.**
21 Q  So if you scanned this into the system, you
22    would no longer be able to tell what color the
23    sheet was?
24 A  **Correct.**
25 Q  And tell me how -- once an inmate -- and let's

**Page 174**

1  A  I don't recall that.
2  Q  So it was, you know, on an as -- as-you-could-do
3     basis in terms of addressing the medical requests
4     in 2016?
5  A  From what I can remember, yes.
6  Q  Were you ever trained on how to determine the
7     level of urgency that a request might have?
8  A  A documented training, no. Hands-on shift
9     training, I would say yes.
10 Q  When you say "shift training," what does that
11    mean?
12 A  I mean just working, being trained, hands-on.
13 Q  So did you go over these medical request forms
14    with other nurses while -- you know, while you
15    were employed there?
16 A  When I first started.
17 Q  Okay. But from that point forward, each person
18    would review some of these forms on their own,
19    correct?
20 A  Yes.
21 Q  And you would make an independent judgment as to
22    how to respond to it?
23 A  Yes.
24 Q  So do you recall what time on 10/29 -- well,
25    strike that. Let me just back up for a second.

**Page 175**

1     This is a medical request form from
2     Ruth Freiwald. It's dated 10/28/16, 5:00 p.m.
3     Do you see that?
4  A  Yes.
5  Q  And she makes a request in the top portion,
6     correct?
7  A  Yes.
8  Q  And then below where it says "For HSU staff
9     only," is that your handwriting?
10 A  Yes.
11 Q  And the date appears to be 10/29/16, correct?
12 A  Yes.
13 Q  Do you know what time you responded to this?
14 A  I do not know.
15 Q  Is there any other record that would indicate
16    what time you responded to this?
17 A  No. We just put the date.
18 Q  Okay. And Ms. Freiwald indicated that she had a
19    migraine headache due to her blood pressure
20    medication being stopped, and she says, "My
21    anxiety due to my PTSD will get worse if
22    this" -- "if that is withheld. I would like my
23    blood pressure monitored."
24    Do you see that?
25 A  Yes.

**Page 176**

1  Q  So at the time that you reviewed this on 10/29,
2     did you look at her file to determine how long
3     it had been since she had received her
4     medications?
5  A  I can't say if I did.
6  Q  Were you aware at the time that you filled this
7     out that she had been prescribed five separate
8     medications, and at the time that you were
9     reviewing this none of them had been ordered?
10 A  I put on there, "Meds to be reviewed with the
11    M.D." I could have looked at her form, the
12    veri -- Medication Verification Form.
13 Q  What did you mean by "Meds to be reviewed with
14    M.D."?
15 A  The medications that she brought in. Or had
16    dropped off. That those medications would be
17    reviewed with the physician for orders.
18 Q  And when would they be reviewed?
19 A  When we called the physician. We don't put like
20    a time on there or a date that they would be
21    reviewed by the provider.
22 Q  So basically what you're telling her with this
23    notation is that they still haven't been reviewed
24    by the doctor?
25 A  Correct.

**Page 177**

1  Q  And you also wrote above that, "Next available
2     appointment with HSU for BP V"?
3  A  Check.
4  Q  "BP check."
5  A  Yeah.
6  Q  So what was the next available appointment with
7     HSU for BP check?
8  A  We never put down a date or time, specifics. We
9     weren't down there on a scheduled date or time.
10 Q  So did you make an appointment for a blood
11    pressure check for Ms. Freiwald on the 29th when
12    you wrote this?
13 A  I don't have it in her file that it was in her
14    medical record.
15 Q  If you had made a set appointment with her to
16    take her blood pressure, would you have reflected
17    that in the medical records?
18 A  It would be like on a -- we kept it on a
19    spreadsheet.
20 Q  And that spreadsheet would be part of the medical
21    records of the inmate?
22 A  It wouldn't be in her medical record, no.
23 Q  Where would it be?
24 A  Like on the computer we use in HSU.
25 Q  Is that the ERMA system?

