UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN


| | |
|---|---|
| ESTATE OF RUTH FREIWALD | ) |
| BY PERSONAL REPRESENTATIVE | ) |
| CHARLES FREIWALD, et al., | ) CASE NO: 18-CV-896 |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| DEAN HEALTH PLAN, INC. and | ) |
| PROGRESSIVE CASUALTY | ) |
| INSURANCE COMPANY, | ) |
| | ) |
|    Involuntary Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ADEYEMI FATOKI, M.D., et al.,) |
| | ) |
|    Defendants. | ) |
| | ) |
| | ) |
|    Defendants. | ) |

_____ )


DEPOSITION OF ALFRED JOSHUA, M.D.

San Diego, California

February 5, 2020


REPORTED BY:  BOBBIE HIBBLER, CSR NO. 12475

EXHIBIT
43

**Page 2**

```
 1       UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF WISCONSIN
 2
 3   ESTATE OF RUTH FREIWALD     )
 4   BY PERSONAL REPRESENTATIVE  )
     CHARLES FREIWALD, et al.,   ) CASE NO: 18-CV-896
 5                               )
       Plaintiffs,               )
 6                               )
     DEAN HEALTH PLAN, INC. and  )
 7   PROGRESSIVE CASUALTY        )
     INSURANCE COMPANY,          )
 8                               )
       Involuntary Plaintiffs,   )
 9                               )
     v.                          )
10                               )
     ADEYEMI FATOKI, M.D., et al.,)
11                               )
       Defendants.               )
12                               )
13     Defendants.               )
14   _____
15
         DEPOSITION OF ALFRED JOSHUA, M.D., taken
16
     by the Plaintiffs, commencing at the hour of
17
         a.m. on Wednesday, February 5, 2020, at 530 B
18
     Street, Suite 350, San Diego, California, before
19
     Bobbie Hibbler, Certified Shorthand Reporter in
20
     and for the State of California.
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES
 2   For the Plaintiffs:
       LAWTON & CATES, S.C.
 3     BY: DIXON R. GAHNZ, ESQ.
       345 W. Washington Avenue
 4     Suite 201
       Madison, Wisconsin 53701
 5     608-282-6200
       Dgahnz@lawtoncates.com
 6
 7
 8   For Defendants D. Peters, John R. Gossage
     and Brown County:
 9     CRIVELLO CARLSON, S.C.
       BY: STEVEN C. McGAVER, ESQ.
10     710 North Plankinton Avenue
       Suite 500
11     Milwaukee, Wisconsin 53203
       414-271-7722
12     Smcgraver@crivellocarlson.com
13
14   For Defendant Adeyemi Fatoki, M.D.:
       GUTGLASS, ERICKSON, BONVILLE & LARSON, S.C.
15     BY: MARIA KYSELY SCHNEIDER, ESQ.
       735 N. Water Street
16     Suite 1400
       Milwaukee, Wisconsin 53202
17     414-273-1144
       Maria.schneider@gebsc.com
18
19
20   For Defendants Correct Care Solutions, Emily
     Blozinski & Jessica Jones:
21     (Telephonic Appearance)
       HEYL, ROYSTER, VOELKER & ALLEN
22     BY: ANDREW J. ROTH, ESQ.
       33 N. Dearborn Street
23     Seventh Floor
       Chicago, Illinois 60602
24     312-853-8700
       Aroth@heylroyster.com
25
```

**Page 4**

```
 1              EXAMINATION INDEX
 2
 3   ALFRED JOSHUA, M.D.
       BY MR. GAHNZ . . . . . . . . . . .   5
 4     BY MS. SCHNEIDER . . . . . . . . .  112
       FURTHER BY MR. GAHNZ . . . . . . .  114
 5
 6
 7
 8              EXHIBIT INDEX
 9   EXHIBIT      DESCRIPTION        PAGE
10   237  CURRICULUM VITAE             11
11   238  CASES INVOLVING DEPOSITION OR TRIAL  24
          TESTIMONY
12
13   239  LIST OF CASES                30
14   240  REPORT BY ALFRED JOSHUA, MD   36
15   241  SUPPLEMENTAL EXPERT REPORT    36
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          ALFRED JOSHUA, M.D.,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4          EXAMINATION
 5   BY MR. GAHNZ:
 6     Q.  Good morning.  Would you state your name
 7   and spell it for the record please?
 8     A.  Sure.  My name is Dr. Alfred Alexander
 9   Joshua.  A-L-F-R-E-D.  Last name is J-O-S-H-U-A.
10     Q.  Doctor, I'm assuming you've given
11   depositions before?
12     A.  Yes.
13     Q.  I'm not going to spend a lot of time
14   going through the mechanics of it.  But one thing
15   that is very important is if you don't understand
16   a question that I ask, please ask me to rephrase
17   it or repeat it, and only answer those questions
18   you understand.  Fair enough?
19     A.  Yes.
20     Q.  Let's talk about what did you do to get
21   ready for today?
22     A.  I reviewed my expert report, my
23   supplemental report, and then just the materials
24   associated with what was in the report.
25     Q.  Did you meet with counsel for
```

1 Dr. Fatoki?
2     A. You mean Maria?
3     Q. Maria.
4     A. Yes.
5     Q. Did you meet with any other attorneys?
6     A. No.
7     Q. Did you speak with Dr. Fatoki?
8     A. No.
9     Q. Have you ever spoken with Dr. Fatoki?
10    A. I don't believe so.
11    Q. Do you know Dr. Fatoki?
12    A. No. Not personally.
13    Q. At any time during -- well, let me back
14 up. When were you first contacted about this
15 case?
16    A. I believe -- I'd have to look at the
17 records. Probably last year.
18    Q. At any time since the time you've been
19 retained in this matter and today, have you spoken
20 with any of the other attorneys for any of the
21 other parties?
22    A. You mean on the plaintiff's side?
23    Q. No. Did any of the other -- let me
24 break it down. Have you spoken with any of the
25 attorneys for CCS?

6

1     A. His report.
2     Q. Do you know why Dr. Folks' report was
3 sent to you?
4     A. Just to review the report. I did not
5 get a chance to review it.
6     Q. Other than Dr. Folks' report, have you
7 reviewed any of the other defense expert reports
8 in this matter?
9     A. Only on the plaintiff side.
10    Q. Okay. Have you reviewed the plaintiff's
11 experts' reports and depositions or --
12    A. If it's listed there. I believe all of
13 the actual reports I definitely reviewed. But if
14 the depositions were there and it's listed,
15 everything in the materials reviewed I have
16 reviewed.
17    Q. Who first contacted you with respect to
18 serving as an expert in this matter?
19    A. I believe it was Maria.
20    Q. Had you worked with Maria or her firm
21 prior?
22    A. No.
23    Q. What were you asked to do?
24    A. To review, you know, the records and
25 everything related to the care that Dr. Fatoki

8

1     A. I don't believe so.
2     Q. Have you spoken with any of the
3 attorneys for Brown County?
4     A. I don't believe so.
5     Q. Have you spoken with any of the
6 attorneys for Nurse Blozinski?
7     A. I don't believe so.
8     Q. Nurse Jones?
9     A. I don't believe so.
10    Q. Have you spoken with any of the named
11 defendants in this case?
12    A. No.
13    Q. Have you spoken with any of the other
14 defense experts in this case?
15    A. No.
16    Q. Have you reviewed any of the defense
17 expert reports?
18    A. Yes.
19    Q. Whose?
20    A. It was Dr. -- because it was sent to me
21 yesterday. It was Dr. --
22       MS. SCHNEIDER: It was Folks.
23 BY MR. GAHNZ:
24    Q. Did you review Dr. Folks report or
25 deposition?

7

1 provided and to see if it was within the standard
2 of care.
3     Q. Anything else?
4     A. That was it.
5     Q. That was your task?
6     A. Yes.
7     Q. The reason I ask is you filed a
8 supplemental report where you give opinions
9 related to other people besides Dr. Fatoki. And
10 my question is did the scope of your engagement
11 change over time?
12    A. So the primary focus was Dr. Fatoki.
13 But in the process of reviewing the materials
14 there were other individuals that were as part of
15 that. But in terms of the overall, I guess,
16 direction of the case and everything else, my
17 opinions are pretty similar. But Dr. Fatoki is
18 the primary person related to the opinions.
19    Q. Let's ask it this way. At trial in this
20 matter are you going to be offering opinions with
21 respect to any of the conduct of Brown County?
22    A. I have not been asked to.
23    Q. Slightly different question. Are you
24 planning on giving any opinions with respect to
25 any of the Brown County defendants?

9

1    A. At this point in time, no.
2    **Q. With respect to Nurse Jones, are you**
3    **planning on giving any opinions with respect to**
4    **her conduct?**
5    A. At this point, no.
6    **Q. With respect to Nurse Blozinski, are you**
7    **planning on giving any opinions with respect to**
8    **her conduct?**
9    A. At this point, no.
10   **Q. Last one, and this one -- and we're**
11   **going a lot quicker than some of these other**
12   **depositions. With respect to CCS, are you**
13   **planning on giving any opinions with respect to**
14   **its conduct?**
15   A. At this point, no.
16   **Q. Okay. Did you as part of your work in**
17   **this case do any sort of a literature search?**
18   A. So, in terms of the materials reviewed
19   it was part of the NCCHC standards book. I
20   believe I provided a copy of the page. But it's
21   an entire book of standards. And then just based
22   on my own knowledge of the medications and
23   everything else. But those are years of reading
24   and knowing. So I didn't do anything specifically
25   outside of just the standards that were applicable

10

1    to this case.
2    **Q. Okay. I'm going to show you what we**
3    **marked as Exhibit 237 and ask is that your**
4    **professional resume?**
5    A. Yes, it is.
6        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
7    WAS MARKED AS EXHIBIT NO. 237 TO THE TESTIMONY OF
8    THE WITNESS AND IS ATTACHED HERETO.)
9    BY MR. GAHNZ:
10   **Q. Is it current and up to date at least as**
11   **of the time you provided it in this case?**
12   A. So at the time, yes. But since February
13   of 2019 I'm currently the Regional Chief Medical
14   Officer for Alvarado and Paradise Valley hospitals
15   in San Diego.
16   **Q. So you're the Regional Chief Medical**
17   **Officer for what facility?**
18   A. Alvarado and Paradise Valley Hospitals.
19   **Q. When did you get that job?**
20   A. February of 2019.
21   **Q. What does your job entail?**
22   A. It's clinical oversight of both
23   hospitals. And they're acute hospitals. They
24   also have psychiatric beds. I mean, it's a 290
25   bed hospital. It's one campus. And then the

11

1    other hospital is I believe has around close to
2    300 beds.
3    **Q. Do either of these facilities have any**
4    **ties to correctional health care?**
5    A. So they do hospitalize custody patients
6    from time to time. But it's not -- the hospitals
7    do not provide contracted care inside the jails.
8    **Q. In looking at your resume, have you**
9    **authored any papers, presentations, etc., that**
10   **would be particularly relevant to the issues in**
11   **this case?**
12   A. So I have done presentations.
13   **Q. What pages are you looking at, sir?**
14   A. If you go to the press releases as well
15   as the presentations and speaking, I have spoken
16   at the National Commission on Correctional Health
17   Care related to the Inmate Safety Program. I have
18   also spoken about mental health a number of times
19   both in the media as well as in public speaking
20   arrangements. And many of them based on the title
21   you should be able to see which ones were mental
22   health related. And then Suicide Prevention
23   Strategies. And then if you look at No. 13 in the
24   public speaking engagement it says National
25   Commission on Correctional Health Association -

12

1    Inmate Safety Program. That was one that
2    basically was pretty pertinent to this type of
3    case.
4    **Q. That was a presentation that you gave?**
5    A. To, you know, a group of probably a
6    hundred people at the National Commission of
7    Correctional Health Care, which is a national
8    conference on the standards and for all the
9    leaders of many of the different jails, federal
10   facilities, prisons together and then sees what's
11   best practices. And so I have spoken at that
12   conference a couple of times, but that one
13   specific for mental health and suicide prevention.
14   **Q. Were there written materials that you**
15   **had prepared?**
16   A. There were PowerPoints.
17   **Q. Okay.**
18   A. I think they were all publicly
19   available.
20   **Q. Have you written anything with respect**
21   **to Clonazepam or benzodiazepine withdrawal?**
22   A. No. The things I read from an article
23   standpoint is Narcan. So San Diego County
24   Sheriff's Department was one of the first law
25   enforcement in the country to basically have the

13

1  officers provide Narcan to heroin overdose
2  patients in the field. And basically that was a
3  program that I was part of. And there was a paper
4  that was written there. And that is No. 4 in the
5  publications.
6      Q.  The one with Karla DW?
7      A.  Yes.
8      Q.  So what was the thrust of this article
9  is how to -- was it how to administer Narcan or
10 when to administer Narcan? What was the article
11 about?
12     A.  So the article was just basically the
13 perceptions of how law enforcement actually having
14 Narcan, not only saved the lives, but also how the
15 project and everything went. I did do a separate
16 video. I don't know if it's in here related to
17 Narcan treating specifically for the 2,000 plus
18 deputies of the San Diego Sheriff's Department.
19 And so everybody had to get trained. And I had to
20 provide those training materials as well.
21     MR. GAHNZ:  Let's go off the record for
22 a moment.
23     (WHEREUPON, A BREAK WAS TAKEN AND THE
24 PROCEEDINGS CONTINUED AS FOLLOWS:)
25 BY MR. GAHNZ:

14

1      Q.  We were talking about you had done a
2  training video with respect to the administration
3  of Narcan to the 2,000 sheriff deputies in San
4  Diego County?
5      A.  Yes.
6      Q.  That is kind of where we left off?
7      A.  Yes.
8      Q.  Anything specific to benzodiazepines?
9      A.  To benzodiazepines, I mean, in the
10 process of being the chief medical officer of the
11 San Diego Sheriff's Department over the five years
12 I have a lot of experience related to alcohol
13 withdrawal, benzodiazepine withdrawal related to
14 the protocols and the people that were coming into
15 the jails.
16     Q.  Okay. We'll get to that in a bit. My
17 question is a little bit more focused in terms of
18 whether or you have written anything specific to
19 benzodiazepine?
20     A.  I have not published anything.
21     Q.  So in terms of -- let's get to that now.
22 You were talking about protocols and what not for
23 benzodiazepine. What is your role or was your
24 role with San Diego Sheriff's Department?
25     A.  So I basically clinically oversaw all

15

1  the medical mental health and dental care in San
2  Diego County jails which had a average daily
3  population of 5,800 people and 91,000 bookings a
4  year. So it encompassed a number of things
5  including policies and procedures, contract
6  oversight, provider oversight, quality assurance,
7  as well as operations, and then obviously for
8  legal and other things to be of an assistance.
9      Q.  In a previous answer you were talking
10 about the protocols and what not that you were
11 involved with related specifically to
12 benzodiazepine?
13     A.  Yes.
14     Q.  Tell me about that?
15     A.  So specifically when individuals would
16 come in, and on average there would be potentially
17 250 inmates coming in per day, many of them would
18 be suffering from alcohol abuse. And some of them
19 were on long-standing benzodiazepine. So we had a
20 protocol in place to make sure that, you know,
21 they didn't go through life-threatening
22 withdrawals.
23     Q.  What was that protocol?
24     A.  That they would potentially get a
25 benzodiazepine taper called Librium versus

16

1  sometimes they would be observed depending on the
2  situation and the nurse's assessment.
3      Q.  What is Librium?
4      A.  Yes.
5      Q.  I'm sorry, Librium. What is Librium?
6      A.  It's a long-acting benzodiazepine.
7      Q.  What was the purpose of putting the
8  inmates on the Librium?
9      A.  So that they wouldn't undergo
10 life-threatening withdrawals for benzodiazepines.
11     Q.  And is there a risk of life-threatening
12 withdrawal if benzodiazepines are stopped
13 abruptly?
14     A.  Yes.
15     Q.  So walk me through the details of how
16 that program worked, if you had an inmate that
17 came in where there was a question as to whether
18 he or she was on a benzodiazepine?
19     A.  So at that point there would be a
20 request for records from the outside to see --
21     Q.  I'm sorry. And I want to back you up.
22 The person comes in. Just walk me through the
23 first thing that happens?
24     MS. SCHNEIDER:  I'm going to object as
25 vague as overly broad. But go ahead.

17

A.  The person would then be assessed by a registered nurse at intake.  And they would have a screening exam done.  And in the San Diego jails there were two screenings.  There was a first stage screening with a limited number of questions.

And then there was a secondary screening that goes more into the medical, mental health, substance abuse history.  If it was determined at that point the person was on a benzodiazepine based on asking the inmate, the person would then sign a release of information for records of where they were getting that, whether it was a pharmacy or other places.

And then depending on the risk level, they could be put into this standard nursing protocol where the individual could potentially get Librium or be monitored based on the conditions.  And then a referral to the physician or psychiatrist as needed.

BY MR. GAHNZ:

Q.  Okay.  So was there a form that the registered nurse used for determining the risk level?

A.  At the point where I was there, there

18

was no clinically validated scoring, such as CIWA or COWS.  CIWA is for alcohol withdrawal.  And COWS is for opiate withdrawal.  There's a clinical scoring system.  So those were not in place at the time I was there.  It was basically a standard nursing protocol with the policies and procedures, as well as the nurse's assessment of the severity of the withdrawal and the risk, and then consultation with the physician as needed.

Q.  So backing up.  There's a CIWA and a CIWA-B; correct?

A.  Yes.

Q.  CIWA-B was not -- well, backing up again.  Is it your testimony that between 2013 and 2018, the CIWA scale had net been developed?

A.  No.  It was not used for the San Diego jails.

Q.  This initial determination was that done at the booking?

A.  At the intake screening.  Yes.

Q.  I'm wondering why you're quibbling with my words.  I just want to know what's the difference between the intake screening and booking?

A.  So it is part of that same process.

19

Q.  Okay.

A.  So they're coming in and they're getting their initial screening, yes.

Q.  So then if it's determined that the person should be tapered off of the benzodiazepines, then how is it that the Librium is prescribed?

A.  So it's basically a protocol of each day they would get a certain dosage of the Librium.  And it would get less and less depending again on what was determined on the severity.  Usually benzodiazepine was a pretty small amount of inmates like on an annual basis versus alcohol.  So alcohol was probably the most common one.  And so it was basically following that.  If there needed to be consultation, a psychiatrist could be called to do a longer taper if an individual was on it at high doses or there was immediate threat.

Q.  Was there any situation where the San Diego County would abruptly stop an inmate's use of benzodiazepines?

A.  There is times where the inmate would come in saying that they were on benzodiazepines, but it was not continued inside the jails.

Q.  What circumstances was that?

20

A.  So if it was not able to be verified from an outside provider, because there were people that were using it recreationally.  So we would then monitor those individuals to see for signs of withdrawal.  And then if there was any signs of withdrawals, then obviously treat them with the Librium, a benzodiazepine taper.

Q.  Those people that were on benzodiazepines and you were able to verify the prescription, were those people then -- were those medications abruptly stopped?

A.  Yes.  Sometimes the psychiatrist thought that this was inappropriate.  So then they would be seen by most of the times a psychiatrist, and they would make a clinical decision.  And sometimes even the physicians, the jail physicians, or internal medicine, ER, family medicine would state that this was inappropriate and then would stop, ask the patient to be monitored and then wean them off the benzodiazepine.

Q.  But it would be weaned off at that point?

A.  Sometimes it would be abruptly stopped and look for signs of withdrawal because from when

21

1  you stop a benzodiazepine usually the peak of the
2  withdrawal is about 48 to 72 hours. And that's
3  when you start getting the life-threatening
4  symptoms where you could have tremors, elevated
5  blood pressure, elevated heart rate, sweating. So
6  it's pretty significant on how the person's
7  presentation is if they're going down the
8  life-threatening withdrawals. They could have
9  visual hallucinations. So it's very similar to an
10  alcohol withdrawal.
11     Q.  The inmates that are being monitored are
12  they monitored in the separate unit within the San
13  Diego jail?
14     A.  It depends on their clinical condition.
15  If there was a high risk individual, there are
16  sobering cells. So it depends on -- some of these
17  individuals were intoxicated. So they would
18  potentially be drug or intoxicated with alcohol
19  but also report that they were on benzodiazepine.
20  So it really was dependent on what their overall
21  clinical picture was.
22     Q.  Okay. So based on your resume you
23  graduated med school in May of 2007; is that
24  right?
25     A.  Yes.

22

1     Q.  And then walk me through your job
2  history upon graduation from Syracuse?
3     A.  Sure. I then moved out to San Diego,
4  did an internship at Scripps Mercy Hospital in
5  2008. Then I did a three-year residency in
6  emergency medicine. So I am a board certified
7  emergency room physician.
8        After the residency I did a two-year
9  hospital administrative fellowship at UCSD,
10  University of California San Diego. At the same
11  time I also got my MBA at UC Irvine and was
12  working as a emergency room physician as well at
13  both Tri-City as well as University of California
14  San Diego.
15        After that I became the senior medical
16  officer for Tri-City Medical Center for health
17  care reform. And then less than a year from that
18  point I then became the chief medical officer for
19  the San Diego Sheriff's Department for close to
20  five years.
21        I left the San Diego Sheriff's
22  Department in June of 2018, did consulting. And
23  then in February of 2019 became the chief medical
24  officer for Alvarado and Paradise Valley
25  Hospitals.

23

1     Q.  So why is it that you left the San Diego
2  Sheriff's Department?
3     A.  I actually wanted to go back to the
4  hospitals. My fellowship, my training, everything
5  was to go into the hospitals. I really enjoyed
6  the jail and that experience. But I really wanted
7  to one day lead a hospital system. So I felt that
8  was the right time to do it.
9     Q.  So reviewing information, when you left
10  there was no succession plan, right, for the chief
11  medical officer in place to take over for you?
12     A.  They put out a recruitment at the time
13  because I did notify them a few weeks earlier.
14  But I think they were interviewing candidates.
15  And some of the candidates that they interviewed
16  initially was promising, was suppose to come on
17  board but did not.
18     Q.  I'll show you what we marked as 238.
19  This was attached to your disclosure. Of the 19
20  cases that are listed here, were you an expert in
21  any of these cases?
22     A.  Yes.
23        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
24  WAS MARKED AS EXHIBIT NO. 238 TO THE TESTIMONY OF
25  THE WITNESS AND IS ATTACHED HERETO.)

24

1  BY MR. GAHNZ:
2     Q.  Which ones?
3     A.  So Number 6, Number 9, Number 12, Number
4  13, Number 15, Number 17, 18 and 19.
5     Q.  Okay. Of the eight cases where you have
6  provided expert testimony, how many of those have
7  been on behalf of plaintiff or a claimant?
8     A.  So Number 6, Number 9, and Number 17.
9     Q.  So the other five would be on behalf of
10  the doctor or facility?
11     A.  Yes.
12     Q.  The Howze case Number 6, what was the
13  issue in that case?
14     A.  So that was an individual I believe who
15  had an inflammatory bowel condition, ended up
16  getting a colectomy and then had complicates
17  related to it. But it was over a course I believe
18  a year and-a-half to two years. It was really a
19  chronic care case.
20     Q.  This was somebody that was incarcerated?
21     A.  In a federal facility I believe, yes.
22     Q.  And you were testifying that the care
23  that he received was inadequate?
24     A.  Over the course of a long period of
25  time, yes.

25

7

**Page 26**

1  Q. Did that case go to trial?
2  A. No.
3  Q. What happened to that case?
4  A. Settled.
5  Q. Were you deposed in that case?
6  A. Yes.
7  Q. Who was the attorney that hired you in
8  the Howze matter?
9  A. I don't remember.
10  Q. Number 9, the Villalon case, what was
11  that case involving?
12  A. It was an individual for starvation.
13  And this was in Texas. And basically the
14  individual died likelihood of starvation.
15  Q. Was this a civil rights case, a
16  deliberate indifference?
17  A. Yes. I believe that was the case.
18  Q. Is that case still going on?
19  A. I believe they settled as well.
20  Q. Who is the attorney that hired you in
21  that matter?
22  A. I'd have to look to see.
23  Q. The next one is the Parker versus
24  Christian. Where is that case out of?
25  A. I believe that was out of Missouri.

**Page 27**

1  Q. Out of Missouri?
2  A. Yes.
3  Q. And what was the issue in that case?
4  A. That was related to an eye complaint.
5  Q. Is this a federal case or this is a -- I
6  guess it's hard to tell.
7  A. I don't know if this was federal or not.
8  Q. Who retained you in that matter?
9  A. I'd have to look at the name again.
10  Q. So the cases where you provided expert
11  testimony on behalf of the defendants, did any of
12  those involve jail suicide?
13  A. No.
14  Q. Did any of them involve a death in the
15  jail setting?
16  A. Yes.
17  Q. Which ones?
18  A. So Nagy was a liver case, a person who
19  had a significant liver issue. And then Russell
20  had a significant cardiac issue. And I forgot
21  what Gordon was. I'd have to look.
22  Q. Did any of the cases where you testified
23  as an expert go to trial?
24  A. Yes. So the ones that say trial
25  testimony, it's there. So Scott versus Clark.

**Page 28**

1  Q. What was the result of Scott versus
2  Clarke?
3  A. So Scott versus Clarke was a class
4  action lawsuit. And it was I think 20-something
5  inmates against the State of Virginia. It was a
6  female facility. So and I was retained by the
7  defense against essentially a class action. So
8  even though it says Scott versus Clarke, there was
9  a number of individuals involved. So I had to
10  review a number of cases there.
11  Q. Did that case involve violation of
12  the -- or an alleged violation of a previous
13  settlement agreement?
14  A. Yes. I believe so.
15  Q. What was your role in that case?
16  A. To basically review all the materials
17  related to the systems of care at the facility, to
18  see if the settlement agreement -- how if there
19  was deviations from it. I ended up doing a site
20  visit. So I went there and then did a report
21  related to that, and testified in front of a judge
22  related to the findings.
23  Q. In any of the cases where you provided
24  testimony as an expert, has your testimony ever
25  been stricken or limited?