**Page 178**

1  A   No. It would be just on a spreadsheet on --
2      like in 2016, noted there.
3  Q   And what would it indicate? What type of
4      information?
5  A   Just for a blood pressure check for the patient,
6      for Ms. Freiwald.
7  Q   And I had asked you before if you had produced
8      documents related to this case to your
9      attorneys, and I believe that you said yes.
10     Correct?
11 A   Yes.
12 Q   Were you -- did you provide that spread --
13     spreadsheet?
14 A   No, I did not.
15 Q   Does that spreadsheet still exist?
16 A   I'd have to look.
17 Q   So if somebody wanted to see what appointments
18     were either scheduled in the future or had
19     occurred in the past for an inmate, they'd have
20     to go to this spreadsheet to make that
21     determination?
22 A   It would be -- yes. They would see it on that
23     spreadsheet.
24 Q   And who had access to this spreadsheet in 2016?
25 A   HSU staff.

**Page 179**

1  Q   But as you sit here today, you don't believe
2      that you made an appointment for Ms. Freiwald
3      because she was in that Huber facility, correct?
4  A   I'd have to review that. She is Huber, but
5      because she was complaining of that, we could
6      have checked it.
7  Q   And you don't know when the next time that you
8      went over to the Huber facility after 10/29/16
9      was?
10 A   No. We don't set dates, specific dates.
11 Q   Did you take any other steps with respect to
12     receiving this request in light of the fact that
13     Ms. Freiwald indicated that she had anxiety and
14     PTSD; it would get worse if her medications
15     continued to be withheld?
16 A   No, I did not.
17 Q   Did you look in the -- in the book of -- the
18     pharmacy book that you referred to earlier to
19     determine what adverse effects might occur if a
20     patient does not get their blood pressure
21     medication for more than 24, 48, 36 hours?
22 A   No. I knew her medications were to be reviewed
23     with the provider.
24 Q   Did you know what the adverse effects of
25     withholding blood pressure medication might be

**Page 180**

1      at -- as of 10/29/16?
2              MS. SCHNEIDER: Object to the form of
3      the question.
4  A   I didn't know off the top of my head, no.
5  Q   Did you know what the adverse effects might be
6      of not having medications for anxiety, PTSD; for
7      example, Prozac or clonazepam?
8              MS. SCHNEIDER: Object to the form of
9      the question.
10             MR. ROTH: Object to the form.
11 A   No, not off the top of my head.
12 Q   And did you check the pharmacy book to see what
13     the potential adverse effects of an inmate or
14     patient not having prescribed medications of the
15     type that we just described, Prozac and
16     clonazepam, was?
17             MS. SCHNEIDER: Object.
18 A   Not that I recall.
19             MS. SCHNEIDER: Object to the form of
20     the question. Incomplete hypothetical.
21 Q   Did you do anything else with respect to
22     responding to Ms. Freiwald's requests other than
23     make the notation that you made on this
24     Exhibit 27?
25 A   Not that I recall.

**Page 181**

1  Q   Did you raise this issue to Nurse Jones, the
2      fact that she had not been ordered her
3      medications yet?
4  A   Not that I recall.
5  Q   Do you recall having any conversations with
6      Dr. Fatoki or any other physician regarding
7      Ms. Freiwald and her condition at this time?
8              MR. ROTH: Object to form. You can
9      answer.
10 A   Not that I recall.
11 Q   And did you ask any correctional staff to -- to
12     take any steps to monitor Ms. Freiwald at this
13     time?
14 A   Not that I recall.
15 Q   And did you ask any correctional staff to bring
16     Ms. Freiwald to the main facility so that you
17     could check her blood pressure or do a
18     face-to-face examination?
19 A   No. She was Huber. She was able to go out to
20     seek medical attention if she needed or set up
21     an appointment.
22 Q   Did you indicate in your response to her health
23     requests that she should undertake steps to get
24     medical care from some other place?
25 A   Not on this form, no.