**Page 29**

1  A. No.
2  Q. So the other 11 cases that are listed on
3  Exhibit 23 are cases where you were a defendant;
4  correct?
5  A. So let's say for one and two with
6  Brummett I was not at the Sheriff's Department at
7  the time. So I was providing just my
8  interpretation -- not interpretation. I was
9  providing testimony and deposition related to what
10  the process was in jail. But it happened prior to
11  my time as chief medical officer.
12  Q. Okay. So the Brummett case you were not
13  a defendant, but the balance of those cases you
14  were?
15  A. So the other ones like Torbert, Jones,
16  and Turner, these were pro per cases that I was
17  not a defendant as well. It was the County of San
18  Diego. They were pro per cases. And then I was
19  just providing testimony related to their
20  accusations.
21  Q. Okay. I'll show you what we marked as
22  Exhibit 239 and ask you to take a look at that.
23  MS. SCHNEIDER: Do you have an extra
24  copy?
25  MR. GAHNZ: I do not. I apologize, I

1    don't.
2        (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
3    WAS MARKED AS EXHIBIT NO. 239 TO THE TESTIMONY OF
4    THE WITNESS AND IS ATTACHED HERETO.)
5    BY MR. GAHNZ:
6       Q. Do you recognize these as cases where
7    you have been named as a defendant?
8       A. So some of these names I have not been
9    served. So I don't know where they were because
10   County counsel of San Diego defends me on all the
11   cases. So my name gets thrown into a lot of
12   lawsuits with, you know, 5,800 inmates and 90,000
13   a year. So some of these things go through. They
14   notify me. The ones that I know about -- like
15   I've never been -- like United States versus
16   Hernandez, I never heard about that. And it's
17   January 8, 2013. And I wasn't the chief medical
18   officer at that time.
19       Q. Okay. You can see that one is marked
20   NR?
21       A. So Thomas this case I was the defendant,
22   but this case settled. Then like the Gilchrist
23   I've never been served. Marchand I never even
24   knew about. So, yeah I'm guessing a number of
25   these things -- Daniels. So County Counsel

30

1    usually just notifies me if I'm actually served
2    with anything like they need to defend.
3       Q. During your time as chief medical
4    officer at San Diego County Sheriff's Department,
5    has the Sheriff's Department settled cases
6    involving claims of deliberate indifference with
7    respect to the medical care?
8       A. They have not -- in terms of deliberate
9    indifference, no. Basically the one case I would
10   say is Brummett, they did lose at trial in that
11   case. And then it was not deliberately different.
12   It was an indifference claim. And then they paid
13   out related to that settlement, which I think was
14   in the media.
15       Q. Other than the Brummett case during your
16   time there as a chief medical officer, were there
17   other verdicts involving claims pursuant to 42 USC
18   1983 civil rights?
19       A. No. That was the only one I know.
20   Everything else I believe settled or still in
21   litigation.
22       Q. Okay. In terms of cases that settled
23   involving civil rights claims that involved you
24   during your time there, how many cases were
25   resolved?

31

1       A. So I believe the Nunez case was
2    resolved, Number 4, Estate of Nunez. And then the
3    -- the other ones are still ongoing.
4       Q. Was the Nunez case the one where the
5    County resolved its claims but the private
6    psychiatric services portion of the claim is still
7    moving forward?
8       A. That might be the case, yes.
9       Q. Okay. And during your time as the chief
10   medical officer at San Diego County Sheriff's
11   Department, there were situations where the County
12   contracted with private providers; correct?
13       A. Yes.
14       Q. And they contracted with psychiatric
15   providers?
16       A. Yes.
17       Q. And you were quite critical of the
18   psychiatric provider that was contracted through
19   the County at least for some period of time?
20       MS. SCHNEIDER: Object to the form of
21   the question. Go ahead.
22       A. I mean, as part of my quality assurance
23   aspect of it, I think anybody in my position would
24   obviously look for ways of improvement with
25   groups. But basically based on my review of it, I

32

1    felt there could be improvement.
2    BY MR. GAHNZ:
3       Q. Do you recall stating that they put the
4    County at great risk based on the quality of their
5    care?
6       MS. SCHNEIDER: Object to the form.
7       A. Again, as part of quality assurance.
8    Those are quality assurance communications. I
9    believe my role is to improve the system.
10   BY MR. GAHNZ:
11       Q. Other than providing presentations at
12   NCCHC, have you done any teaching with respect to
13   correctional health care?
14       A. In terms of with the staff, yes to the
15   nursing staff while I was at the San Diego County
16   Sheriff's Department. And then even in some of my
17   presentations to certain groups, some of it was
18   more on the educational side.
19       Q. Do you have any psychiatric training?
20       A. Just as part of my emergency medicine
21   background.
22       Q. Other than the PowerPoint presentation,
23   are there other course materials that you have put
24   together with respect to the training that you
25   provided?

33

9

1    A.  So those would be all part of the --
2  with the development of the inmate safety program,
3  there were materials that were developed as part
4  of the policies and procedures as well as some of
5  the training.  And that's within the Sheriff's
6  Department.
7    Q.  Do you hold any board certifications?
8    A.  Yes.  Emergency medicine.  And then also
9  National Commission of Correctional Health Care,
10  I'm a Certified Correctional Health Professional,
11  CCHP.  And I also have the physician's designation
12  with that organization.
13    Q.  What does that entail?
14    A.  Basically providing -- you know, being
15  inside the field of correctional health care,
16  essentially doing the continuing medical education
17  credits, and then taking a test to see that you're
18  certified.  And the test is related to the
19  standards of correctional health care.
20    Q.  Okay.  So other than the eight cases
21  that are listed, are you still doing consulting
22  work?
23    A.  Yes.
24    Q.  What percentage of your time is spent on
25  doing consulting work?

34

1    A.  Probably 10 percent.
2    Q.  And what type of consulting work other
3  than the jail civil rights litigation consulting
4  are you doing?
5    A.  That's pretty much it.  Because I'm the
6  chief medical officer for the two hospitals that
7  occupies a lot of my time.
8    Q.  I'm sorry?
9    A.  I'm the chief medical officer of the
10  hospitals, so that occupies much of my time.
11    Q.  That's why I was asking.  It seem like
12  you had a pretty full plate.  Do you work through
13  a service?
14    A.  No.
15    Q.  Have you ever worked with -- I think I
16  may have asked this.  But have you ever worked
17  with Maria's firm before?
18    A.  No.
19    Q.  What about any of the firms in this
20  case?
21    A.  I don't believe so.
22    Q.  Okay.  Do you have a copy of your report
23  handy?  If not I do.  I'll show you what we marked
24  as Exhibit 240.  Is this a copy of the report that
25  you authored in this matter?

35

1    A.  Yes.
2      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
3  WAS MARKED AS EXHIBIT NO. 240 TO THE TESTIMONY OF
4  THE WITNESS AND IS ATTACHED HERETO.)
5  BY MR. GAHNZ:
6    Q.  The first three or four pages deal with
7  your background; correct?
8    A.  Yes.
9    Q.  And so then at page 5 you list the items
10  that you reviewed; is that correct?
11    A.  Yes.
12    Q.  That's everything that you have seen in
13  this case or have you seen -- you indicated that
14  you saw Dr. Folks' report subsequent; correct?
15    A.  And then there's additional materials
16  and supplemental I reviewed.
17    Q.  Those are in bold in the supplemental
18  report; correct?
19    A.  Yes.
20    Q.  That one we marked as Exhibit 241;
21  correct?
22    A.  Yes.
23      (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
24  WAS MARKED AS EXHIBIT NO. 241 TO THE TESTIMONY OF
25  THE WITNESS AND IS ATTACHED HERETO.)

36

1  BY MR. GAHNZ:
2    Q.  All right.  If we go to the supplemental
3  Exhibit 241, there's a listing of 29 items;
4  correct?
5    A.  Yes.
6    Q.  And this is the 29 items that you
7  reviewed in preparation for your testimony?
8    A.  Yes.
9    Q.  And you already testified that you did
10  look at the NCCHC standards?
11    A.  Yes.  And that's listed as Number 2.
12    Q.  That was the standards that were in
13  place in 2016; correct?
14    A.  2014.
15    Q.  They were promulgated in 2014, and they
16  were still the standards in 2016?
17    A.  Yes.
18    Q.  There's been changes to them subsequent?
19    A.  In 2018 a new book.
20    Q.  Have you been provided with everything
21  that you have asked for?
22    A.  Yes.
23    Q.  Is there any additional information that
24  you would have wanted to review that you did not
25  receive?

37

1   A.  No.
2   Q.  Okay.  Other than the NCCHC, did you
3   consult with any books, articles or other learned
4   treatises?
5   A.  Just from my knowledge base on the
6   benzodiazepines, Gabapentin, and other things that
7   were present from a clinical standpoint.
8   Q.  So these are things that you had
9   previous knowledge of based on reading that you
10  had done?
11  A.  Based on previous reading, based on
12  working in the emergency department, and my other
13  clinical experience.
14  Q.  Okay.  Is there any particular source
15  that you would say this is what I was trained
16  using and this is why I know what I know with
17  respect to --
18  A.  So I typically use UpToDate, which
19  essentially gives you a synopsis and summary of
20  all of the up to date literature and the studies
21  related to various clinical topics.  So I do have
22  a subscription for that.  So I do research based
23  on that.
24  Q.  Okay.  The UpToDate is something that
25  you use to keep yourself current and in your daily

                                              38

1   practice of medicine; correct?
2   A.  Yes.
3   Q.  Did you discuss any of the issues
4   related to this case with any of your colleagues?
5   A.  No.
6   Q.  Did you speak with any of Ms. Freiwald's
7   treating providers?
8   A.  No.
9   Q.  Did you speak with any witnesses?
10  A.  No.
11  Q.  Did you visit the jail?
12  A.  No.
13  Q.  Did you do any sort of a virtual tour?
14  A.  No.
15  Q.  At pages 5 and 6 of your report --
16  A.  The regular report or the supplemental?
17  Q.  It looks like you did it twice.  So at
18  pages 2 and 3 of your supplement, and 5 and 6 of
19  your regular.  My first question is was there
20  anything that was added to the summary of document
21  review in your supplement or did you just copy and
22  paste it?
23  A.  That was copy and paste.
24  Q.  Let's deal with your initial report.
25  You went through and tell me what the purpose was

                                              39

1   of the summary of document review?
2   A.  So it was just to provide a timeline of
3   the care that Ms. Freiwald received.  Also, for
4   the purpose of deposition as well to basically
5   make sure the dates and everything else are
6   correct, and just to highlight points related to
7   what the opinions were based on.
8   Q.  So is it a fair statement that these are
9   to you the important events in the chronology of
10  this case?
11  A.  Yes.
12  Q.  Okay.  The information that is contained
13  in your summary, where did you get the information
14  from?
15  A.  From the medical records.  So from the
16  records and materials reviewed.
17  Q.  And was this information that you
18  gleaned as you were reviewing the records or was
19  this information that this timeline provided to
20  you by somebody else?
21  A.  No.  I write all my own reports and all
22  my own summary myself.
23  Q.  Okay.  So the first thing that you have
24  in here in your summary of document review is the
25  February 8, 2016 suicide attempt; correct?

                                              40

1   A.  Yes.
2   Q.  Why is that significant to your analysis
3   in this matter?
4   A.  So the crux of this case comes down to
5   based on the complaint is that the Gabapentin and
6   not being on the Klonopin was a trigger for
7   Ms. Freiwald attempting suicide.  Why I think this
8   is extremely important is she was on Klonopin and
9   Gabapentin on February 2016.  And she overdoses on
10  90 pills of Klonopin at that time, cuts her wrist
11  and then uses her car as a weapon to try to hurt
12  herself and potentially kill other people.  I
13  think that is extremely important because those
14  are the -- based on the complaint the accusation
15  is that she was stable on those medications.  She
16  wasn't stable on it months earlier.
17      And I think again based on my
18  supplemental report that it's reckless of the
19  psychiatrist to re-prescribe the Klonopin to begin
20  with.  And I don't believe she should have been on
21  it if you overdose on 90 pills of that in just a
22  few months earlier.
23  Q.  So in looking at your document review,
24  did you have any of Ms. Freiwald's records?
25  A.  Yes.  So I guess the Prevea Health

                                              41

1   Records, the Brown Community Treatment Center, the

2   St. Vincent, the Belin. So, yeah what is in

3   there.

4   Q. My question was inartfully worded. Let

5   me try it a different way. Did you have records

6   from Ms. Freiwald prior to February of 2016 that

7   you reviewed?

8   A. If it was not based on these records, I

9   don't believe so.

10   Q. Do you know the dosage of Clonazepam

11   that Ms. Freiwald was on as of February 8, 2016?

12   A. I would have to look at the records

13   again to see what the dosage was. I don't recall

14   it off the top of my head.

15   Q. Do you know what the dosage of

16   Gabapentin?

17   A. Again, I'd have to -- I'm thinking it's

18   around six -- I don't know if it was 600

19   milligrams. But I'd again have to look at the

20   records to verify.

21   Q. Do you know whether Ms. Freiwald was

22   receiving any sort of counseling as of February 8,

23   2016 and before?

24   A. I know that she received counseling

25   afterward. I'd have to look. I don't know if she

42

1   was receiving it before.

2   Q. Do you know if Ms. Freiwald had ever

3   been treated for PTSD symptoms prior to February

4   8, 2016?

5   A. I believe she was. But, again, I'd have

6   to look at the records.

7   Q. Would any of those make any difference

8   to the opinions that you have in this case?

9   A. No.

10   MS. SCHNEIDER: Object to the form.

11   BY MR. GAHNZ:

12   Q. The 90 tablets of Clonazepam, do you

13   know how many milligrams that was per tablet?

14   A. I don't know if it was the one --

15   Q. Were they half milligram tablets? Were

16   they two milligram tablets? Do you know?

17   A. It was in the range of -- around that

18   range. But I'd have to look at the records to see

19   what the exact dosage was.

20   Q. Do you have any of that information here

21   with you today?

22   A. No.

23   Q. So the next item that you have is the

24   commitment to the Nicolet Psych Center at Brown

25   County; correct?

43

1   A. Yes.

2   Q. And what was significant to that event

3   to your opinions?

4   A. It actually provided based on her seeing

5   the mental health staff there why she tried to

6   commit suicide. And it was related to the

7   relationship issues and the loss of business. So

8   those were what they determined was the triggers.

9   Q. Then was there anything else that was

10   significant to your opinions that occurred between

11   February 12th and March 10th?

12   A. That she was referred to basically a

13   psychiatrist, a psychiatric nurse practitioner,

14   and to mental health. So that referral process

15   took place.

16   Q. Then you indicate that she was seen by

17   Dawn Vardia and Dr. Sheets; correct?

18   A. Yes. I know she was also seen by Nurse

19   Practitioner Paige during that time too.

20   Q. You note that at that point she was

21   being prescribed Gabapentin, Clonazepam, aspirin,

22   Diclofenac, fluoxetine, Lisinopril-HCTZ,

23   multivitamins and Ambien; correct?