**Page 182**

1  Q   On any form?
2  A   **Not to my knowledge, no.**
3  Q   At any time?
4  A   **Not to my knowledge.**
5  Q   And do you know if anybody informed Ms. Freiwald
6      that she should take care of her medical needs
7      on her own while she was incarcerated at Brown
8      County Jail?
9  A   **That would be under the jail for Huber patient --**
10     **or Huber inmates.**
11 Q   But my question was are you aware of whether
12     anybody at the jail or as part of HSU informed
13     Ms. Freiwald that she needed to take care of her
14     own medical care?
15 A   **Not that I'm aware.**
16 Q   Let's take a look at what we'll mark as
17     Blozinski Exhibit 28.
18         (Exhibit 28 marked for identification.)
19         MS. AUERBACH:  For the record, this
20     bears Bates Number Brown County Sheriff
21     Department 39.
22 Q   Do you recognize this document?
23 A   **Yes.  It's an Inmate Request Medical Care form**
24     **by Ruth Freiwald.**
25 Q   So this is the second request that you are aware

**Page 183**

1      of that Ms. Freiwald filled out, correct?
2  A   **Yes.**
3  Q   And it's dated 10/30/16, 5:00 p.m.  Correct?
4  A   **Yes.**
5  Q   Do you know if there's any special significance
6      to the fact that both of her requests were made
7      at 5:00 p.m.?
8  A   **No.**
9  Q   Okay.
10 A   **Till you just pointed it out, no.**
11 Q   Okay.  I wasn't sure if perhaps you were aware
12     of whether inmates, you know, were given the
13     forms at a certain time or anything like that.
14 A   **Not that I'm aware.**
15 Q   Okay.  So this is two days after the initial
16     request made by Ms. Freiwald that you reviewed,
17     correct?
18 A   **Yes.**
19 Q   And here she indicates, "I've been here since
20     Thursday evening.  My son brought my medication
21     into the main jail on Friday morning.  Please, I
22     need my medication.  My blood pressure is so
23     high I have a migraine headache and am having a
24     hard time thinking straight.  I have four exams
25     at school this week.  I have to be able to think

**Page 184**

1      clearly.  I was ordered by the judge to take my
2      medication as ordered.  Please provide me with
3      my medication that I gave to your workers.
4      Please help.  Thank you."
5          Is that your handwriting in the box below
6      her request?
7  A   **Yes, it is.**
8  Q   And you filled this out on 10/31/16, correct?
9  A   **Correct.**
10 Q   Do you know what time you filled this out?
11 A   **I don't.**
12 Q   And there's no record that you're aware of that
13     would indicate what time, correct?
14 A   **Not that I'm aware of.**
15 Q   So Ms. Freiwald indicated that she still had not
16     received any medication as of 10/30.  So as of
17     this time, did you know how many days had
18     elapsed since Ms. Freiwald had received any of
19     her medications?
20 A   **I knew the medication I processed on the 30th.**
21     **And if the form -- that form said the 28th that**
22     **it was brought in.**
23 Q   So --
24 A   **And her saying Thursday evening.**
25 Q   Right.  So by this point, 10/31, you know that

**Page 185**

1      she has gone for multiple days without any
2      medication, correct?
3          MS. SCHNEIDER:  Object to the form of
4      the question.
5  A   **Correct.**
6  Q   And she indicates that she still has a migraine,
7      correct?
8  A   **Yes, she states that.**
9  Q   And in your training is a migraine different
10     than just a regular headache?
11         MR. ROTH:  Well, I'm going to object
12     to the form.  Assumes facts.  You can answer if
13     you can.
14         MS. SCHNEIDER:  Join.
15 A   **It could be different, yes.**
16 Q   After the first request, did you prescribe any
17     Tylenol or anything else to help alleviate
18     Ms. Freiwald's stated migraine?
19 A   **No, I did not.**
20 Q   Okay.  And here she indicates again that her
21     blood pressure is -- she says, quote, unquote,
22     "so high."  Did you order a blood pressure check
23     at this point for Ms. Freiwald?
24 A   **No, I did not.**
25 Q   And she also indicated that she's having a hard