24   A. Yes.

25   Q. It's your opinion that Dr. Sheets

44

1   committed malpractice by putting Ms. Freiwald back

2   on Clonazepam?

3   MS. SCHNEIDER: Object to the form.

4   A. Yes. Based on again on my supplemental

5   report I think it's equivalent to someone who

6   tries to commit suicide by firearms and then

7   allowing them to have access to firearms in a very

8   short period of time.

9   BY MR. GAHNZ:

10   Q. Did Dr. Sheets commit malpractice in

11   your opinion in any other way?

12   A. No.

13   Q. You list as her past medical history

14   that she had anxiety; correct?

15   A. Yes.

16   Q. How long had she been suffering anxiety?

17   A. It was for many years.

18   Q. And prior to February 9, 2016 how long

19   had she been on Clonazepam?

20   A. I'd have to look through the records.

21   But I believe it was a significant period of time.

22   Q. She was also diagnosed with a major

23   depressive disorder; is that correct?

24   A. Yes.

25   Q. In your opinion did she carry -- was she

45

1  still suffering from anxiety and major depressive
2  disorder as of October 27, 2016 when she checked
3  into the Brown County Jail?
4      A.  Yes.
5      Q.  She was also diagnosed in March of 2016
6  with post-traumatic stress disorder; correct?
7      A.  Yes.
8      Q.  Was she still suffering from post-
9  traumatic stress disorder when she checked into
10  the jail on October 27, 2016?
11      A.  Yes.
12      Q.  Was she actively treating for anxiety as
13  of October 27, 2016?
14      A.  Yes.
15      Q.  Was she actively treating for major
16  depressive disorder as of October 27, 2016?
17      A.  Yes.
18      Q.  And was she actively treating for post-
19  traumatic stress disorder as of October 27, 2016?
20      A.  Yes.
21      Q.  Was she receiving treatment beyond
22  medication treatment for those conditions as of
23  October 27, 2016?
24      A.  She was getting counseling throughout
25  those months.

46

1      MR. GAHNZ:  Why don't we take a short
2  break.
3      (WHEREUPON, A BREAK WAS TAKEN AND THE
4  PROCEEDINGS CONTINUED AS FOLLOWS:)
5  BY MR. GAHNZ:
6      Q.  As we were going through your timeline
7  and in terms of the decision of Dr. Sheets to
8  restart the Clonazepam, what information did you
9  review before coming to your opinion that that was
10  reckless?
11      MS. SCHNEIDER:  Object to the form.
12      A.  It was related to the overdose attempt
13  of 90 pills of Clonazepam, and then her
14  essentially being at the Nicolet Psych Center,
15  what the reasons were.  Based on her mental health
16  records it was pretty clear that if a life trigger
17  was going to happen, that she would utilize things
18  around her to hurt herself.  And so to basically
19  put her on a medication that she could overdose
20  again if a similar event happened in the future, I
21  thought was again reckless.
22  BY MR. GAHNZ:
23      Q.  So what is the legal dose of Clonazepam?
24      A.  It is dependent on the person.  It is to
25  the point where you get respiratory depression,

47

1  and essentially you could aspirate, which is
2  essentially the gastric contents going into your
3  lungs, or you could just stop breathing.  So it
4  could be different for different people.
5      Q.  So on an annual basis how many people
6  die from Clonazepam overdose?
7      A.  I would have to do a literature search
8  to know that.  But in many overdoses
9  benzodiazepine is mixed with alcohol and other
10  types of drugs.  So it's typically a mixed
11  picture.
12      Q.  So did you review Dr. Sheets' medical
13  records?
14      A.  Specifically for the ones that were
15  listed in this materials.  I did see his -- that
16  he did see her.  And, so yes for those records I
17  did review.
18      Q.  And in review of those records were you
19  able to determine what information he had, he
20  being Dr. Sheets, when he made his determination
21  to continue the Clonazepam for Ms. Freiwald?
22      A.  So he stated that I believe that due to
23  her anxiety that he restarted the Clonazepam
24  related to the anxiety.
25      Q.  Do you know what other information he

48

1  had in coming to the determination to restart the
2  Clonazepam?
3      A.  I do not know.
4      Q.  So whether he had seen 20 years worth of
5  previous records to make the determination is not
6  something that you know one way or the other?
7      A.  Well, I would think that if he knew, and
8  I think he did know that she had a serious suicide
9  attempt overdosing on 90 pills, that a similar
10  event could happen in the future, and then she
11  would have access to those same medications under
12  maybe unsupervised conditions, the same issue
13  would have happened.  So, again, I think he's
14  putting his own medical license at risk there too
15  for prescribing something that clearly could be
16  used to hurt herself in the future.
17      Q.  I appreciate that.  But my question was
18  slightly different.  Do you know whether or not he
19  reviewed Ms. Freiwald's previous medical record in
20  coming to his conclusions to restart the
21  Clonazepam?
22      A.  I don't know specifically.  I would
23  assume so.
24      Q.  Dr. Sheets did, in fact, meet with
25  Ms. Freiwald; correct?

49

1   A. Yes.
2   **Q. How many times?**
3   A. I believe twice.
4   **Q. For how long?**
5   A. I didn't look at what the time notes
6   were.
7   **Q. Which other of Ms. Freiwald's doctors**
8   **did Dr. Sheets talk to before he made the**
9   **determination to restart the Clonazepam?**
10   A. I don't remember.
11   **Q. Are those things that you considered in**
12   **coming to your opinions?**
13   A. So, again, it would be -- to me this is
14   the equivalent of someone having serious attempt
15   by -- let's say another like opiate overdose, the
16   person has a history of opiate addiction, and then
17   essentially getting restarted on opiates. So to
18   me in this type of situation the Clonazepam
19   clearly is not, you know, helping.
20   In terms of her anxiety there are
21   alternatives that could be used. To put her on a
22   medication that she could potentially harm herself
23   in a lethal way again I think -- he should have
24   tried something different for the anxiety versus
25   the Clonazepam when it clearly led to a serious

50

1   suicide attempt.
2   **Q. So do you know prior to February 2016**
3   **the last time that Ms. Freiwald had refilled her**
4   **Clonazepam prescription?**
5   A. I'd have to look at the records to see.
6   **Q. Do you know whether or not prior to**
7   **February 8, 2016 she had taken Clonazepam in the**
8   **last week to two weeks?**
9   A. Again, I'd have to look at the records
10   to see the compliance part of it. I wouldn't
11   know.
12   **Q. As you were coming to your opinions, you**
13   **didn't note that in the significant event**
14   **timeline; correct?**
15   A. Because it's not relevant. Again, the
16   relevant part where it starts off is the serious
17   suicide attempt and what was the methods used,
18   which is the 90 pills of overdose, the cutting of
19   the wrist, and then using the car to hurt
20   herself or others. So that I feel was the focal
21   point because that is a person that is extremely
22   determined to want to basically kill themselves
23   and using multiple methods.
24   So essentially what this clearly shows
25   is she will use whatever method possible in a life

51

1   trigger event to basically kill herself. And so
2   that is why I thought this was extremely important
3   to note.
4   **Q. Would it make any difference to you if**
5   **the situation was that she had stopped taking her**
6   **Clonazepam a week before the February 8, 2016**
7   **suicide attempt?**
8   MS. SCHNEIDER: Object to the form.
9   Assumes facts not in evidence. Go ahead.
10   MR. MCGAVER: Join.
11   A. So if that was the case I would say that
12   it is even more reckless to put her back on the
13   Clonazepam knowing that any time she stops it, she
14   would basically try to harm herself. So it almost
15   reinforces my -- that Dr. Sheets I don't believe
16   he should have put her back on the Clonazepam, and
17   he should have done an alternative non-addicting
18   substance that doesn't have both the
19   life-threatening withdrawals as well as the
20   propensity for this event to happen.
21   BY MR. GAHNZ:
22   **Q. Did you come to the conclusion that**
23   **Ms. Freiwald was addicted to Clonazepam?**
24   A. Anyone who is on Clonazepam for that
25   long period of time clearly develops a tolerance

52

1   and clearly needs that medication, because based
2   on again Dr. Sheets re-prescribing it for anxiety,
3   there is a level I believe in this situation of
4   her being tolerant of the medication that she
5   needs. So whether you call it addiction or
6   dependence, I do believe there was some dependence
7   on Clonazepam for her.
8   **Q. Okay. At page 7 your statement that**
9   **there is no evidence that Dr. Fatoki fell below**
10   **the standard of care or provided anything other**
11   **than appropriate care related to the medical care**
12   **and medication management of Ms. Freiwald.**
13   A. Yes.
14   **Q. So the question that I have is what**
15   **information did Dr. Fatoki have at the time that**
16   **he made the determination to discontinue the**
17   **Gabapentin and the Clonazepam, what did he know**
18   **about Ms. Freiwald?**
19   A. So he knew she was on those medications
20   coming into the jail. I do not believe he knew
21   about the suicide attempt.
22   **Q. Okay. Did he know any of the mental**
23   **health diagnoses that Ms. Freiwald carried when**
24   **she came into the jail?**
25   A. I believe -- I don't know -- based on

53

14

her being prescribed these medications, I would
assume that he would definitely know that there
were indications for why these medications were
prescribed. So he would have a knowledge in that
aspect of what potential past medical history is.
Similar to if somebody came to me and said they
were on the Lisinopril, I would assume this person
has a history of hypertension and is being treated
for it whether I ask that person or not. So in
terms of gleaning it, I think he would be able to.

Q. Sure. But there's a difference, isn't
there, between a drug like Lisinopril and a drug
like Gabapentin in terms of off label uses; right?

A. Yes.

Q. Gabapentin is Neurontin?

A. Yes.

Q. Neurontin has a number of label uses and
a number of off label uses; correct?

A. Yes.

Q. So it's a little bit different in terms
of being able to glean why someone is on
Gabapentin than it is why somebody is on
Lisinopril?

A. But based on the totality of all the
medications she is prescribed, you can get a

54

number of the diagnosis.

Q. You read Dr. Fatoki's testimony; right?

A. Yes.

Q. And so you know that his testimony it
was essentially that he didn't have any knowledge
or information as to Ms. Freiwald's past medical
history?

MS. SCHNEIDER: Object to the form. It
misstates his testimony. But go ahead.

A. The past mental health of the suicide
attempt, yes.

BY MR. GAHNZ:

Q. You're also aware that Dr. Fatoki
testified that he was unclear as to why
Ms. Freiwald was on Gabapentin?

A. Yes.

Q. And that he was unclear as to why she
was on Clonazepam?

A. Yes.

Q. In fact, he testified that he did not
have any information as to why Ms. Freiwald was
prescribed Gabapentin or Clonazepam?

A. And that is why I think he requested a
release of information records for the Gabapentin.

Q. That's something that would take several

55

weeks to get the answer to that question; correct?

MS. SCHNEIDER: Object to the form.

A. It depends on the jail. Some jails can
get it in a much shorter period of time.

BY MR. GAHNZ:

Q. You're aware that Dr. Fatoki testified
that the process of getting previous records this
process sometimes can take many days?

A. Yes.

Q. That when Dr. Fatoki made the decision
to stop the Gabapentin and the Clonazepam, he had
not communicated in any way with Ms. Freiwald?

A. Not with Ms. Freiwald, no.

Q. Or any of her doctors?

A. Not with her physicians, no.

Q. Or her nurses?

A. I believe he did state for her to be
monitored for withdrawal for the Clonazepam.

Q. What's your understanding of who was to
be doing the monitoring for the Clonazepam
withdrawal?

A. The nursing staff.

Q. Was that to be done in a protocol
similar to what you had described with the San
Diego County?

56

A. I don't believe it was based on that
protocol. It was based on to me more visual
observation. Again, when you withdraw from
benzodiazepines like Clonazepam, you will get
tremors, you will get shakes. It's very, very
readily apparent that the person is going through
withdrawals. So it's obvious to even a
correctional officer or to a nursing staff the
person is going through a withdrawal.

Q. Is it your understanding though that
Dr. Fatoki was expecting the nursing staff to
monitor Ms. Freiwald's condition?

MS. SCHNEIDER: Object to the form.

A. For signs of withdrawal, yes.

BY MR. GAHNZ:

Q. Thank you. Let me restate the question.
Was it your understanding that Dr. Fatoki was
expecting that the nurses would be monitoring
Ms. Freiwald for signs of benzodiazepine
withdrawal?

A. Yes.

MS. SCHNEIDER: Object to the form.

BY MR. GAHNZ:

Q. At the time of her incarceration at the
Brown County Jail, what was the dosage of

57

1  Clonazepam that Ms. Freiwald was on?
2      A.  I believe it was 1.5 milligrams.  I'd
3  have to look to verify.
4      Q.  1.5 milligrams per day?
5      A.  I'd have to look to verify that dose.
6  If you have it --
7      Q.  I'm showing you what was previously
8  marked as Exhibit 24.  Have you seen that?
9      A.  Yes.
10      Q.  As part of the documents that you
11  reviewed?
12      A.  Yes.
13      Q.  That indicates that at least based on
14  Exhibit 24 that she was on Clonazepam 1 milligram
15  plus an additional .5 milligrams as needed?
16      A.  Yes.
17      Q.  So she could be taking one milligram up
18  to three or four milligrams a day?
19      A.  Yes.
20      Q.  So kind of back up to your statement.
21  So Dr. Fatoki at the point in time he made the
22  decision to take Ms. Freiwald off the Gabapentin
23  and the Clonazepam had the information only that
24  she was on these medications?
25      A.  Yes.