**Page 186**

1  time thinking straight, correct?
2  A  **Yes, she states that.**
3  Q  And given your understanding from the booking
4     report that she suffers from anxiety and
5     depression, did her indication that she's not
6     thinking straight suggest to you that she could
7     be having symptoms of withdrawal from medication?
8        MR. ROTH: Show my objection.
9     Foundation, speculation, beyond the scope of
10    this witness's license. You can answer if you
11    can.
12       MS. SCHNEIDER: Join.
13 A  **I would have to review the medications.**
14 Q  Well, one of the things on your resumé, I
15    thought, was a bullet point that indicated that
16    you worked with inmates specifically with respect
17    to withdrawal from medications and alcohol,
18    correct?
19 A  **Yes.**
20 Q  And so based on your experience, did the fact
21    that Ms. Freiwald's indicating that she was
22    having a hard time thinking straight suggest to
23    you that she might be having withdrawal symptoms
24    because of the cessation of her medications?
25       MR. ROTH: Same objections.

**Page 187**

1        MS. SCHNEIDER: Join.
2  A  **Could be from medication, could be from the**
3     **environment.**
4  Q  What steps did you take to -- to inquire what
5     the reason was for why she could no longer think
6     straight?
7        MR. ROTH: Object to form.
8        MS. SCHNEIDER: Join.
9  A  **I answered the form, and the medications were**
10    **sent down after I processed them. That's**
11    **what -- the action I took, the medications were**
12    **sent down for the patient.**
13 Q  So you say medication sent down to WRC. That's
14    the Work Release Center, correct?
15 A  **Correct.**
16 Q  Is that the same as Huber --
17 A  **Yes.**
18 Q  -- facility? And when had the medications been
19    sent down?
20 A  **I don't know the transportation time. I don't**
21    **know.**
22 Q  So as of 10/31/16 when you filled this out, had
23    you already sent the medications down, or was
24    that something you were doing in conjunction
25    with responding to this?

**Page 188**

1  A  **I ordered -- or I processed the order --**
2     **completed the orders on 10/30. So they would**
3     **have been packaged then at that time when I did**
4     **the orders on 10/30.**
5  Q  And so you were indicating that all the steps
6     that you needed to take had already been done by
7     the time that you responded to this, correct?
8  A  **Correct.**
9  Q  But certainly by reviewing this and seeing that
10    as of 5:00 p.m. she still had indicated that she
11    hadn't received any medications, you were aware
12    that even if you had sent them down on 10/30, she
13    had not yet received them by 5:00 p.m., right?
14 A  **That's what she's stating, yes.**
15 Q  So did you take any steps to make sure that --
16    that the medications were actually delivered to
17    her?
18 A  **I don't recall.**
19 Q  Okay. You also noted, "HSU does not have
20    judge's order at this time." Do you see that?
21 A  **Yes, I do.**
22 Q  What steps did you take to try to obtain the
23    judge's order?
24       MR. ROTH: Object to form. You can
25    answer.

**Page 189**

1  A  **I didn't -- I don't obtain judge's orders.**
2  Q  In general, you don't?
3  A  **Correct.**
4  Q  Right. But if it -- if -- would you agree that
5     if a court orders an inmate to continue
6     medication, that is something important for HSU
7     staff to know, to take into consideration?
8        MR. ROTH: I'm going to object,
9     improper and incomplete hypothetical, lacks
10    foundation. You can answer.
11       MS. SCHNEIDER: Object to the form.
12       MR. McGAVER: I'll join both
13    objections.
14 A  **I do not have the form in HSU, I don't contact**
15    **for the form; medications are reviewed by our**
16    **Brown County provider.**
17 Q  I understand that. My question was slightly
18    different.
19       If a judge was ordering an inmate to take
20    medication, is that something that you as an HSU
21    staff member would want to know?
22       MR. ROTH: Same objections. Go ahead.
23       MS. SCHNEIDER: Object to the form.
24    It assumes facts not in evidence.
25       MR. McGAVER: Join both.