58

1      Q.  And that she was in jail?
2      A.  Yes.
3      Q.  Was there any other information that he
4  had about Ms. Freiwald at the time that he made
5  those decisions with respect to Gabapentin and
6  Clonazepam?
7      A.  So, in speaking with the nursing staff
8  I'm assuming that he had a more in-depth
9  conversation about how she was looking, if she was
10  undergoing issues or withdrawal or other aspects
11  because normally any provider would ask that type
12  of information for that.  So I assume he and the
13  nurse had some communication related to her
14  appearance and how she was presenting.
15      Q.  Okay.  That's an assumption on your
16  part?
17      A.  Yes.
18      Q.  Is there any written record that would
19  show that there was some discussion between
20  Dr. Fatoki and any nurse as to how Ms. Freiwald
21  was presenting?
22      A.  It was just the fact that they had that
23  communication, so I think that that phone call
24  happened.  But I don't know what the contents of
25  the phone call were.

59

1      Q.  What is your understanding as to the
2  contact between any nurse and Ruth Freiwald?  And
3  I want to be very precise in terms of the time
4  frame.  Between the time that Ms. Freiwald got to
5  jail and the time that there was the phone call
6  between the nurse and Dr. Fatoki?
7      A.  So I think it was based on them
8  responding back to her related to the inmate
9  request forms.
10      Q.  Is it your understanding that a nurse
11  had face-to-face contact with Ms. Freiwald in
12  response to the inmate request form?
13      A.  Based on the documentation, I don't know
14  how that was relayed back to her, if it was
15  face-to-face or an alternative communication plan.
16  But it's documented that they addressed the inmate
17  with the form itself.  So I assume there was some
18  potential communication.
19      Q.  Okay.  Do you know based on your review
20  of the records in this case whether or not a
21  registered nurse had face-to-face contact with
22  Ruth Freiwald at any time that she was at the
23  Brown County Jail from October 27th to November
24  2nd?
25      A.  I have to assume throughout the course

60

1  of this that there were probably interactions.
2  But I did not see it in the documentation.
3      Q.  Would it make any difference if there
4  were not any face-to-face interactions between
5  Ms. Freiwald and a registered nurse during the
6  time that she was at the Brown County Jail?
7      MS. SCHNEIDER:  Object to the form.
8      A.  No.  Unless she was in acute medical
9  distress.  But based on again all the records,
10  there is no evidence of withdrawal or acute
11  distress while she was incarcerated.
12  BY MR. GAHNZ:
13      Q.  Okay.  What records are you relying on
14  for your conclusion that there was no evidence of
15  acute withdrawal?
16      A.  Based on a number of things, the
17  depositions as well as the medical records.  So
18  the depositions of some of the correctional
19  officers, some of the staff that -- majority of it
20  is also during the time she goes to the HUBER or
21  the work release program that there was no
22  evidence of distress or withdrawal at that time
23  that they allowed her to go outside of the jail.
24      Q.  So within the supplemental report, I
25  just wanted to double check in terms of -- so you

61

16

had the opportunity to look at the deposition of
Debora Gryboski; correct?
A. Correct.
Q. Do you recall Debora Gryboski's
testimony about Ms. Freiwald at NWTC?
A. Yes.
Q. And she was distressed when she was at
NWTC?
MS. SCHNEIDER: Object to the form.
A. So not in medical distress, but there
were I guess other factors that she was
complaining about.
BY MR. GAHNZ:
Q. Was she complaining about not getting
her medications?
A. She was complaining about not getting
her medications and I believe also that the TV was
too loud, and I think the window and the lighting.
There was a number of issues that were not related
to an actual medical issue.
Q. Okay. You also had the chance to see
Julie Chapman's deposition; correct?
A. Yes.
Q. She was testifying about her
observations of Ms. Freiwald at NWTC?

62

A. Yes.
Q. Did you see any testimony or any records
that there was any interaction between anybody
from the Brown County Jail staff and Ms. Freiwald?
A. I mean, there were -- there definitely
was interaction especially on the day she goes to
the HUBER program, because there were correctional
officers that were involved there. And I think --
I forgot which deposition it was. I think there
was no -- again, in the issue of acute medical
distress or withdrawal that no one observed that
she was having any kind of those types of issues.
Q. There's no report one way or another;
correct?
A. There's no report, no.
Q. You also saw the deposition of Matthew
Fett, her son; correct?
A. Yes.
Q. He described what his mother's condition
was?
A. Yes.
Q. In terms of Dr. Fatoki's decision to
discontinue the medications of Gabapentin, is it
your understanding that the jail would dispense
those medications as stated on the dosage provided

63

by the provider?
MS. SCHNEIDER: Object to the form of
the question.
BY MR. GAHNZ:
Q. As opposed to giving the inmate the
entire bottle of pills?
A. The nurse would essentially administer
each pill.
Q. And so the way that I understand the
process is each day the provider would come by
with the medication packaged in a particular
envelope and say this is your medication for the
day?
A. For those medications, yes. In certain
jails there's also a Keep On Person program where
they can actually get like Motrin. They can get a
packet of -- a number of them. So in those
situations they could get a number of pills. But
outside of the KOP or Keep On Person program,
everything else would be administered usually by a
nurse to the inmate.
Q. The import of the question is your
review of the records indicate that Brown County
had security policies in place to make sure that
medications were being dispensed appropriately?

64

A. Yes.
Q. Okay. And so with respect to
Gabapentin, what would have been the harm to
Ms. Freiwald had Dr. Fatoki continued that
medication until such time as he got the medical
records to determine why she was on it?
MS. SCHNEIDER: Object to the form.
Incomplete hypothetical. But go ahead.
A. So Gabapentin is one of the most highly
abused medications in a correctional facility.
It's number one. I think number two is Ultram and
Tramadol back in 2016. So it is significant abuse
potential for the inmate. The other thing is
they're significant in many jail victimization.
Inmates get beat up on those medications or they
sell and trade and hoard them. Overdose potential
is very, very high where they take a number of the
pills and they try to cheek it. So there's a lot
of dangers especially with those two medications
specifically.
BY MR. GAHNZ:
Q. Was there any indication that the Brown
County Jail medication dispensing policies and
methods were such that hoarding and cheeking
medications was an issue?

65

1  A. It's an issue in any jail or facility.
2  Q. So other than the security concern that
3 you just expressed, were there other potential
4 harms to continuing the Gabapentin?
5  A. Yes. If she hoards the medication and
6 then tries to overdose on it, that could be
7 potentially creating a issue where she could have
8 self-harm while in the jail.
9  Q. Now given that Ms. Freiwald was on the
10 HUBER work release, does that mitigate that
11 concern in any way?
12  MS. SCHNEIDER: Object to the form.
13 Incomplete hypothetical.
14  A. So again, I think when you look at the
15 records, the other aspect that is kind of glossed
16 over here is she doesn't bring in the medications
17 when she reports to the jail of what she was
18 supposed to be on and everything else. And,
19 again, I think the trigger here was the fact that
20 I think she expected to be out in a day or so, but
21 had to be there for a longer period of time. So I
22 think that's what triggered all of these events
23 that was irrespective of the medication.
24 BY MR. GAHNZ:
25  Q. I don't want to gloss over anything.

66

1 The medications were brought in the next morning;
2 correct?
3  A. Yes.
4  Q. Had she brought them in on the 27th,
5 what difference, if any, would that have made in
6 Dr. Fatoki's decision making?
7  MS. SCHNEIDER: Object to the form.
8 Incomplete hypothetical.
9  MR. MCGAVER: Join.
10  A. So in terms of the Gabapentin and having
11 the outside records, if all of those records were
12 brought at the point of the intake, he would have
13 just made a decision based on the available
14 records. So I would think that if the person has
15 the ability and they know they're checking into
16 the jail in a planned type of way, that
17 they would provide all of the available
18 information at that point. If it's not there,
19 then he has to then make the clinical judgment
20 which in his situation he basically asked for
21 prior records to verify that this person was on
22 Gabapentin.
23 BY MR. GAHNZ:
24  Q. So it's your expectation that
25 Ms. Freiwald should have brought in her medical

67

1 records and her medications on the 27th when she
2 was ordered to jail?
3  MS. SCHNEIDER: Misstates his testimony.
4 But go ahead.
5  A. So in this type of situation I think in
6 a planned incarceration episode, which this look
7 like it was to ask someone to be reporting at a
8 specific time, that with her history and
9 everything else like that, she would bring in
10 the records of what she was prescribed, and not
11 just specific to these two, but to the blood
12 pressure and other medications.
13 BY MR. GAHNZ:
14  Q. Do you know whether or not Ms. Freiwald
15 had any knowledge as to whether or not there was
16 going to be a doctor, a jail doctor reviewing her
17 medications?
18  A. I do not know.
19  Q. You are aware, however, that she was
20 ordered by the court to take all of her prescribed
21 medications?
22  MS. SCHNEIDER: Object to the form.
23  A. Yes.
24 BY MR. GAHNZ:
25  Q. And Dr. Fatoki was not aware at the time

68

1 that he discontinued those medications of this
2 court order; correct?
3  A. So I've been in very similar situations.
4 The court order about continuing medication does
5 not substitute clinical judgment. The doctor is
6 the one prescribing the medication. So it's under
7 his license. So unlike what -- again, this is
8 where the supplemental report goes into that. But
9 it's not the expectation that anything prescribed
10 on the outside would immediately be continued on
11 the inside by that provider. That provider would
12 just then be a technician.
13  And he has to exercise independent
14 clinical judgment and essentially prescribe this
15 medication almost as new when they're coming into
16 the jail, because different clinical factors could
17 be in play and you're dealing with a very
18 different population of situation. So as a result
19 it's under his license and his clinical judgment
20 on what he's going to provide. And he has a right
21 to not prescribe medications too.
22  Q. And I appreciate that. My question was
23 a little bit different though. Was Dr. Fatoki
24 aware that the court had ordered Ms. Freiwald to
25 take all of her prescribed medications at the time

69

1  he made the decision to discontinue the Gabapentin
2  and the Clonazepam?
3     MS. SCHNEIDER:  Objection.  Asked and
4  answer.
5     A.  I don't believe so.
6  BY MR. GAHNZ:
7     Q.  Is the standard of care different if a
8  person is going to be in jail than for a person
9  that is not going to be in jail?
10     MS. SCHNEIDER:  Object to the form.
11     A.  So the standard is not different.  But
12  there are different factors that would make
13  certain medications potentially not viable inside
14  a correctional facility versus on the outside.
15  BY MR. GAHNZ:
16     Q.  What is the number one symptom of
17  Clonazepam withdrawal?
18     A.  Number one symptom?
19     Q.  Yes.
20     A.  Depending on the various stages it could
21  cause evaluated heart rate.  It can cause sweating
22  or diaphoresis.  It can cause evaluated blood
23  pressure.  It can cause tremors.  And then in a
24  really bad case it could start causing visual
25  hallucinations.

70

1     Q.  What about rebound anxiety?
2     A.  So anxiety would be part of that
3  constellation of symptoms.
4     Q.  In fact, isn't rebound anxiety the
5  number one symptom of withdrawal from
6  benzodiazepine?
7     MS. SCHNEIDER:  Object to the form.
8     A.  So typically that is accompanied by
9  elevated blood pressure, sweating, elevated heart
10  rate.  So that would be constellation of -- those
11  physical symptoms would also be present with the
12  increased anxiety.
13  BY MR. GAHNZ:
14     Q.  Was Ms. Freiwald complaining of any of
15  these symptoms while she was incarcerated?
16     A.  Based on the records she did say that
17  she had anxiety.
18     Q.  And what, if anything, was done in
19  response to that?
20     A.  So I don't believe -- specifically for
21  the anxiety she was not re-prescribed the
22  Clonazepam.  But I believe she was prescribed
23  Prozac.
24     Q.  So when somebody comes into jail, would
25  you agree with me, that that is an anxiety

71

1  inducing event?
2     A.  It's a major life trigger.  Yes.
3     Q.  And if somebody comes into jail and they
4  have a history of anxiety, would that be something
5  that the treating physician would want to take
6  into account in his or her medical decisions?
7     MS. SCHNEIDER:  Object to the form.
8     A.  So I don't think it would -- again, I do
9  not see a causal link here between the anxiety and
10  the suicidal ideation, or suicide attempt.
11  Everybody experiences anxiety and obviously has
12  different coping mechanisms.  Even with many
13  history of anxiety there's thousands of
14  individuals that come in with anxiety on anxiety
15  medications that are abruptly stopped but they
16  don't go on to do suicide attempts.  So I think
17  this situation is very, very different in terms of
18  her coping mechanism.
19     MS. SCHNEIDER:  Would you read the
20  question back please.
21     (RECORD READ BY THE COURT REPORTER.)
22     A.  Yes.
23  BY MR. GAHNZ:
24     Q.  What about an inmate that has severe
25  depression?

72

1     A.  Yes.
2     Q.  And what about an inmate who had
3  attempted suicide within six months of her
4  incarceration?
5     MS. SCHNEIDER:  Object to the form.
6     A.  Yes.
7  BY MR. GAHNZ:
8     Q.  What about within eight months of her
9  incarceration?
10     MS. SCHNEIDER:  Object to the form.
11     A.  Again, the more information the better.
12  So if that information is available, obviously
13  they would have to take that into account.
14  BY MR. GAHNZ:
15     Q.  Is there any literature that supports
16  the proposition that it is medically acceptable to
17  stop somebody's benzodiazepine cold turkey?
18     MS. SCHNEIDER:  Object to the form.
19     A.  There's no literature that states that.
20  BY MR. GAHNZ:
21     Q.  In fact, all the literature says if
22  you're going to take somebody off of a
23  benzodiazepine it should be done on a tapered
24  basis; correct?
25     A.  Or to look for signs of withdrawal.