## Page 190

1  A   I wouldn't know that unless I receive the order.
2      I would have no idea.
3  Q   And again, I don't mean to -- to seemingly
4      repeat my question, but I am going to try to
5      rephrase my question because I don't think that
6      you -- you are understanding the part that I'm
7      trying to get at.
8          I know that typically you did not receive
9      judge's orders, and in this case you indicated
10     that you didn't have the judge's order. My
11     question is, if a judge ordered an inmate to
12     continue to take prescription medications, is
13     that information that you as an HSU staff member
14     would want to know?
15         MR. ROTH: Same objections as before.
16         MS. SCHNEIDER: Object to the form.
17         MR. McGAVER: Join both.
18 A   I go by what the provider of our facility orders.
19     The form I did not have.
20 Q   So --
21 A   She's in the custody of the Brown County Jail.
22     I did not have that form.
23 Q   So what steps did you take to obtain the form
24     after you learned from Ms. Freiwald that the
25     judge ordered her to take her medication?

## Page 191

1          MR. ROTH: Objection to the form,
2      assumes facts not in evidence, improper,
3      incomplete hypothetical.
4          MS. SCHNEIDER: Join.
5  Q   Did you take any steps to obtain the court order
6      after you received this medical request form
7      indicating there was such an order?
8  A   No, I did not.
9  Q   Did you ask anybody at HSU staff to do so?
10 A   Not that I recall.
11 Q   Did you ask anybody at the correctional facility
12     to try to locate the judge's order to confirm
13     whether in fact Ms. Freiwald had been ordered to
14     continue to take her medication?
15 A   Not that I recall.
16 Q   Did you raise this issue to Nurse Jones?
17 A   Not that I recall.
18 Q   Did you raise the issue to Dr. Fatoki?
19 A   Not that I recall.
20 Q   As of 10/31/16 when you wrote this response to
21     Ms. Freiwald, you were aware that two of her
22     five medications that had been prescribed were
23     not approved by Dr. Fatoki, correct?
24         MR. ROTH: Show my objection, form,
25     incomplete and improper hypothetical, misstates

## Page 192

1      the record, misstates testimony.
2          MS. SCHNEIDER: Join.
3          MR. McGAVER: Join.
4          MR. ROTH: You can answer.
5  A   Yes, I would have completed the orders, processed
6      the orders that the doctor approved to continue.
7  Q   And so as of the time of responding to this, you
8      knew based on Exhibit 26 -- do you still have
9      that in front of you?
10 A   Yes.
11 Q   Okay. So as of 10/31/16 when you responded to
12     Ms. Freiwald's second request for medical
13     assistance, you knew that clonazepam and
14     gabapentin had not been approved by Dr. Fatoki,
15     correct?
16 A   Correct.
17 Q   And you didn't do anything to inform anybody at
18     CCS or Brown County Jail that the judge had
19     ordered Ms. Freiwald to take medication, and yet
20     two medications were not approved?
21         MR. ROTH: Well, show my objection.
22     This has been asked and answered several times.
23     It's an improper, incomplete hypothetical, it
24     assumes facts not in evidence, and is improper
25     form. But you can answer if you can.

## Page 193

1          MS. SCHNEIDER: Join in those
2      objections.
3  A   I do not recall.
4  Q   But as you sit here today, you don't recall
5      doing anything else with respect to the medical
6      form other than signing the portion that you
7      signed?
8          MR. ROTH: Well, I'm going to object.
9      That misstates her testimony. Go ahead.
10 A   This form?
11 Q   The second form. Exhibit 28. Other than filling
12     this out and returning it to Ms. Freiwald, did
13     you take any other steps --
14 A   No. I --
15 Q   -- with respect to this request?
16 A   No. I answered it.
17 Q   Okay. What is the process for getting the
18     medical request responses back to inmates who
19     are housed at the Huber facility? So when we
20     talked about how HSU gets it, they get the form
21     by medical transport -- I'm sorry -- by Lock and
22     Load transport, correct?
23 A   Yes.
24 Q   Okay. So when you respond to a medical request,
25     where does it go from there?