73

1  Q.  Under a close monitoring situation;
2  correct?
3  A.  Under a monitored situation, yes.
4  Q.  And the monitoring should be done every
5  15 minutes?
6  MS. SCHNEIDER:  Object to the form.
7  A.  So the time frames are different
8  depending on the literature.  But there are
9  standard time intervals, yes.
10 BY MR. GAHNZ:
11 Q.  What is the maximum allowable interval
12 of monitoring?
13 MS. SCHNEIDER:  Object to the form.
14 It's vague.  Overly broad.
15 MR. MCGAVER:  Join.
16 A.  I have seen protocols that you can go
17 eight to twelve hours.
18 BY MR. GAHNZ:
19 Q.  It's your understanding that
20 Ms. Freiwald was out in the community for how long
21 on a daily basis on the HUBER release?
22 A.  It was just to participate in those
23 classes.  So I'm guessing a few hours.
24 Q.  But you don't know -- she could have
25 been out as much as 12 to 14 hours as far as you

74

1  know?
2  A.  I didn't see the clock in, clock out
3  systems.
4  Q.  It's also your opinion that
5  Ms. Freiwald's mental status was not well
6  controlled at the time she entered into the jail.
7  Is that a fair summation of your opinion?
8  A.  Yes.
9  Q.  Do you know whether Dr. Fatoki was aware
10 that Ms. Freiwald was going to be sent to the
11 HUBER Center upon her incarceration?
12 A.  I don't believe so.
13 Q.  I didn't see it in the list but I'm
14 going to ask you, did you look at the contract
15 between CCS and Brown County?
16 A.  No.
17 Q.  Would you expect that Dr. Fatoki as the
18 medical director of the region would know of the
19 terms of the contract between Brown County and
20 CCS?
21 MS. SCHNEIDER:  Object to the form.
22 A.  I would not believe that he would be
23 knowledgeable.  Usually the medical directors are
24 not.  Unless he needed to know for a particular
25 reason, they're usually not given those cross.

75

1  BY MR. GAHNZ:
2  Q.  In review of any of the records or
3  documents that you saw in this case, did you note
4  that CCS's contract excluded HUBER inmates?
5  A.  I did not review the contract.
6  Q.  You read testimony though?
7  A.  Yes.
8  Q.  And you have seen there's been a bunch
9  of questions that have been asked about the
10 contract.  So that's my question, did you see that
11 in any of the information that you reviewed?
12 A.  Can you repeat that?
13 Q.  Sure.  In any of the information that
14 you reviewed, did you see that the contract
15 between CCS and Brown County excluded HUBER
16 inmates?
17 A.  I don't recall.
18 Q.  Okay.  Would it make any difference if
19 CCS excluded HUBER inmates from the contract as
20 far as medical care to be provided?
21 MS. SCHNEIDER:  Object to the form.
22 MR. MCGAVER:  Join the objection.
23 A.  Again, I don't know like what -- I'm
24 actually kind of confused.
25 BY MR. GAHNZ:

76

1  Q.  Let's assume for a minute that there is
2  a contract between CCS and Brown County.
3  A.  Yes.
4  Q.  Okay.  And within that contract it
5  specifically says CCS will not be providing
6  medical care to HUBER inmates.
7  A.  Yes.
8  Q.  Okay.  Are you with me so far?
9  A.  Yes.
10 Q.  Assuming those two things to be true,
11 does that make any difference to you in terms of
12 your opinions?
13 MS. SCHNEIDER:  Object to the form.
14 Incomplete hypothetical.
15 MR. MCGAVER:  Join.
16 A.  So is this when she's in the HUBER
17 program or is this while she's in the jail?
18 BY MR. GAHNZ:
19 Q.  Assume for the sake of this question
20 that the contract says that HUBER inmates are
21 excluded from the contract as far as medical care
22 being provided by CCS.
23 A.  So, I mean, I'm assuming it's when
24 they're outside of the jail.  So if it's for both,
25 I mean -- again, I'd have to see the contract to

77

1    see.

2    **Q.  That's just not something you have**

3    **reviewed?**

4    A.  No.

5    **Q.  So you're not prepared to testify one**

6    **way or another?**

7    A.  I'm prepared to testify based on, again,

8    what I have read in the report that when

9    Ms. Freiwald leaves the jail, the responsibility

10   of all of the actions, the suicide prevention and

11   all of those things is not the responsibility of

12   the jail, clinical, or Dr. Fatoki at that point.

13   If she makes an impulsive decision while she's

14   unsupervised outside of it, that is not the

15   responsibility of the jail.  That is my opinion.

16   **Q.  What's that based on?**

17   A.  It's based on any jurisdiction of any

18   correctional facility.  Once a person is released,

19   that person -- if somebody was released out of

20   custody at 2:00 a.m. and they walked out of like

21   the jail right behind us, and this has happened

22   and they collapsed like two or three minutes later

23   or something else happens, technically --

24   obviously the deputies are there or somebody is

25   there, they could call 911.  But they're not the

78

1    responsibility of the facility.  The facility's

2    responsibility is within the jurisdiction of the

3    actual inside of the facility.  So once they're

4    outside of it and they're unsupervised, they would

5    be like any normal person like me or you if

6    something was to happen to us here.

7    **Q.  So is it your understanding that**

8    **Ms. Freiwald was released from custody to attend**

9    **the work and school?**

10   **MR. MCGAVER:  Object to the form.**

11   **MS. SCHNEIDER:  Join.**

12   A.  So she was unsupervised.  So, in

13   essence, for the period of time that she's

14   physically outside of the walls, she is out of

15   custody in my opinion.  And I will say that even

16   in San Diego jails there are individuals who

17   report to their incarceration just for weekends,

18   and then they work Monday through Friday.  They

19   report on Friday, and they leave on I think Sunday

20   or Monday morning.  During the time they're in the

21   jail, the jail is fully responsible for things

22   that happen inside the jail.

23   But outside of that jail during the

24   Monday through Friday, if something was to happen,

25   obviously the jail is not responsible and the

79

1    clinical staff is not because the person is not

2    being escorted with a guard and being said that

3    this person is under custody with ankle bracelets

4    and everything else like that.  So based on this,

5    that's why I think this case is very unique that

6    she commits the suicide attempt while she's

7    unsupervised outside of custody in my opinion.

8    **BY MR. GAHNZ:**

9    **Q.  If she still subject to the jail rules?**

10   **MS. SCHNEIDER:  Object to the form.**

11   **MR. MCGAVER:  Join.**

12   A.  So I would assume in this type of

13   situation there would be consequences if she

14   didn't follow the rules, like if she tried to

15   escape and went to a different state.  She could

16   have the power to do all of those things and never

17   show back up to the jail.  So there would be

18   consequences.  But, in essence, she's out of

19   custody because no officer is running after her if

20   she, let's say, decides to bolt and tries to not

21   report back.

22   **BY MR. GAHNZ:**

23   **Q.  Okay.  Is it your understanding that**

24   **Ms. Freiwald is not allowed to take her prescribed**

25   **medications -- strike the question and start over.**

80

1    **Under the jail rules would Ms. Freiwald**

2    **have been allowed to take Clonazepam while she was**

3    **at NWTC for class?**

4    A.  Again, I think it's based on the

5    clinical decision of the provider.  I'd have to

6    look to see if they disallowed like

7    benzodiazepines to be as part of the program.

8    **Q.  While Ms. Freiwald is at class on the**

9    **work release, you're saying that she's not under**

10   **the supervision of the clinical staff; fair**

11   **enough?**

12   A.  Yes.

13   **Q.  So would that mean that her medical care**

14   **would revert to her community provider?**

15   **MS. SCHNEIDER:  Object to the form.**

16   **MR. MCGAVER:  Join.**

17   A.  It is very well possible at that point.

18   **BY MR. GAHNZ:**

19   **Q.  Okay.  And so as far as your opinion is**

20   **is that Dr. Fatoki was well within his rights to**

21   **discontinue the Gabapentin and the Clonazepam**

22   **while she was within the jail facility, but then**

23   **Ms. Freiwald was free to take those outside of the**

24   **jail facility while she was on work release?**

25   **MS. SCHNEIDER:  Object to the form.**

81

1    Incomplete hypothetical.
2        MR. MCGAVER:  Join the objection.
3    A.  So if she was followed by her outpatient
4    doctors, once she's out there in the classroom
5    setting, I mean, that is -- if she has outpatient
6    providers, they could provide certain types of
7    care for her, I do believe that.  But Dr. Fatoki
8    is not responsible while she's physically outside.
9    BY MR. GAHNZ:
10       Q.  Okay.  Do you have your report handy?
11   A.  Yes.
12       Q.  At page 7 towards the bottom you
13   indicate that it should be noted that a suicide
14   screening questionnaire and booking observation
15   are completed on October 27, 2016 on Ms. Freiwald
16   and no assessment was made where she posed an
17   immediate suicide risk; right?
18   A.  Yes.
19       Q.  I want to talk about that a little bit.
20   A.  Okay.
21       Q.  The suicide screening showed that she
22   posed a suicide potential; correct?
23       MS. SCHNEIDER:  Object to the form.
24       MR. MCGAVER:  Join the objection.  It
25   misstates testimony.

82

1    A.  I think it says that she potentially had
2    a prior attempt.  But she was actively denying any
3    suicide ideations.
4    BY MR. GAHNZ:
5        Q.  My question was different.  The result
6    of the suicide screening indicated that
7    Ms. Freiwald was a potential suicide risk;
8    correct?
9        MS. SCHNEIDER:  Object to the form.  It
10   misstates the records.
11   A.  I don't believe so.
12   BY MR. GAHNZ:
13       Q.  Let's pull up the record.  Showing you
14   Exhibit 16.  Do you see the part marked "Result"
15   up at the top?
16   A.  Yes.
17       Q.  "Suicide potential exist."  Did I read
18   that correctly?
19   A.  Yes.
20       Q.  And is that the result of the suicide
21   screening that was done by Brown County?
22       MS. SCHNEIDER:  Object to the form.
23   A.  Yes.
24       MR. GAHNZ:  I guess, Counsel, what is
25   the issue with that particular question?

83

1        MS. SCHNEIDER:  It misstates the
2    testimony in the case as to the outcome of the
3    suicide screening.  If you're asking him to read
4    what's on the document, it's on the document.
5    BY MR. GAHNZ:
6        Q.  Now part of what you did was you looked
7    at the NCCHC standards; correct?
8    A.  Yes.
9        Q.  And what they provide is one of the
10   standards requires that a receiving screening be
11   done; correct?
12   A.  Yes.
13       Q.  There was no receiving screening done in
14   this case; correct?
15   A.  That is correct.
16       Q.  Okay.  In this case all that was done
17   was the suicide screening questionnaire and a
18   booking observation report?
19   A.  Yes.
20       Q.  And one of the things that you were
21   provided with has been previously marked as
22   Exhibit No. 5, I'm assuming you have, which is the
23   CCS receiving screening form; correct?
24   A.  Yes.
25       Q.  This is blank and we've not -- it's your

84

1    understanding that this was not actually done by
2    Brown County or CCS for Ms. Freiwald; correct?
3    A.  I did not see this, no.
4        Q.  Completed?
5    A.  Yes.
6        Q.  And it should have been done?
7        MS. SCHNEIDER:  Object to the form.
8        MR. MCGAVER:  Join the objection.
9    A.  Again, it's based on their policies and
10   procedures.
11   BY MR. GAHNZ:
12       Q.  Those are the policies and procedures
13   that were in place indicate that Exhibit 5 should
14   have been completed for Ms. Freiwald?
15       MS. SCHNEIDER:  He's not offering
16   opinions as to Brown County policies.
17       MR. MCGAVER:  I will join the objection.
18       MR. ROTH:  Join the objection.
19   BY MR. GAHNZ:
20       Q.  Would you give the answer even though
21   the objection has been made?
22   A.  So again, I can't comment on their
23   policies and procedures.
24       Q.  Well, you did, however, indicate that
25   you were basing your opinions based on NCCHC

85

standards; correct?

A. Yes.

Q. This document is one of the forms that relates to the receiving screening which CCS indicated it did as part of the compliance with NCCHC standards; correct?

MR. ROTH: Objection. The question lacks foundation. Incomplete hypothetical. And it assumes facts not in evidence. It's beyond the scope of this witness's disclosed opinions.

MS. SCHNEIDER: Join in his objections.

MR. MCGAVER: Join.

BY MR. GAHNZ:

Q. You can answer the question.

A. Can you repeat the question?

Q. Let me give you a document to look at. I want you to -- showing you what we previously marked as Exhibit 44. Is that the CCS receiving screening policy?

MR. ROTH: Object; foundation.

MS. SCHNEIDER: Join.

A. Yes.

BY MR. GAHNZ:

Q. At page CCS 47, the last page of that document, do you see where it says references?

86

A. Yes.

Q. What is it referencing?

A. The NCCHC standards.

Q. So is it your understanding that Exhibit 44 was the CCS policy related to receiving screening for Brown County as in compliance with NCCHC standards?

MS. SCHNEIDER: Object to the form and foundation.

MR. ROTH: Object to the form and foundation.

MR. MCGAVER: Join.

A. So that is what it is here.

BY MR. GAHNZ:

Q. Okay. So on Exhibit 5, there's a number of questions that this form asks, and I want to go through them. One of them is any recent hospitalizations. From your experience in correctional health care, why would this be important information to be at a receiving screening?

MS. SCHNEIDER: Object to the form. It's vague and overly broad. Incomplete hypothetical.

A. So if a person, let's say, had surgery a

87

couple of days ago and they needed follow-up with a surgeon, and they said that they were hospitalized and needed that check, then obviously you would have to coordinate the follow-up for that.

BY MR. GAHNZ:

Q. Okay. A little bit farther down the page there's a question "Do you now or have you ever had mental health treatment, hospitalization, or were prescribed psych meds." And then over to the right it ask specifically about psychotropic meds. Why is this information important to find for receiving screening?

MS. SCHNEIDER: Object to the form. Vague and overly broad. Incomplete hypothetical.

MR. ROTH: Object.

A. Again, to see if medications needed to be continued or if there needs to be follow-up on certain conditions.

BY MR. GAHNZ:

Q. The next question ask "Have you ever attempted suicide?" why is that question part of the receiving screening?

MS. SCHNEIDER: Object to the form. Incomplete hypothetical.