**Page 230**

1  could you just repeat that question?
2      MR. ROTH: Sure. Let me back up.
3      MS. AUERBACH: Okay.
4  Q  So on Exhibit 27 you respond to the sick call
5     request, right?
6  A  Yes.
7  Q  And you write "Meds to be" -- "Meds to be
8     reviewed by the M.D." Correct?
9  A  Yes.
10 Q  So it stands to reason, looking at 26, that this
11    document hadn't been filled out completely yet
12    at that point?
13     MS. AUERBACH: Object to the form,
14  calls for speculation.
15 A  Correct. I put on there reviewed -- "Meds to be
16    reviewed with the M.D."
17 Q  And then you took this order out on 10/30; is
18    that right?
19 A  Yes.
20 Q  And we know that Ms. Freiwald did get her
21    medication on -- by the MAR on Exhibit 29 on
22    10/31?
23 A  Correct.
24 Q  And that's the medication that was ordered by
25    Dr. Fatoki; is that right?

**Page 231**

1  A  Yes.
2  Q  Did you ever see any other sick call request
3     from Ms. Freiwald? Well, strike that.
4     We -- we have the two exhibits, 27 and 28,
5     correct?
6  A  Yes.
7  Q  So she filled those out on 10/28 and 10/30; is
8     that right?
9  A  Correct.
10 Q  Do you know if she filled out any other sick
11    call requests after 10/30?
12 A  I did not receive any other ones.
13 Q  And you reviewed the chart in this matter,
14    correct?
15 A  Yes.
16 Q  And you didn't see any other sick call requests?
17 A  I did not.
18 Q  And you're not aware of her filing any
19    grievances in this case, are you?
20 A  I am not aware of that.
21 Q  You had no knowledge at the time that you
22    responded to either of these sick call requests
23    that Ms. Freiwald had a previous suicide
24    attempt, did you?
25 A  I did not, no.

**Page 232**

1  Q  In -- have you heard of when assessing somebody
2     for suicidal ideation, the phrase "thought,
3     plan, and intent"?
4      MS. AUERBACH: Object to the form.
5  A  In 2016?
6  Q  Sure.
7  A  Yes.
8  Q  In either of these sick call requests filled out
9     by Ms. Freiwald, there's no evidence of any
10    suicidal thoughts in the -- in there, is there?
11 A  I --
12     MS. AUERBACH: Objection. Calls for
13  speculation, foundation.
14 A  I did not read any.
15 Q  Okay. And I mean these questions from your
16    perspective as an LPN at the -- in the
17    correctional setting, okay? You don't see any
18    evidence of a suicidal thought in that -- either
19    one of those paragraphs, is that true, on
20    Exhibits 27 and 28?
21 A  Correct.
22 Q  You don't see any evidence of a suicidal plan in
23    either one of those, correct?
24 A  I do not.
25 Q  You don't see any evidence of suicidal intent in

**Page 233**

1  either one of those, correct?
2  A  I do not.
3  Q  You had no knowledge at any point before
4     Ms. Freiwald passed away that she was in any way
5     suicidal; is that fairly stated?
6  A  I did not, no.
7      MR. ROTH: Just give me one second.
8  Q  There are professionals within the Health
9     Service Unit that specialize in mental health;
10    is that right?
11 A  Correct.
12 Q  Okay. You've never been in the mental health
13    unit; is that right?
14 A  I'm not a mental health specialist, no,
15    professional, no.
16 Q  As an LPN, you don't diagnose psychiatric
17    conditions; is that right?
18 A  No, I do not.
19 Q  You don't diagnose posttraumatic stress disorder,
20    correct?
21 A  No, I did not.
22 Q  You don't diagnose depression or anxiety; is
23    that right?
24 A  No, I do not.
25 Q  Okay. If I use the term "standard of care," I