88

MR. ROTH: Join. And object to foundation as well the witness interpreting the document.

A. So attempted suicide in the past is a predictor of one of many factors that could predict suicide in the future.

BY MR. GAHNZ:

Q. Isn't a prior suicide attempt the most predictive of future suicide attempts?

MS. SCHNEIDER: Object to the form.

MR. MCGAVER: Join.

A. Based on the literature, yes.

BY MR. GAHNZ:

Q. The second page it talks about "What drugs do you use? If opiates/benzo, immediately refer to medical staff."

Why would a receiving screening provide that information?

MS. SCHNEIDER: Object to the form and foundation.

MR. ROTH: Join.

A. Related to withdrawal symptoms.

BY MR. GAHNZ:

Q. Okay. Is it your understanding that if Exhibit 5 had been filled out on behalf of

89

**Page 90**

1  Ms. Freiwald would have been provided to the
2  clinical staff, the nurses?
3  MS. SCHNEIDER: Form and foundation.
4  MR. MCGAVER: Calls for speculation.
5  A. Again, I think this is irrelevant even
6  if it was filled out.
7  BY MR. GAHNZ:
8  Q. I understand you think it's irrelevant.
9  That's not really my question.
10  My question is should it have been given
11  to the -- would it have been given to the clinical
12  staff?
13  MS. SCHNEIDER: Argumentative. Form and
14  foundation.
15  A. So any clinical information I assume
16  would be given to the clinical staff.
17  BY MR. GAHNZ:
18  Q. And the policy provides that in Exhibit
19  44 that once the receiving screening is filled out
20  it is, in fact, suppose to be provided to the
21  clinical staff; correct?
22  MS. SCHNEIDER: Form and foundation.
23  MR. ROTH: Objection. Form and
24  foundation. Beyond the scope of this witness's
25  testimony to interpret or opine on health care

**Page 91**

1  policies.
2  A. That is what this document states.
3  BY MR. GAHNZ:
4  Q. Okay. And presumably had Exhibit 5 been
5  filled out on behalf of Ruth Freiwald, this is
6  information that Dr. Fatoki would have had in hand
7  at the time he was making his decisions?
8  MS. SCHNEIDER: Object to the form.
9  Foundation.
10  A. Yes. I assume so.
11  MR. GAHNZ: Why don't we take a short
12  break.
13  (WHEREUPON, A BREAK WAS TAKEN AND THE
14  PROCEEDINGS CONTINUED AS FOLLOWS:)
15  BY MR. GAHNZ:
16  Q. Doctor, will you turn to page 8 of your
17  original report please?
18  A. Okay.
19  Q. Do you know what -- you write that
20  Ms. Freiwald did not exhibit any signs of
21  benzodiazepine withdrawal and the visual
22  observation done to assess this showed no
23  observation that she suffered from tremors or
24  cardiovascular instability. Who did the visual
25  observation of Ms. Freiwald?

**Page 92**

1  A. The correctional officers as well as --
2  majority is correctional officers.
3  Q. And is this statement based on the fact
4  that there was nothing reported?
5  A. And also from the depositions that no
6  one observed her in acute medical distress. And
7  so when you're having life-threatening
8  benzodiazepine withdrawal, it's rather apparent
9  the person is in medical distress.
10  Q. Okay. Will you pull up Exhibit 241.
11  That's your supplemental report?
12  A. Yes.
13  Q. So the first number on page 4 is your
14  comment on Dr. Greist's supplemental report;
15  correct?
16  A. Yes.
17  Q. And you indicated that Dr. Greist
18  erroneously attributes the cessation of Clonazepam
19  and Gabapentin to Ms. Freiwald's cause of death;
20  correct?
21  A. Yes.
22  Q. And we've talked about this in some
23  detail. But I want to make sure I've given you
24  the opportunity to give all of the reasons why
25  you're critical of Dr. Greist's conclusion to that

**Page 93**

1  effect?
2  A. Yes.
3  Q. Is there anything that we haven't
4  covered?
5  A. Yes. So the literature is very, very
6  clear. If you're going to die from Clonazepam,
7  it's from Clonazepam withdrawal, which essentially
8  gives you cardiovascular instability with rapid
9  heart rate, blood pressure, visual hallucinations
10  and then complete cardiovascular collapse. That
11  is not what has happened in this type of
12  situation.
13  Two, in terms of if these medications
14  were so egregious and causing like increased
15  suicide ideation and attempts, there would be a
16  black box warning about this similar to anti-
17  depressants where they put a warning that says
18  people who are on anti-depressants can commit
19  suicide. And there is an actual warning there.
20  There is no FDA warning about this. There are
21  studies that can show correlation. But it doesn't
22  show causation. And that's where I think
23  Dr. Greist is trying to show causation with the
24  Clonazepam and Gabapentin, which is just not
25  supported in the literature.

**Page 94**

```
 1      Q.  Okay.  With respect to suicide, is there
 2  a relationship between suicide and people that
 3  suffer from a combination of severe depression and
 4  anxiety?
 5      MS. SCHNEIDER:  Object as vague and
 6  overly broad.
 7      MR. MCGAVER:  Join.
 8      THE WITNESS:  Please repeat it.
 9      (RECORD READ BY THE COURT REPORTER.)
10      A.  So those are risk factors.
11  BY MR. GAHNZ:
12      Q.  And what, if any, literature research
13  did you do to determine the interplay of
14  depression and anxiety in suicide?
15      MS. SCHNEIDER:  For this case?
16  BY MR. GAHNZ:
17      Q.  Well, first for this case?
18      A.  So again, it's related to my knowledge
19  based on the other mental health literature, and a
20  lot of the suicide literature that I have reviewed
21  previous to this case.  But, again, it's specific
22  about what are the risk factors for suicide.  And
23  then what would trigger someone to basically want
24  to have an attempt, what are life triggers as well
25  as what are risk factors from the past medical
```

**Page 95**

```
 1  history.
 2      Q.  Would you agree that if a person's
 3  anxiety goes up appreciably that is a suicide risk
 4  factor?
 5      MS. SCHNEIDER:  Object to the form.
 6      A.  Again, it would have to be mixed with
 7  other things.  Not pure anxiety.  More depression
 8  would probably be more related to suicide
 9  attempts.
10  BY MR. GAHNZ:
11      Q.  So a person who has severe depression
12  and then whose anxiety increases appreciably is at
13  greater risk for suicide.  Is that a fair
14  statement of your knowledge of the literature?
15      MS. SCHNEIDER:  Object to the form.
16      A.  Again, based on the literature they are
17  risk factors.
18  BY MR. GAHNZ:
19      Q.  You state in the last paragraph under
20  bullet point one, "Her clinical assessments did
21  not show she was actively suicidal for the
22  clinical staff to stop her from leaving the jail
23  to attend the HUBER program."
24      Who did a clinical assessment of
25  Ms. Freiwald?
```

**Page 96**

```
 1      A.  So, when I'm talking about her clinical
 2  assessment I'm talking about the visual
 3  observations at which she was voicing.  And so to
 4  any of the staff she has never made statements
 5  that she is actively suicidal.  So the term
 6  clinical assessment in that type of situation is
 7  when she's asked or if she's volunteering that
 8  information about having suicidal thoughts or
 9  anything else.  And she has not voiced that to any
10  of the staff to basically stop her from going to
11  the HUBER program.
12      And I think this is a really important
13  distinction here because again the jail's
14  responsibility is do they hold this person against
15  the judge's order for the person not to go to the
16  HUBER program.  And there are certain indications
17  you would do that.  If the person was in acute
18  medical distress or immediate harm to life.
19      In all of the depositions and visual
20  observation of the staff, there was no indications
21  that she should have been held to go to the HUBER
22  program.  And, again, once she is outside of the
23  walls of the jail, she's not the responsibility of
24  the clinical staff of that jail.
25      Q.  I want to make sure I'm understanding
```

**Page 97**

```
 1  the distinction here.  Clinical assessment is that
 2  something that you would expect that would be done
 3  by a nurse or a physician?
 4      MS. SCHNEIDER:  Object to the form.
 5      A.  So in terms of this statement, it's also
 6  a combination of the correctional officers.
 7  BY MR. GAHNZ:
 8      Q.  So that's what my confusion is.  Are
 9  correctional officers competent to do clinical
10  assessments?
11      A.  So again, to clarify this sentence.  The
12  assessment is really the visual observation and
13  whether she is voicing any suicidal ideation or
14  posing any sign of withdrawal.  None of that was
15  apparent in any of the materials that I reviewed.
16      Q.  My understanding is the clinical
17  assessment needs to be done by a medical
18  professional?
19      A.  Yes.
20      Q.  And was there any clinical assessment
21  done of Ms. Freiwald during the entire time that
22  she was at Brown County Jail?
23      MS. SCHNEIDER:  Object to the form.
24  That misstates what he's put in his report.
25      MR. MCGAVER:  Join.
```

1  A. There was no assessment done by the
2  clinical staff based on the documentation.
3  BY MR. GAHNZ:
4  Q. Okay. So when you write her clinical
5  assessment, what you really meant was the guards
6  didn't see anything that gave them pause?
7  A. Yes. There was no medical distress,
8  signs of withdrawal or active suicidal ideation.
9  Q. Ms. Freiwald was ordered to have blood
10  pressure checks that were done; correct?
11  A. Yes.
12  Q. And those were suppose to be done for
13  the first three days that she was there?
14  A. Yes.
15  Q. Those were not done; correct?
16  MS. SCHNEIDER: Object to the form.
17  A. I don't believe so.
18  BY MR. GAHNZ:
19  Q. That would have given clinical staff the
20  opportunity to actually do an assessment; correct?
21  A. I would believe so. Yes.
22  Q. Under .3 you write "What is clear is
23  that the mental health outpatient therapy for
24  Ms. Freiwald only worked when there are no
25  significant triggers in her life."

98

1  What did you mean by that?
2  A. So the months between the February
3  incident and the jail, even though she was getting
4  outpatient therapy, there were no significant
5  trigger events like going through a divorce or
6  personal relationship, loss of a job, or like what
7  ended up happening in this situation where she's
8  incarcerated and her length or perception of her
9  length of stay was different than what her
10  expectation was. So there was no significant
11  trigger in those months to really say that this
12  therapy was working.
13  And not to minimize what happened here,
14  but for someone to go into the jail thinking they
15  will be there for a day but then having to be
16  there for 30 days, and will be going in and
17  outside of the jail, for them to not have a coping
18  mechanism and then to jump in front of a vehicle
19  while she is unsupervised, I think that it clearly
20  shows that outpatient mental health treatment
21  didn't give her the skillsets to obviously cope
22  with this type of situation.
23  Even though for most people when they're
24  going to commit suicide, the real risk factor is
25  they get 10 years, 20 years, 30 years, life

99

1  sentences. That's typically what we see in this
2  type of situation. For such a short period of
3  incarceration, it seems like her coping mechanisms
4  were extremely poor.
5  Q. Okay. What is your understanding of the
6  therapy that she was receiving between February
7  and October of 2016?
8  A. I think it was those medications. So it
9  would be these outpatient medications.
10  Q. Was she getting any other therapy?
11  A. And then talking with somebody, with the
12  licensed mental health person.
13  Q. And really my specific question is what
14  was the role of the Dawn Vardia in the time period
15  between February of '16 and October of '16?
16  MS. SCHNEIDER: Object to the form as to
17  the word role. But go ahead if you understand.
18  BY MR. GAHNZ:
19  Q. Let me rephrase the question. That's
20  fine.
21  What treatment was Dawn Vardia providing
22  to Ms. Freiwald between February of '16 and
23  October of '16?
24  A. Counseling.
25  Q. For what?

100

1  A. For her mental health conditions.
2  Q. Do you recall any of the specifics of
3  that?
4  A. I'd have to go through it. But it was
5  really with her PTSD, her depression. And her
6  anxiety was related to those conditions.
7  Q. And do you recall whether or not
8  Ms. Vardia was providing behavioral therapy
9  related to the PTSD issues?
10  A. I believe she was.
11  Q. Do you recall that Ms. Vardia was having
12  Ms. Freiwald relive sexual abuse by her father
13  during that time frame?
14  A. I believe that was in the medical
15  records.
16  Q. Did you read Dawn Vardia's notes as it
17  related to how Ms. Freiwald reacted to the
18  behavior therapy involving the sexual abuse by her
19  father?
20  A. I don't remember the reaction. I just
21  remember reading all of the prior history of what
22  caused the PTSD.
23  Q. Would that in your opinion be a
24  significant trigger in somebody's life to go
25  through and to confront the sexual abuse by one's

101

father?

MS. SCHNEIDER: Object to the form.

A. Again, in this situation I think the trigger, and its pretty clear based on the records and everything else, it was her being incarcerated and actually having a different expectation of her incarceration that created this incident where she became impulsive and tried to harm herself.

BY MR. GAHNZ:

Q. I understand we're talking about after October 27th. I'm talking about during the time frame when she was out. Is confronting sexual abuse by one's father a significant trigger in somebody's life?

MS. SCHNEIDER: Object to the form.

A. It's in a very controlled setting with the outpatient mental health clinician. So I would think it's actually safer in that venue with somebody she has developed a relationship, knows and trust. So I think it's a safe environment. If a regular person was to bring that out, it could have been a much -- it could have been a life trigger.

BY MR. GAHNZ:

Q. At page 5 you wrote her prescription of

102

Clonazepam, which in her case caused a serious suicide attempt. Is it your understanding -- is it your testimony that the fact that she was on Clonazepam caused a serious suicide attempt?

MS. SCHNEIDER: Misstates his earlier testimony.

BY MR. GAHNZ:

Q. That's why I'm asking.

A. My thing basically states that she overdosed on 90 pills of Clonazepam. She used what was available to her to try and harm herself. And so that is the pills that she used. It wasn't the Clonazepam that -- because it doesn't look like it was the Clonazepam as much as a method to try to harm herself.

Q. I just wanted to make sure the sentence -- that I was understanding the sentence correctly. What you're meaning by this statement her prescription of Clonazepam, which in her case caused a serious suicide attempt is that the Clonazepam was the methodology by which she attempted to suicide?

A. Yes.

Q. Not that because she was on Clonazepam she became suicidal?

103

A. That is correct.

Q. Okay. In medical terms when somebody uses the phrase "classic signs" is that a term of art for medication in medicine?

MS. SCHNEIDER: Object to the form.

A. Yeah. I've heard the term before.

BY MR. GAHNZ:

Q. What does it mean?

A. That certain, let's say, symptoms would be classic. So a good example would be classic signs of a flu is fever, body aches, cough.

Q. And that means that it's across the population of people that have the flu, classic signs would be fever, etc.?

A. Yes.

Q. It's not -- okay. I think you had stated this earlier but I just want to see if you agree with this that benzodiazepine withdrawal develops within a few days of stopping benzodiazepines?

A. Typically the peak of symptoms are 48 to 72 hours.

Q. Would you agree that the most prominent symptom of benzodiazepine withdrawal is rebound anxiety?

104

MS. SCHNEIDER: Objection. Asked and answer.

A. The most prominent is elevated heart rate, blood pressure, sweating, tremors, and then obviously anxiety as part of that.

BY MR. GAHNZ:

Q. Would you agree that the CIWA-B states the constellation of symptoms that one could expect from benzodiazepine withdrawal?

A. Yes.

Q. Is it important to know how long somebody has been on benzodiazepine when making a determination as to whether or not to continue the prescription?

MS. SCHNEIDER: Object to the form. Vague and overly broad.

A. So the duration of the benzodiazepine is important to know if withdrawal symptoms are going to happen to begin with and how severe.

BY MR. GAHNZ:

Q. And are there categories? You know, so is there a difference if somebody has been on it for a week, versus six months, versus six years, is it categorized in terms of the level of dependence that somebody is going to have?

105

27

1  A.  So typically the longer the person is on
2  it, the more tolerant they are to it and more
3  dependent they are.  So the withdrawal will
4  sometimes happen on a more sooner basis than on a
5  latter basis.
6  **Q.  Okay.  If somebody is thought to be a**
7  **suicide risk, whose responsibility of Brown County**
8  **was it to refer them for further follow-up?**
9  **MS. SCHNEIDER:  Object to the form.**
10  **MR. MCGAVER:  Join.**
11  **MR. ROTH:  Join.**
12  A.  I believe Brown County had -- again,
13  I can't speak on Brown County's mental health
14  policies because I haven't reviewed the contract.
15  **BY MR. GAHNZ:**
16  **Q.  Did Dr. Fatoki have any responsibility**
17  **with respect to the inmates at Brown County to**
18  **review the suicide screening form to determine**
19  **whether or not they were a suicide risk?**
20  **MS. SCHNEIDER:  Object to the form.**
21  **Incomplete hypothetical.**
22  A.  I don't believe he was -- I believe his
23  primary focus was on the medical side and not on
24  the mental health side unless it went into the
25  medical.

106

1  **BY MR. GAHNZ:**
2  **Q.  Okay.  Do you know whether or not**
3  **Ms. Freiwald was exhibiting any respiratory issues**
4  **while she was incarcerated at Brown County?**
5  A.  I don't believe she was in any
6  respiratory distress.
7  **Q.  Same question with respect to the time**
8  **frame between February of 2016 and October of**
9  **2016, do you know, was there any evidence that you**
10  **saw in any of the medical records that she was**
11  **having any respiratory issues?**
12  A.  So I don't believe she was having any
13  respiratory issues.  I don't remember if she
14  hyperventilated, if you're considering that
15  respiratory issues.
16  **Q.  We've talked about previous suicides**
17  **being a predictor of future suicide?**
18  A.  Yes.
19  **Q.  Is there a time frame that a medical**
20  **professional is concerned about in terms of the**
21  **recency of the prior attempt?**
22  A.  So the Columbia Suicide Severity Scale
23  has a time frame on it.  I think within the past
24  month is very, very significant where it triggers
25  it.  But I think it says within three months, and

107

1  then I think lifetime.  But I think it's within
2  just a few months.
3  **Q.  So it's most severe within a month?**
4  A.  Well, based on that tool.
5  **Q.  What is that called again?**
6  A.  The Columbia Suicide Severity Scale.
7  And that's a clinically validated tool that a lot
8  of jurisdictions use for suicide screening.
9  **Q.  Do you know whether or not that Columbia**
10  **Suicide Severity Scale was used by CCS in Brown**
11  **County?**
12  A.  I don't believe so.
13  **Q.  Do you know what scale they used to**
14  **determine whether somebody was a suicide risk or**
15  **not?**
16  A.  I think it was -- again, I think it's
17  the suicide screening questionnaire.
18  **Q.  Okay.  Do you agree that a person in**
19  **Ms. Freiwald's situation was in more danger --**
20  **strike that question.**
21  **The monitoring that you were talking**
22  **about if somebody is taken off of benzodiazepine**
23  **abruptly, is that normally done in an inpatient**
24  **setting?**
25  **MS. SCHNEIDER:  Object to the form.**

108

1  Vague.
2  A.  So it's done where there is people that
3  can observe the patient's appearance, behavior,
4  and can communicate with the patient.
5  **BY MR. GAHNZ:**
6  **Q.  And so in the community, for instance,**
7  **if you're to stop somebody from -- as a prescriber**
8  **if a patient comes to you and they're on**
9  **benzodiazepine, you're not going to stop them**
10  **abruptly because they go home and there's nobody**
11  **to watch them and monitor them; correct?**
12  A.  So in that type of situation there's
13  nobody to monitor or watch, typically you would
14  just prescribe them a taper, you would not admit
15  them to monitor.
16  **Q.  And in the clinical setting people are**
17  **physically trained to look for benzodiazepine**
18  **withdrawal symptoms; correct?**
19  A.  Again, it's similar to alcohol
20  withdrawals.  So it would be the same picture.
21  **Q.  Going back to your report the timeline,**
22  **you indicated that you reviewed a couple of**
23  **medical request slips from Ms. Freiwald on the**
24  **28th that she had provided on the 28th and 29th;**
25  **correct?**

109

28

110

```
1      A.   Yes.
2      Q.   Was she requesting health services at
3   that point?
4      A.   She was requesting I believe the
5   medications.
6      Q.   Was she describing symptoms that -- was
7   she describing clinical symptoms in either of
8   those requests?
9      A.   Yes.
10     Q.   Do you know whether or not there was any
11  face-to-face encounters as a result of those two
12  requests by any nurse from CCS?
13     A.   I know it's stated that the nurse
14  responded to the inmate request form.  But I don't
15  know if it was face-to-face.
16     Q.   In looking at the NCCHC standards, did
17  you review the J-G-02 standard which has been
18  previously marked as Exhibit 227?
19     A.   Yes.  I am aware of this standard.
20     Q.   Did Ms. Freiwald meet the definition of
21  a patient with special needs pursuant to this
22  standard?
23     A.   No.
24     Q.   So if you look at page 2, which is she
25  had a depressive disorder; is that correct?
```

112

```
1   special needs; correct?
2         MS. SCHNEIDER:  Object to the form.
3   It's been asked and answered.
4      A.   Again, from what I'm looking at from
5   this special health needs it says individualized
6   treatment plan.  It's basically based on
7   Dr. Fatoki's assessment.  So, yes if you want to
8   go with this very broad definition and treatment
9   plan, I would say that it would technically meet
10  this.  But it's not for the purposes of the actual
11  depression and everything else.  There is a
12  treatment plan, so it was actually done.  But I
13  wouldn't consider this like a special needs case.
14        MR. GAHNZ:  That's all the questions
15  that I have.
16        MR. MCGAVER:  I have no questions.
17        MS. SCHNEIDER:  Andy, do you have any
18  questions?
19        MR. ROTH:  Not for me.  Thanks.
20            EXAMINATION
21  BY MS. SCHNEIDER:
22     Q.   I just have a couple of clarification
23  questions.
24        Doctor, you were asked earlier about
25  whether or not there's the risk of
```

111

```
1      A.   Yes.
2      Q.   She had tried to self-injure?
3      A.   Yes.
4      Q.   And she had post-traumatic stress
5   disorder?
6      A.   Yes.
7      Q.   She also had a recent hospitalization;
8   is that correct?
9      A.   Yes.
10        MS. SCHNEIDER:  Object to the form.
11  BY MR. GAHNZ:
12     Q.   I'm sorry?
13     A.   Yes.
14     Q.   These are all indicative of a patient
15  with special needs; correct?
16        MS. SCHNEIDER:  Object to the form.
17  BY MR. GAHNZ:
18     Q.   According to the standard?
19     A.   So based on this, I would say she's
20  prescribed an anti-depressant by Dr. Fatoki.  And
21  so as a result the depression is essentially
22  treated.
23     Q.   I appreciate that.  My question was a
24  little bit different.  Based on this standard
25  Ms. Freiwald met the definition of a patient with
```

113

```
1   life-threatening withdrawal with abruptly stopping
2   benzodiazepine.  Do you recall that?
3      A.   Yes.
4      Q.   And that varies depending on dosage and
5   how long someone is on the medication?
6      A.   Yes.
7      Q.   And in Ruth Freiwald's case, she did not
8   develop any life-threatening withdrawal symptoms;
9   is that your testimony?
10     A.   Yes.
11     Q.   You were asked a little bit about the
12  receiving screening and the CCS policy.  You were
13  not provided with the receiving screening policy;
14  is that correct?
15     A.   Not prior to today.
16     Q.   And in terms of rendering any opinions
17  on that, you would want to see the policy before
18  you gave an opinion in that regard?
19     A.   Yes.
20     Q.   And you just haven't been asked to look
21  at that aspect of the case; fair?
22     A.   That is correct.
23     Q.   And then you were asked a little bit
24  about the as-needed dosage of the Clonazepam.  Do
25  you recall that?
```

1    A.  Yes.
2        Q.  You weren't indicating that Ms. Freiwald
3    was taking three to four milligrams of Clonazepam
4    a day; is that correct?
5        A.  No.  It was basically she's prescribed
6    one milligram a day with 0.5 milligrams as needed.
7    So you could get up to that dosage if she took it
8    multiple times a day.
9        Q.  Your understanding was that she was
10   taking one to one and-a-half milligrams a day?
11       A.  Yes.
12           MS. SCHNEIDER:  That is all I have.
13               FURTHER EXAMINATION
14   BY MR. GAHNZ:
15       Q.  Doctor, I want to show you what's been
16   previously marked as Exhibit 228.  That's the
17   NCCHC standards for receiving screening; correct?
18       A.  Yes.
19       Q.  You have reviewed that document as part
20   of your work in this case; correct?
21       A.  Yes.
22       Q.  This document at .6, do you see that?
23       A.  Yes.
24       Q.  It says that "The receiving screening
25   form is approved by the responsible health

114

1    authority and inquires as to the inmate's," and
2    then it list a whole series of things; correct?
3        A.  Yes.
4        Q.  So Exhibit 5 which we went through is,
5    in fact, the receiving screening form that was
6    created for Brown County; correct?
7        A.  Yes.
8            MR. ROTH:  Object to foundation and to
9    the form.
10           MS. SCHNEIDER:  Join.
11   BY MR. GAHNZ:
12       Q.  It's your understanding that this
13   receiving screening form, Exhibit 5, was created
14   in an effort to comply with the standard set forth
15   in Exhibit 228?
16           MS. SCHNEIDER:  Form.
17           MR. ROTH:  Objection.  Foundation.
18   Calls for the witness to speculate.
19           MS. SCHNEIDER:  Join.
20       A.  So I cannot answer that question because
21   I don't know the reason, if that was directly
22   related to the standard.
23   BY MR. GAHNZ:
24       Q.  Okay.  It does, however, state at the
25   top that this is the receiving screening form on

115

1    Exhibit 5?
2        A.  That is what it says.
3            MR. GAHNZ:  That's all.
4            MS. SCHNEIDER:  We're done.
5            (The deposition concluded at 11:05 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

116

1            Declaration Under Penalty of Perjury
2
3        I, ALFRED JOSHUA, M.D., the witness herein,
4    declare under penalty of perjury that I have read
5    the foregoing in its entirety; and that the
6    testimony contained therein, as corrected by me,
7    is a true and accurate transcription of my
8    testimony elicited at said time and place.
9
10       Executed this_____day of _____20__, at
11   _____,_____.
12   (city)            (state)
13
14
15
16           _____
16           ALFRED JOSHUA, M.D.
17
18
19
20
21
22
23
24
25

117

```
1          I, BOBBIE HIBBLER, Certified Shorthand Reporter,
2    in and for the State of California, Certificate No. 12475,
3    do hereby certify as follows:
4          That the witness in the foregoing deposition was
5    by me first duly sworn to testify to the truth, the whole
6    truth and nothing but the truth in the foregoing cause;
7    that the deposition was then reported by me in shorthand
8    and transcribed, through computer-aided transcription,
9    under my direction; and that the above and foregoing
10   deposition transcript is a true and accurate record of the
11   witness' testimony elicited and proceedings had at said
12   deposition.
13          Further, that if the foregoing pertains to
14   the original transcript of deposiiion in a Federal
15   case, before completion of the proceedings, review of
16   the transcript [ ] was [x] was not requested.
17   I do further certify I am neither financially
18   interested in the action nor a relative or employee of
19   any attorney or party to this action.
20          In witness whereof, I have hereunto set my hand
21   this _____ day of _____, _____.
22
23
24          _____
            BOBBIE HIBBLER, CSR No. 12475
25
```

118