UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
-----------------------------------------------------

ESTATE OF RUTH FREIWALD, by personal
representative, CHARLES FREIWALD,
NATHAN RANDALL FETT, MELES LEE TEKLAY
FETT, ZAFU ANN TEKLAY FETT, KALKIDAN
MARIE SOLOMON FETT, MATTHEW JOHN FETT,
SEYAYE ELLEN TEKLAY FETT, NATINAEL
EARL SOLOMON FETT, BRANDON CHARLES FETT,

        Plaintiffs,

   and

DEAN HEALTH PLAN, INC.,
PROGRESSIVE CASUALTY INSURANCE COMPANY,

        Involuntary Plaintiffs,

  -vs-           Case No. 18-CV-896

ADEYEMI FATOKI, M.D.; D. PETERS;
JESSICA JONES, R.N.; EMILY BLOZINSKI,
L.P.N.; CORRECT CARE SOLUTIONS, LLC;
JOHN R. GOSSAGE, BROWN COUNTY,

        Defendants.
-----------------------------------------------------

        Video Examination of THOMAS D.

FOWLKES, M.D., taken at the instance of the

Plaintiffs, under and pursuant to the Federal

Rules of Civil Procedure, before Sarah A. Hart,

RPR, RMR, CRR, and Notary Public in and for the

State of Wisconsin, at Gutglass, Erickson,

Larson, & Schneider, S.C., 735 North Water

Street, Suite 1400, Milwaukee, Wisconsin, on

January 22, 2019, commencing at 9:38 a.m. and

concluding at 3:42 p.m.

EXHIBIT
**58**

Page 2

```
 1            A P P E A R A N C E S
 2
   LAWTON & CATES, S.C., by
 3   MR. DIXON GAHNZ
     345 West Washington Avenue, Suite 201
 4   P.O. Box 2965
     Madison, Wisconsin  53701
 5   appeared on behalf of Plaintiffs.
 6
   GUTGLASS, ERICKSON, LARSON, & SCHNEIDER, S.C., by
 7   MS. MARIA K. SCHNEIDER
     735 North Water Street, Suite 1400
 8   Milwaukee, Wisconsin  53202
     appeared on behalf of Defendant
 9   Adeyemi Fatoki, M.D.
10
   HEYL, ROYSTER, VOELKER & ALLEN, P.C., by
11   MR. SCOTT G. SALEMI
     120 West State Street, 2nd Floor
12   Rockford, Illinois  61101
     appeared on behalf of Defendants
13   Correct Care Solutions, LLC, Emily J.
     Blozinski, L.P.N., and Jessica Jones, R.N.
14
15   CRIVELLO CARLSON, S.C., by
     MS. AMY J. DOYLE
16   710 North Plankinton Avenue, Suite 500
     Milwaukee, Wisconsin  53203
17   appeared on behalf of Defendants
     D. Peters, John R. Gossage, and Brown County.
18
19            * * * * *
20            A L S O   P R E S E N T
21   Ms. Stephanie Olson, videographer
22   Mr. Stuart Langdon, by telephone
23
24
25
```

Page 3

```
 1                * * * * *
 2                I N D E X
 3   Examination By:                            Page
 4   By Mr. Gahnz ...................................5
     By Ms. Schneider .............................236
 5
 6   Exhibits Identified:                       Page
 7   Exhibit 203 - Binder of materials belonging to   6
                   Dr. Fowlkes
 8   Exhibit 204 - Report prepared by Dr. Fowlkes    63
     Exhibit 205 - Supplemental report prepared by   63
 9                 Dr. Fowlkes
     Exhibit 206 - CIWA Assessment Scale for        111
10                 Benzodiazepines
     Exhibit 207 - PowerPoint presentation -        147
11                 "Benzodiazepines: An Update"
     Exhibit 208 - Article - "Prescribing and       160
12                 Tapering Benzodiazepines"
     Exhibit 209 - Affidavit of Dr. Thomas Fowlkes  183
13
14   Previously Marked Exhibits:                Page
15   Exhibit 46 - ...............................220
     Exhibit 61 - ...............................206
16   Exhibit 66 - ...............................221
17
18
19
20   Disposition of Original Exhibits:
21   Exhibits 204 through 209, copy of Exhibit 203
     Attached to Original Transcript.
22
     Original Exhibit 203 was retained by Attorney
23   Schneider.
24
25
```

Page 4

```
 1        TRANSCRIPT OF PROCEEDINGS
 2          (Exhibit No. 203 was marked.)
 3        THE VIDEOGRAPHER:  We are officially
 4   on the record at 9:38 a.m.  Today's date is
 5   January 22nd, 2020.  This is disc number one of
 6   the deposition of Dr. Thomas Fowlkes.
 7        This deposition is being taken in
 8   the matter of the Estate of Ruth Freiwald
 9   versus Fatoki, M.D.  This matter is pending in
10   the United States District Court in the Eastern
11   District of Wisconsin and is case number
12   18-CV-896.
13        This deposition is taking place at
14   Gutglass, Erickson, Larson & Schneider, S.C.,
15   located at 735 Water Street, Suite 1400,
16   Milwaukee, Wisconsin, 53214.
17        My name is Stephanie Olson,
18   videographer.  The court reporter is Sarah
19   Hart.  Will counsel please state their
20   appearances and whom they represent, beginning
21   with plaintiffs' counsel, and then the reporter
22   will swear in the witness.
23        MR. GAHNZ:  Good morning.  Dixon
24   Gahnz on behalf of the plaintiffs.
25        MS. SCHNEIDER:  Attorney Maria
```

Page 5

```
 1   Schneider on behalf of Dr. Fatoki.
 2        MR. SALEMI:  Scott Salemi.  I
 3   represent defendants, Nurse Blozinski and Jones
 4   and Correct Care Solutions.
 5        MS. DOYLE:  Attorney Amy Doyle on
 6   behalf of Brown County, Sheriff Gossage, and
 7   Officer Peters.
 8        THOMAS D. FOWLKES, M.D., called as a
 9   witness herein, having been first duly sworn on
10   oath, was examined and testified as follows:
11              EXAMINATION
12   BY MR. GAHNZ:
13   Q   Good morning, Doctor.  My name is Dixon Gahnz.
14   We met briefly off the record.  I represent --
15   one of the attorneys representing the
16   plaintiffs in this matter.
17        You've been through this process
18   before; is that correct?
19   A   I have.
20   Q   The only thing that I'll remind you of is if
21   you don't understand a question that I've
22   asked, please ask me to rephrase it, repeat it,
23   and only answer those questions you understand.
24   Fair enough?
25   A   I'll do.
```

Page 6

1  Q   All right.  Prior to going on the record, you
2      handed me two binders of materials; is that
3      correct?
4  A   That is correct.
5  Q   And these are the materials that you've brought
6      with you from your file today?
7  A   That's correct.
8  Q   This is not your entire file, correct?
9  A   That's correct -- it's not all the documents I
10     was provided.
11 Q   Okay.  So why did you choose to bring the two
12     binders?
13 A   They were items which I either felt I might
14     need to refer to today or in the case of some
15     of the expert reports that I hadn't read prior
16     to getting on the airplane so I wanted to be
17     able to read them.
18 Q   Okay.  All right.
19          So we've marked one of the binders
20     as Exhibit 203, and I just want to go through
21     briefly with you what's in that.  And then I'm
22     going to give it back to you, okay?
23          There's a -- a handwritten billing
24     statement, correct?
25 A   That's correct.

Page 7

1  Q   And is this up to date?
2  A   It is up to date as of the submission of my
3      supplemental report in the last couple of
4      weeks.
5  Q   All right.  There's the notice of deposition?
6  A   That's correct.
7  Q   There is a calendar for October and November of
8      '16; is that correct?
9  A   That's correct.
10 Q   Your Rule 26 report?
11 A   That's correct.
12 Q   Your supplemental report?
13 A   That's correct.
14 Q   You've got it marked as complaint, but it's the
15     second amended complaint?
16 A   That's right.  The operative complaint to my
17     understanding.
18 Q   CCS records?
19 A   That's correct.
20 Q   Other records which would include the Huber
21     preregistration, the Brown County Nicolet
22     discharge summary?
23 A   That's correct.
24 Q   The next item that you've got in this binder is
25     marked Policies and Procedures.  And within

Page 8

1      that you've got several CCS procedures,
2      correct?
3  A   I'll take your word for it.  I believe I have
4      maybe two policies in there, two --
5  Q   All right.  You have the Medication
6      Verification Policy which starts with CCS59,
7      and you also have the No Missed Medication
8      Policy; is that correct?
9  A   That's correct.
10 Q   All right.  Then the next thing is you've got
11     the references.  Are these the articles that
12     are cited to in your report?
13 A   That's correct.
14 Q   All right.  And there are six articles that you
15     cited, and there's complete copies of those in
16     the -- in the file --
17 A   That's correct.
18 Q   -- in this binder?  All right.
19          The second binder I did not mark
20     because it's things that everybody should have,
21     but if you want it marked, we'll go ahead.
22          So the first item that you've got is
23     the plaintiff expert reports, which includes
24     Dr. Greist and Dr. Greist's supplemental,
25     correct?

Page 9

1  A   Correct.
2  Q   Mr. Stanley and Mr. Stanley's supplemental?
3  A   Correct.
4  Q   Nurse Ward and Nurse Ward's supplemental?
5  A   Correct.
6  Q   All right.  Then the next set of documents
7      are -- is noted Other Defense Experts, which
8      you have a report of Dr. Joshua, Dr. Daniel,
9      Nurse Pearson; is that correct?
10 A   That's correct.
11 Q   And then you have a tab noted Co. Defense
12     Experts.
13 A   I --
14 Q   And then --
15 A   I believe that's short for County.
16 Q   I'm sorry.
17 A   County Defense Experts.
18 Q   Fair enough.
19          And then under that tab you have
20     Hayes, Carter, and Robbins; is that correct?
21 A   That's correct.
22 Q   And within the -- did you also include the
23     supplemental reports of each of these witnesses
24     if there is a supplemental?
25 A   I will tell you that to the best of my

Page 10

1    knowledge, no -- or to the best of my
2    knowledge, there was only one report of each
3    one of them.
4  Q   Okay.
5  A   I can't tell you with 100 percent certainty was
6    that the supplemental -- I believe it was the
7    original report, so I believe I do not have
8    supplementals.
9  Q   All right.
10 A   I can spend time trying to make certain that
11   it's not the supplementals if you would like.
12 Q   No.  We have things to do.
13 A   Okay.
14 Q   All right.  What did you do to prepare for your
15   testimony today?
16 A   In general, I reviewed these documents that I
17   have with me and the other documents that were
18   produced to me in discovery.
19 Q   Anything else?
20 A   I traveled here and met with Attorney Schneider
21   yesterday afternoon.
22 Q   Did you meet with anybody else?
23 A   No.
24 Q   Did you do any independent research?
25 A   Well, the -- well, of course, yes, I reviewed

Page 11

1    those documents that I had disclosed in my
2    report.
3  Q   Okay.  Anything else?
4  A   No.  I mean, I don't know -- I don't exactly
5    know what you mean.  I reviewed the documents
6    that -- the expert disclosure, the documents
7    that were in there, and that included some
8    things such as review -- I've reviewed the
9    NCCHC Guidelines for Jail Standards.
10 Q   Okay.
11 A   And any -- and potentially articles that were
12   disclosed by other experts.
13 Q   And these are things that you did in
14   preparation for your testimony today?
15 A   Well, I prepared a supplemental report a couple
16   of weeks ago, so some of that preparation was
17   done during that time.
18 Q   All right.  So which particular NCCHC -- NCCHC
19   standards did you review?
20 A   The entire policy or specifically any that were
21   addressed in any of the experts' reports.
22 Q   And why did you do that?
23 A   Because the other experts mentioned them.
24 Q   Did you review any medical records other than
25   what's contained in Exhibit 203?

Page 12

1  A   Is your question specifically in preparation
2    for this deposition or in my entire work in
3    this case?
4  Q   I'm just dealing right now with your work in
5    this case -- or your deposition preparation.
6  A   No.
7  Q   Okay.  Did you look at any jail records?
8  A   No.
9           MS. SCHNEIDER:  For all of these
10   questions, Dixon, you're just talking about
11   depo prep?
12 BY MR. GAHNZ:
13 Q   Everything is -- the umbrella is what did you
14   do in preparation for your deposition today.
15   Do you understand that?
16 A   Not exactly.
17 Q   Okay.  What part of that don't you understand?
18 A   Well, for instance, I prepared a supplemental
19   report approximately two weeks ago.
20 Q   Okay.
21 A   So in preparing that report I reviewed jail
22   records, I reviewed jail policies and
23   procedures, I reviewed medical records,
24   research of the other plaintiffs' experts.  So
25   that was all done two weeks ago.  I would

Page 13

1    consider that in preparation for this
2    deposition for today because I remember it.
3  Q   Okay.
4  A   But now, as far as yesterday did I review
5    any -- or, you know, in the last two days have
6    I reviewed any policies -- other policies and
7    procedures, no.
8           So I don't understand what you mean
9    by "in preparation for this deposition today."
10   I mean, I did -- I did a good bit of work
11   preparing my Rule 26 report, preparing my
12   supplemental report.  All of those have
13   prepared me for my deposition today.
14 Q   Have you listed in your supplemental report all
15   of the items that you reviewed?
16 A   Yes.
17 Q   Other than the literature that was contained in
18   Exhibit 203 and the articles that you may have
19   read referenced by other experts, did you do
20   any additional literature review?
21 A   No.
22 Q   Did you discuss any of the issues in this case
23   with any of the other experts?
24 A   No.
25 Q   At any time?

Case 1:18-cv-00896-WCG   Filed 03/04/20   Page 4 of 61   Document 109-18

Page 14

1  A   No.
2  Q   Did you meet or discuss any of the issues in
3      this case with any other colleagues?
4  A   No.
5  Q   As part of your materials you have your resumé;
6      is that correct?
7  A   **It is attached to my Rule 26 report, yes.**
8  Q   Do you want to pull that up?
9  A   **I have it.**
10 Q   And my copy is marked "Last updated May 22,
11     2019."
12         Is that the most up-to-date version?
13 A   **No. The one that was attached to my Rule 26**
14     **report and which is also my current one was**
15     **updated October the 8th, 2019.**
16 Q   All right. Do you have a resumé that you post
17     online?
18 A   **I believe that my CV is available on my**
19     **website, yes.**
20 Q   All right. And if somebody is to copy that
21     from the online, is it going to say "Expert,
22     not retained"?
23 A   **I wouldn't doubt that it would.**
24 Q   Okay. And then after you've been hired, then
25     you take that watermark off and you provide

Page 15

1      that resumé to other folks?
2  A   **Well, so, for instance, when it's attached to a**
3      **Rule 26 report, it doesn't have a watermark,**
4      **yes, that's correct.**
5  Q   All right. So how come it -- what difference
6      does it make whether or not you've been
7      retained or not if one wants to look at your
8      CV?
9  A   **Well, so I wouldn't want for someone to**
10     **download my CV and say, you know, I expect this**
11     **expert is going to say this when I haven't**
12     **even -- I didn't provided it to them. So the**
13     **public can download a document off of my**
14     **website. I don't want people to misuse it and**
15     **indicate that they have retained me if they**
16     **have not.**
17 Q   All right. So with respect to the resumé that
18     was attached to the Rule 26 report, other than
19     the watermark are there any differences between
20     the May 22nd and the October 2019? Did you
21     update it?
22 A   **I did update it. I don't recall if there are**
23     **any differences. If you would like me to**
24     **compare, I would be glad to.**
25 Q   No, that's all right. I think we can work off

Page 16

1      of this.
2          So let's -- the summary of your
3      qualifications it indicates that you're a
4      seasoned physician. What do you mean by a
5      seasoned physician?
6  A   **I have been practicing for over 20 years, and I**
7      **have begun to develop some gray hair.**
8  Q   It indicates that you are board-certified in
9      emergency medicine and addiction medicine; is
10     that correct?
11 A   **That is correct.**
12 Q   When was the last time that you updated those
13     certifications?
14 A   **For the emergency medicine I believe it was**
15     **2010. And for addiction medicine -- I'm sorry,**
16     **for addiction medicine I believe it was 2010,**
17     **and for emergency medicine 2013, I believe.**
18 Q   Okay. Where are you licensed to practice
19     medicine?
20 A   **The state of Mississippi.**
21 Q   Anywhere else?
22 A   **Not at this time.**
23 Q   Have you had your license limited in any way by
24     the state of Mississippi?
25 A   **No.**

Page 17

1  Q   Have you had -- do you have hospital privileges
2      anywhere?
3  A   **No.**
4  Q   Have you ever?
5  A   **Well, in general, emergency physicians don't**
6      **have hospital privileges in the typical sense,**
7      **in other words, admitting privileges.**
8      **Emergency physicians typically work in an**
9      **emergency room and have privileges for that,**
10     **yes.**
11 Q   Okay. And are you currently working in any
12     emergency rooms?
13 A   **Not at this time.**
14 Q   When is the last time you worked in an
15     emergency room?
16 A   **It has been approximately ten or more -- ten**
17     **years or so before -- since I've worked in an**
18     **emergency department. I've worked in urgent**
19     **cares since that time.**
20 Q   When was the last urgent care you worked at?
21 A   **I owned an urgent care for -- just a minute. I**
22     **owned a primary care and urgent care clinic**
23     **from 2009 through 2017, and presently I own a**
24     **different urgent care. So I own an urgent care**
25     **now.**

Page 18

1  Q   Where are these located?
2  A   **Oxford, Mississippi, and Cleveland,**
3      **Mississippi.**
4  Q   Why did you stop -- what happened to the urgent
5      care center that you owned between 2009 and
6      2017?
7  A   **I turned it over to the nurse -- to nurse**
8      **practitioners who were working with me there.**
9  Q   And when did you open the new urgent care
10     center?
11 A   **2019.**
12 Q   How come?
13 A   **Because that town needed an urgent care center,**
14     **and I was approached and I'm one of the**
15     **co-owners of it.**
16 Q   The next paragraph starts with "Accomplished
17     expert witness with more than ten years'
18     experience at both deposition and trial in
19     state and federal courts."
20         How many cases have you testified in
21     court on?
22 A   **My -- my federal case list is attached, so...**
23 Q   Okay. But the question was, how many times
24     have you testified in court?
25 A   **In my career?**

Page 19

1  Q   As an expert witness.
2  A   **But -- for all years. Countless. I can't tell**
3      **you.**
4  Q   Okay.
5  A   **But most of them were not -- not as a paid**
6      **expert witness. Most of them were for other**
7      **purposes. As an expert witness, but...**
8  Q   As a retained expert how many times have you
9      testified at trial?
10 A   **I can't give you an exact number, but I would**
11     **say between five and ten probably.**
12 Q   It indicates -- you indicate that you're an
13     accomplished expert witness.
14         What does that mean?
15 A   **I take my work seriously and I have been**
16     **retained in a number of cases.**
17 Q   Okay. I mean, have you been recognized by any
18     agency, any accrediting body, any awards as
19     having the specific distinction as an expert?
20 A   **Not that I'm aware of.**
21 Q   All right. You list your areas of expertise;
22     is that right?
23 A   **That's correct.**
24 Q   And does this -- I have correctional health
25     care, deaths in custody, drug abuse and effects

Page 20

1      of addiction, drug testing interpretation and
2      effects of substances, urgent care, and
3      emergency medicine. Is that list that you
4      provided accurate today?
5  A   **It is.**
6  Q   Okay.
7  A   **I mean, those are not necessarily all my areas**
8      **of expertise, but...**
9  Q   Well, how come you left certain areas off your
10     resumé?
11 A   **Because I don't -- in other words, this is the**
12     **kind -- this is the type of work -- type of**
13     **cases that I take.**
14 Q   Do you take type -- other types of work that
15     aren't listed on the --
16 A   **No. That's what I'm saying. I limit my expert**
17     **witness work to this.**
18 Q   Okay.
19 A   **I was saying I may have expertise in other**
20     **areas, but I don't hold myself out as an**
21     **expert. I'm not looking for those type of**
22     **cases.**
23 Q   Okay. It indicates that you're a certified
24     correctional health care professional. And
25     that certification was July 17th to June --

Page 21

1      July of '17 to June of 2020.
2          What is a certified correctional
3      health care professional?
4  A   **I would point out that it also has a dash**
5      **physician. So there -- which is different.**
6      **Certified correctional health care professional**
7      **is a level of certification that is issued by**
8      **the National Commission On Correctional**
9      **Healthcare. And one can demonstrate knowledge**
10     **in and experience with the standards -- NCCHC**
11     **standards there and can take a test and can**
12     **become a certified correctional health care**
13     **professional, in other words, demonstrating**
14     **knowledge and expertise on those standards.**
15 Q   Okay.
16 A   **You can become just a plain -- a CCHP without**
17     **any dash, or you can take advanced-level**
18     **certifications which have additional knowledge**
19     **requirements. And so the physician one is the**
20     **one that is the most advanced for physicians to**
21     **take. So it would be in addition to the**
22     **standards knowledge of treating conditions that**
23     **are common in a jail setting, mental health,**
24     **infectious disease, public health, those type**
25     **of things.**

Page 22

1 Q  Okay.
2 A  There -- it's the closest thing that there is
3    to a board certification in correctional health
4    care.
5 Q  All right.  Your professional experience, the
6    first thing that you have listed is that you
7    were a medical director at Lafayette County,
8    Mississippi, Detention Center.
9         Is that a jail?
10 A  It is.
11 Q  All right.  It indicates that it has local and
12    federal detainees?
13 A  Correct.
14 Q  Does that mean that it has people only that
15    have not been sentenced, or does it got people
16    that have been detained and are serving
17    sentences?
18 A  So jails in general -- it does have people who
19    were sentenced.
20 Q  Okay.
21 A  In general, county jails mainly hold pretrial
22    detainees; they may also hold convicted persons
23    who are serving short sentences, you know, 30,
24    45 days, up to a year.  Normally if you've been
25    convicted of a felony and are serving more than

Page 23

1    one year, you're remanded to the state
2    Department of Corrections and you would not be
3    held in the jail typically.
4 Q  And are you speaking of Mississippi, Wisconsin,
5    nationwide?
6 A  That's pretty much a nationwide -- pretty much
7    a nationwide practice.
8         In addition, the federal detainees
9    that I have, the process is slow.  And so I may
10    keep federal detainees for up to a year after
11    they have been sentenced to the Bureau of
12    Prisons -- before they're transferred to the
13    Bureau of Prisons.
14 Q  So your job as the medical director at the
15    Lafayette County Detention Center, what does
16    that include?
17 A  That includes the provision of health care to
18    the patients under my care.  That includes
19    supervising the other health care employees who
20    work there.  That includes interacting with the
21    administration on, you know, matters that are
22    important to the administration, policies,
23    procedures, et cetera.  It involves training of
24    both the nursing staff and the security staff.
25 Q  It indicates here that from '98 to '15 you were

Page 24

1    working as an independent contractor; is that
2    correct?
3 A  Yes.  My practice was an independent
4    contractor.  So, in other words, I provided the
5    nurses, the pharmaceutical services, radiology
6    services, lab services.  They were all provided
7    by me, and I was paid a per capita rate, in
8    other words, an all-inclusive rate to provide
9    those services.
10 Q  So between '98 and 2015 your role at the -- as
11    the medical director at Lafayette County would
12    be similar to the CCS role in Brown County in
13    this case?
14 A  That is correct.
15 Q  Okay.  How many nurses did you employ?
16 A  I had one full-time -- I have now and have for
17    a long time had one full-time and two part-time
18    nurse positions.  My two part-time positions
19    are occupied by one person, so I guess
20    technically I employ two nurses, but I have
21    three positions.
22 Q  Other than you --
23 A  I --
24 Q  I'm sorry.
25 A  I also have a nurse practitioner.  I'm sorry, I

Page 25

1    wasn't counting them amongst the nurses.  I was
2    counting the nurse practitioner as a provider,
3    but...
4 Q  All right.  So there's you, a nurse
5    practitioner, two nurses.  Any other health
6    care staff that you employed between '98 and
7    '15?
8 A  Yes.  A paramedic between those years.
9 Q  I'm sorry, a paramedic?
10 A  A paramedic does not work for me now but did in
11    those years.
12 Q  Did he work for you at the Lafayette County
13    Detention Center?
14 A  Correct.
15 Q  Currently you're an employee of Lafayette
16    County, Mississippi?
17 A  That is correct.
18 Q  And your job title is a medical director?
19 A  That is correct.
20 Q  Have your job duties changed since you became
21    an employee?
22 A  In general I would say no.  Obviously, I don't
23    directly provide the pharmacy services now; the
24    County contracts with somebody.  So I oversee
25    those.  It's the same job that we did before,

Page 26

1    in other words, but rather than me being the
2    one that awards the pharmacy contract, for
3    instance, now that's a County function and I
4    just oversee it.
5 Q  Okay.  So in your role as the medical director
6    at Lafayette County, have there been inmate
7    lawsuits against you?
8 A  No.
9 Q  Against the County?
10 A  I am aware of one lawsuit against the County in
11    my 20 years, which was not a medical lawsuit.
12 Q  What about either of the nurses or the nurse
13    practitioner?
14 A  No.
15 Q  So do you consider it a conflict of interest to
16    work as a medical director at a jail and
17    provide expert opinions as to the standards
18    related to health services at a jail?
19 A  Absolutely not.
20 Q  Okay.  Do you take into account -- the fact
21    that you're testifying in the depositions and
22    your report may be available to the public, do
23    you take that into account as how it may impact
24    the provision of services and the -- in a
25    lawsuit that could be brought against you as

Page 27

1    the director of the Lafayette County Medical --
2    Lafayette County Detention Center?
3       MS. SCHNEIDER:  Object to the form.
4    Go ahead.
5       THE WITNESS:  I'm not sure that I
6    even understand what you're trying to ask.  I
7    guess you're asking if I -- if I understand you
8    correct, you're asking do I -- do I take it
9    into account or change my -- I take that to
10    mean do I change my opinions as a result of
11    that.  And no, I do not.  My opinions are what
12    they are and they're available to who they are,
13    so I don't know of any effects that they do or
14    don't have, but I'm not concerned about that if
15    that's what you're asking.  That does not play
16    into my formation of opinions.
17 BY MR. GAHNZ:
18 Q  You also list here that you're a prisoner
19    advocate member of the Institutional Review
20    Board, Division of Research, Integrity, and
21    Compliance at the University of Mississippi.
22    And that was from 2007 to present.  What is
23    that?
24 A  That is correct.  The University of
25    Mississippi, like any institution which

Page 28

1    receives federal money for research, must have
2    an institutional review board that reviews and
3    approves research involving human subjects.
4    And if any of that research is going to involve
5    inmates or prisoners, then there is special
6    federal requirements that someone be appointed
7    who has special knowledge of inmates and so can
8    look out for their interests as it relates to
9    research projects that involve them.  And that
10    is a volunteer role I have done for the last 13
11    years.
12 Q  So if someone at the University of Mississippi
13    wants to do research on jail inmates, that's
14    what we're talking about?
15 A  Not just jail inmates, but prisoner -- any kind
16    of prisoners anywhere.
17 Q  And your job is to advocate for the prisoners
18    such that any research is done appropriately?
19 A  That's correct.
20 Q  Anything else?
21 A  No.  That's the -- I mean, that's the gist of
22    the role -- of my role.
23 Q  All right.  You also -- what is the name of the
24    urgent care center that you currently own?  Is
25    that listed on your resume?

Page 29

1 A  It is.  At least it's listed on the one that
2    was with my Rule 26 report.  Express Care of
3    Mississippi.
4 Q  All right.  So you're a co-owner and physician
5    at Right Track Medical Group, an outpatient
6    provider of mental health services in northern
7    Mississippi, correct?
8 A  That is correct.
9 Q  And you've been doing that since 2018?
10 A  That is correct.
11 Q  What is your role at Right Track Medical Group?
12 A  It is primarily an administrative role at this
13    time.
14 Q  Meaning?
15 A  Meaning I'm the CFO.
16 Q  Okay.  Do you see any patients there?
17 A  At this time I do not.
18 Q  Have you ever?
19 A  No.
20 Q  Okay.
21 A  The reason I'm saying that is right now we
22    don't provide addiction services, substance
23    abuse services.  We probably will in the
24    future, and I will -- I will likely see
25    substance abuse patients at that practice, but

Page 30

1    I am not at this time.
2 Q   Okay. The next page indicates that you're the
3    sole shareholder of Thomas Fowlkes, M.D., P.A.,
4    a contractor of emergency physician services to
5    acute care facilities and emergency
6    medicine/EMS consultant.
7         What is that?
8 A   So P.A. standards for professional association.
9    So it's just the corporation that a physician
10    has. It's been in existence since 1992. When
11    I have done work in urgent cares or emergency
12    departments, it is usually as an independent
13    contractor through that corporation. That was
14    the corporation that provided health care
15    services to the jail for those 17 years. And
16    now it's the corporation that I do consultation
17    and expert witness work through.
18 Q   Okay. You are also a co-owner and chief
19    medical officer of the Oxford Center between
20    2011, 2015; is that correct?
21 A   That is correct.
22 Q   What is the Oxford Center?
23 A   A comprehensive substance abuse treatment
24    facility. So we had detox services,
25    residential rehabilitation, intensive

Page 31

1    outpatient, and all levels of substance abuse
2    treatment.
3 Q   There's an acronym CARF. What is that?
4 A   That is an accrediting organization which
5    accredits rehab facilities. I believe it
6    stands for the Commission an Accreditation of
7    Rehab Facilities. Don't hold me to those
8    letters, but I believe that's correct.
9 Q   What type of detox did you -- were you involved
10    with at the Oxford Center?
11 A   Well, all types of detox. It is not a -- it is
12    not and was not a licensed hospital. So, in
13    other words, if a person required detox
14    services, they could only be provided in, say,
15    a hospital or intensive care unit setting. We
16    did not provide those. But it is what is
17    called residential detox from opiates, alcohol,
18    benzodiazepines.
19 Q   I don't understand that answer. So it says
20    it's a 76-bed CARF accredited detox residential
21    and outpatient substance abuse treatment
22    facility.
23         What is the difference between the
24    services that you provided as far as detox as
25    the co-owner of the Oxford Center and those

Page 32

1    services that would be provided by a hospital?
2 A   So an example would be that a person who is
3    having alcohol detox in most cases can be
4    treated within a residential detox facility
5    such as we had. But if, for instance, they
6    became delirious and required to be on a
7    ventilator, for instance, we -- or required
8    intensive care unit level of services,
9    intravenous, medications, we do not provide
10    those. We would send the person to an acute
11    care medical hospital.
12 Q   Okay. Were there types of detox if a person
13    came to you and was detoxing off of a
14    particular substance that you would not take
15    that person, that they would be sent
16    immediately to the hospital?
17 A   No.
18 Q   So it was the -- the determining factor as to
19    whether somebody was sent to the hospital was
20    the level of symptoms that the person was
21    exhibiting?
22 A   Well, our ability to take care of them. In
23    other words, if we were able to manage their
24    detox with -- with the treatment services we
25    were able to provide, then we would do that.

Page 33

1    If they required a higher level of care such as
2    cardiac monitoring or some other level of care
3    that we couldn't provide, we would send them to
4    a hospital.
5 Q   So I'm trying to figure out how that's any
6    different than what I just said. I mean, we're
7    going to be here for quite a while today. And
8    if we can't agree on basic terms, then it seems
9    like we're going to --
10         So when I said the determiner as to
11    whether somebody is sent to the hospital or not
12    is based on the symptoms or the severity of the
13    symptoms, what is your disagreement with that
14    statement?
15         I just want to make sure that we can
16    get on the same page so we can get done before
17    4:30.
18 A   Well, patients --
19         MS. SCHNEIDER: Argumentative. But
20    go ahead.
21         THE WITNESS: Patients can have
22    severe symptoms and yet not require high level
23    of medical intervention. On the other hand,
24    patients can be completely asymptomatic and not
25    be breathing and need a very high level of

Page 34

1    care.  So it's not based upon their level of
2    symptoms but upon their level of care which
3    they require.  That's the difference.
4  BY MR. GAHNZ:
5  Q    So in -- is it your position that a patient
6    that's not breathing is -- that's a mild
7    symptom?
8  A    That's --
9            MS. SCHNEIDER:  Object to form.
10           THE WITNESS:  That's exactly not
11    what I -- that's what I just did not say.
12           I said that a person cannot have
13    symptoms --
14  BY MR. GAHNZ:
15  Q    And not be breathing.
16  A    Symptoms or complaints.  So that might be a
17    sign, that they weren't breathing and need to
18    go to the hospital.  My point is that -- or the
19    reason -- the difference is that it's not what
20    the person's complaint is but what level of
21    service I'm able to provide for them.  So those
22    are different things.
23           I'm doing my best to answer your
24    questions.
25  Q    The next section of your resumé is your

Page 35

1    education; is that correct?
2  A    That's correct.
3  Q    So you started out at the University of the
4    South in Tennessee; is that right?
5  A    That's correct.
6  Q    And did you get -- that was a community -- was
7    that a two-year school?
8  A    No.
9  Q    What was that?
10  A    It is a liberal arts four-year college.
11  Q    All right.  Did you graduate from there?
12  A    I did not.
13  Q    All right.  Then what did you do between
14    '82 and '85?
15  A    I went to school at Rhodes College in Memphis,
16    Tennessee.
17  Q    Okay.  And at that point you got a degree in
18    psychobiology; is that right?
19  A    That is correct.
20  Q    Then you went to medical school in Tennessee;
21    is that right?
22  A    That is correct.
23  Q    And then from there you went to the University
24    of Pittsburgh for a residency in emergency
25    medicine; is that right?

Page 36

1  A    That is correct.
2  Q    Is that the sum total of your education after
3    high school?
4  A    To the best that I understand your question,
5    yes.
6  Q    Well, did you go somewhere and get your MBA?
7  A    No.
8  Q    Okay.  Did you go somewhere and get an
9    engineering degree?
10  A    No.  But I'm quite certain that I -- during
11    medical school I went to -- did electives in
12    other places; same with the University of
13    Pittsburgh.  So, I mean, it's a fair
14    representation of a summary of my -- it may not
15    list every course that I took or every -- every
16    elective that I engaged in, but yes.
17  Q    Does it accurately list all of the degrees that
18    you hold?
19  A    It does.
20  Q    All right.  Where did you go to nursing school?
21  A    I did not go to nursing school.
22  Q    Where did you get your L.P.N. license?
23  A    I do not have an L.P.N. license.
24  Q    Where did you go for correctional training?
25  A    For correctional training?

Page 37

1  Q    As a correctional officer.
2  A    I have taught correctional officer training
3    courses.  I am not a certified correctional
4    officer, but I teach those certification
5    courses.  I instruct.
6  Q    You teach the medical aspect of it, correct?
7  A    That is correct.
8  Q    What education do you have with respect to the
9    formulation of jail policy?
10  A    What education?  I have 20 years' experience.
11    I don't -- I'm not aware of any formal
12    education that one can obtain -- achieve for
13    that.
14  Q    Do you have any degrees related to correctional
15    sciences?
16  A    Say that again.
17  Q    Have you attended a police academy?
18  A    I have not.
19  Q    Have you attended a correctional officer
20    seminar?
21  A    I have.
22  Q    Related to what?
23  A    Correctional officer training.
24  Q    In what area?
25  A    Basic detention officer training.

Case 1:18-cv-00896-WCG   Filed 03/04/20   Page 10 of 61   Document 109-18

Page 38

1 Q   Describe that for me.
2 A   The State of Mississippi has a -- I believe
3     it's an 80-hour training course.  I have taught
4     several modules of that and attended several
5     other modules that I didn't teach.
6 Q   Okay.  What modules did you teach?
7 A   The ones as it relates to medical services
8     within a jail, health services within a jail,
9     mental health services within a jail, suicide
10    prevention.  I believe -- I'm not certain
11    about -- I helped teach a portion on chemical
12    use of restraint -- or the use of force, a
13    module on chemical -- chemicals in
14    decontamination.
15 Q   What courses -- what modules did you attend?
16 A   I don't recall the specifics.
17 Q   In the areas of expertise that you include on
18    page 1 you don't hold yourself out as a jail
19    policy expert, correct?
20 A   I disagree.
21 Q   You are a jail policy expert?
22 A   As it relates to correctional health care, yes.
23 Q   Okay.  So you're a medical expert, a jail
24    policy expert, a nursing expert, and a licensed
25    practical nurse expert.  Is that accurate?

Page 39

1 A   That's your characterization, not mine.
2 Q   Well, are you offering opinions in all four of
3     those disciplines here today as an expert
4     opinion -- as an expert retained?
5 A   No.  I am offering opinions on correctional
6     health care.  That may include the actions of
7     physicians, other health care providers,
8     nurses, and correctional officers as it relates
9     to the delivery of the -- assessment and
10    delivery of emergency care to inmates.  And
11    obviously of necessity, those also involve
12    policies and procedures relating to each one of
13    those.
14 Q   All right.  So you've offered opinions that are
15    critical of Nurse Ward, correct?
16 A   I'm sorry, of?
17 Q   You've offered opinions in this case that are
18    critical of Nurse Ward, correct?
19       MS. SCHNEIDER:  Object to the form
20    of that question.
21       THE WITNESS:  No.
22 BY MR. GAHNZ:
23 Q   You agree with the assessment that Nurse Ward
24    has provided in her reports?
25 A   No, I -- I disagree with a number of her

Page 40

1     opinions.
2 Q   Okay.  How is that different than being
3     critical of her?
4 A   I thought you -- because -- I thought you were
5     talking about a defendant in this case, and
6     then I realized you're talking about an expert.
7     So I don't believe she breached the standard of
8     care.  There's not -- I'm not critical of her
9     actions; I'm only disagreeing with her report
10    and her opinions.  So I agree -- might agree
11    with some, might disagree with some.  I just
12    stated my agreements and disagreements.
13 Q   One of the defendants in this case is an
14    L.P.N., correct?
15 A   That's correct.
16 Q   And you've offered opinions that the L.P.N.
17    acted within the standard of care?
18 A   That was not amongst the scope of what I was
19    asked to look at, but yes, that is my opinion.
20 Q   All right.  So when we get to trial in this
21    case, is anybody going to -- if anybody asks
22    you those questions, are you going to answer
23    them with respect to the standard of care that
24    an L.P.N. should be held to in this case?
25 A   If I am asked --

Page 41

1       MR. SALEMI:  Hold on.  Hold on.  I
2     object to form.  You just asked him and he just
3     said she did comply with the standard of care.
4     So I object to form.  He can be --
5 BY MR. GAHNZ:
6 Q   Did you understand the question, sir?
7       MR. SALEMI:  He can be asked that
8     question, and he will be asked that question.
9       THE WITNESS:  I did understand, and
10    yes, I will give that opinion.
11 BY MR. GAHNZ:
12 Q   All right.  So my confusion is, how is it that
13    you're not holding your -- you're going to
14    offer expert opinions that the L.P.N. in this
15    case met the standard of care.  Isn't that the
16    role of an expert opinion who holds himself out
17    as an expert in L.P.N.?
18       MS. SCHNEIDER:  Object to the form.
19       MR. SALEMI:  Yeah, object to form.
20       THE WITNESS:  I don't know how to
21    answer that question.  I'm an expert in
22    correctional health care and all the levels --
23    I have hired, trained, and supervised all level
24    of health care professionals within a jail
25    setting, and I believe that I am qualified to

Page 42

1    offer opinions about those actions.
2 BY MR. GAHNZ:
3 Q   Have you ever worked as an L.P.N.?
4 A   No.
5 Q   Have you ever worked as a registered nurse?
6 A   No.
7 Q   Do you have --
8 A   I have supervised both.
9 Q   Do you have the ability to report any of them
10    to a disciplinary board?
11 A   Yes.
12 Q   Let me break that question out.
13        Do you have the ability to bring
14    charges against an L.P.N.?
15 A   I don't understand the question.
16 Q   Well, you did when you were asked the question
17    by the attorney from Benton, Arkansas, last
18    year.  Do you remember going through that
19    deposition?  He was a colorful fellow.
20        MS. SCHNEIDER:  Argumentative.  Is
21    there a question in there?
22 BY MR. GAHNZ:
23 Q   Do you remember being deposed in the case of
24    Marziale versus Correct Care Solutions?
25 A   I do.

Page 43

1 Q   And it was a 300-some-odd page deposition?
2 A   I remember.
3 Q   All right.  And do you remember being asked
4    questions with respect to staying in your lane
5    as to whether or not you could opine on the
6    L.P.N. standard of care?
7 A   I do not recall specifically.  If you would
8    like to show me, I'll see if it refreshes my
9    memory.
10 Q   Well, let's just do it this way:  When you gave
11    this deposition, you were under oath, right?
12 A   I was.
13 Q   And you gave the answers that were truthful to
14    the best of your knowledge?
15 A   I answered the questions to the best of my
16    ability, yes.
17 Q   Well, are you saying that you weren't truthful?
18        MS. SCHNEIDER:  That misstates his
19    testimony.
20        MR. GAHNZ:  Do you want to read back
21    the question that I asked and the answer that
22    he gave?
23        (Requested portion read.)
24 BY MR. GAHNZ:
25 Q   My question:  Why did you omit truthful from

Page 44

1    your answer?
2 A   I answered your question the best that I could.
3    If you would like to ask me another question,
4    I'll be glad to answer it.
5 Q   When you're retained as an expert, does it make
6    any difference in terms of how you formulate
7    your opinions as to whether it's the
8    plaintiff's attorney that's retained you or the
9    defense attorney that's retained you?
10 A   Your question was, does it make any --
11        Would you repeat the question,
12    please, ma'am.
13        (Last question read.)
14        THE WITNESS:  No.  I have a standard
15    protocol that I use when I am reviewing cases
16    no matter which attorney has retained me.
17 BY MR. GAHNZ:
18 Q   Tell me that protocol, please.
19 A   Well, I request the pertinent medical records;
20    I request any prior medical records on the
21    person in question, the plaintiff.
22 Q   Um-hmm.  Okay.
23 A   If I am asked to opine about policies and
24    procedures, I ask for the policies and
25    procedures.  Sometimes I am, sometimes I am

Page 45

1    not.  I believe I may have said prior medical
2    records, but I certainly ask for those.  I ask
3    for the operative complaint.
4 Q   Okay.
5 A   And I ask for any other items that have been
6    produced in discovery to that point.
7 Q   Okay.
8 A   I formulate my initial opinions.
9 Q   I'm sorry?
10 A   I formulate my initial -- I review those
11    records.
12 Q   Okay.
13 A   I formulate my initial opinions, discuss them
14    with the attorney.
15 Q   Okay.  The next part of your resumé provides
16    publications.  And it looks to me like you have
17    three publications in your career; is that
18    right?
19 A   That would be correct.
20 Q   Are any of these peer-reviewed?
21 A   The answer to that question is I don't recall.
22    They're a long time ago and I don't recall.
23 Q   Okay.  Are you a member of any peer-reviewing
24    committee?
25 A   To the best --

Page 46

1  Q   Let me rephrase the question if it's a little
2      unclear.
3  A   It is.
4  Q   You understand -- tell me what the process of
5      peer review is.
6  A   Well, my understanding is that publications
7      which are peer-reviewed have a process and/or a
8      committee by which articles which are submitted
9      for publication are reviewed by that committee
10     prior to -- prior to publication to ensure lack
11     of bias and scientific validity.
12 Q   Have you been on a peer-review committee?
13 A   Not since my residency.
14 Q   And have you written any textbook chapters?
15 A   I believe at least two of those publications
16     are textbook chapters.
17 Q   Which two?
18 A   I believe that would be the first two.
19 Q   Okay.  Have you written any articles with
20     respect to correctional health care?
21 A   No.
22 Q   Have you been on any peer-review committees
23     with respect to correctional health care?
24 A   Not to the best of my understanding.
25 Q   Okay.  In any circumstance have you reviewed

Page 47

1      any article with respect to correctional health
2      care prior to its publication?
3  A   So I believe that's a restatement of the last
4      question.  I don't believe I am on any
5      journal -- I'm not presently on any journals'
6      peer-review committee if that's what you're
7      asking.  I have --
8  Q   Have you ever been on a journal peer-review
9      committee?
10 A   Not since my residency.
11 Q   In your residency what peer-review journal were
12     you on?
13 A   I don't recall that.  University of Pittsburgh
14     was just heavily involved in research, and so
15     there was lots of peer review that occurred in
16     my residency.
17 Q   Have you written any articles with respect to
18     any issue related to mental health?
19 A   I don't believe so.
20 Q   Do you have any -- do you hold any degrees
21     related to mental health?
22 A   Yes.
23 Q   What?
24 A   Well, I have a medical degree.
25 Q   Okay.

Page 48

1  A   I have a board certification in emergency
2      medicine, a board certification in addiction
3      medicine, and a bachelor's degree in
4      psychobiology.
5  Q   Are you a psychiatrist?
6  A   I am not.
7  Q   Are you a psychologist?
8  A   I am not.
9  Q   The next part of your resumé deals with
10     presentations that you have given over the
11     years; is that correct?
12 A   That's correct.
13 Q   Are there any of the presentations that are
14     contained on pages 3, 4, and 5 that are
15     relevant to any of the issues that you gave
16     opinions on in this case?
17 A   Yes.
18 Q   Which ones?
19 A   I believe a number of them.
20 Q   All right.  Why don't we start at page 3, and
21     you tell me which ones are --
22         MS. SCHNEIDER:  Do you mean page 4?
23         THE WITNESS:  Yeah, mine is page 4
24     is where mine starts.
25

Page 49

1  BY MR. GAHNZ:
2  Q   Go ahead.
3  A   We have different ones.
4          So the first one would be instructor
5      for modules on "Health Care Issues,"
6      "Responding to Medical Emergencies," and
7      "Responding to Special Needs Inmates" for the
8      Mississippi State Standards & Trainings -
9      Corrections Officer Training Course.
10         The second one -- there are a number
11     of them that are very similar presentations
12     that all involve the safe prescribing of
13     sedative hypnotics or benzodiazepines
14     essentially for the Mississippi State Medical
15     Association.  And I can point them all out to
16     you, but there's probably 15 of them on here.
17 Q   Are they called "Benzodiazepines an Update"?
18 A   That's one of them.  Sedative Hypnotics would
19     be another word.  So anytime you see
20     benzodiazepine or sedative hypnotic, that would
21     be relevant to the issues in this case.
22 Q   All right.  Anything else?
23 A   I'll need to review.  Just a moment.
24         "Mental Health in the Primary Care
25     Setting," a keynote address at an outcomes

Page 50

1   conference.
2       The ones called "Controlled
3   Substance Update" would also involve the issues
4   in this case.
5   Q   All right.
6   A   One called "Benzodiazepines, The Good News and
7     Bad News."
8   Q   All right.
9   A   "Managing Controlled Substances in
10    Mississippi."
11   Q   Are these presentations available publicly?
12   A   I don't know. They may be.
13   Q   Are the -- are these presentations that you
14    give on an annual basis and then update based
15    on if there's been a change in the previous
16    year?
17   A   That is what some of these are. So there's a
18    variety of types of presentations. I can't say
19    there's just one type of presentation within
20    there. In other words, some are to hospital
21    faculty, some are to doctors within the State
22    of Mississippi.
23   Q   Okay. All right. I think I saw somewhere that
24    you indicated that your testimony splits about
25    60 percent defense and 40 percent plaintiff.

Page 51

1   Is that --
2   A   I may have said that in the past, and that may
3    have been -- probably accurate if I said it
4    somewhere in the past. I would say in the last
5    six months it's probably closer to 70 percent
6    defense and 30 percent plaintiff or something
7    like that. But I certainly do work for both
8    plaintiff and defense attorneys.
9   Q   Okay. You provided a case listing for the last
10    four years that was up to date as of
11    November 8, 2019, right?
12   A   That is correct.
13   Q   Have you -- can you go through this list and
14    tell me which cases you've testified on behalf
15    of the plaintiff?
16   A   I can.
17   Q   All right.
18   A   I will say I can to the best of my knowledge.
19    I believe I --
20   Q   All right. Go ahead.
21   A   I'll tell you if I don't recall.
22       So you're looking at a list which
23    says 11/8/2019 and is three pages long; is that
24    correct?
25   Q   Um-hmm.

Page 52

1   A   Okay.
2   Q   The first case is State of Mississippi versus
3    Dobbs.
4   A   Yes. Those first several cases, I don't know
5    whether you -- those are criminal cases, and I
6    was testifying for drug court -- just as a
7    consultant to drug court. So it's really for
8    neither side but just as an expert on drug
9    testing.
10   Q   All right.
11   A   So I don't know that you call that --
12       In the State of Mississippi versus
13    Joshua Blunt, that was a criminal case. That
14    was for the defendant.
15       Mississippi Board of Medical
16    Licensure, that was on behalf of the
17    Mississippi Board of Medical Licensure.
18       Mississippi Board of Nursing, two
19    cases. Those were on behalf of the Mississippi
20    Board of Nursing regarding nursing practice by
21    those two nurses.
22       The next one, Lee -- do you want me
23    to just say the name and then defense or
24    plaintiff or do you want me to go on?
25   Q   Yes. That would be good.

Page 53

1   A   Lee, defense. Paylan, defense. Bost, defense.
2    Singleton, defense. On the second page the
3    first two, Filichia and Ajibade, both defense.
4    Then Benoit, Clark, Hays, all plaintiff, all
5    three of those.
6   Q   Okay.
7   A   Sparks v. Tooke is defense. Brooks, plaintiff.
8    Gracia, plaintiff. Parkes v. Jasper County,
9    I'm not recalling that case at this moment. I
10    think it may have been plaintiff, but I -- I
11    just don't recall what that case is about.
12       Leverett, defense. Ivey, defense.
13    Wesley, defense. Harris is not a -- that is
14    not a jail case, but it was defense.
15    Stufflebean, defense. Legros, plaintiff.
16    Clifton, defense. Marziale, defense. Warner,
17    plaintiff. Angerbauer, defense. Pickle,
18    defense.
19   Q   All right. So going back to -- through this
20    list again -- thank you for that by the way --
21    which out of any of these cases that are listed
22    deal with benzodiazepines?
23   A   If you'll give me just one moment.
24   Q   That's fine.
25   A   I am not aware that any of them involve

Page 54

1   benzodiazepines as a central issue in the case.
2 Q   Okay.
3 A   Which is not to say that some -- you know,
4   sometimes the plaintiff -- or, I mean, the
5   inmate may have been taking a benzodiazepine,
6   but that was not the issue. I don't recall
7   which cases those even were, but it was not a
8   central issue in any case that I'm aware of.
9 Q   There are several cases here that are listed
10   where CCS is a defendant; is that correct?
11 A   That's correct.
12 Q   Have you ever testified on behalf of a
13   plaintiff against CCS?
14 A   The short answer is no, because I would -- I
15   now don't take cases involving -- since I have
16   present cases that -- many of these cases are
17   still ongoing, so I would not take a case with
18   a plaintiff involving a defendant that I --
19   where I'm representing -- where I've been
20   retained on behalf of a defendant in another
21   jurisdiction. Same with if I have been
22   retained by the plaintiff, I wouldn't then take
23   a case on their behalf while the cases are
24   active.
25 Q   All right.

Page 55

1 A   If I might just clarify or add to my answer,
2   I've not -- I've not been retained on behalf of
3   CCS in this case either.
4 Q   Okay. So let's deal with that.
5   Who contacted you -- well, in fact,
6   how did you first learn about this case?
7 A   I received correspondence from Ms. Schneider.
8   I don't recall if it was a phone call or an
9   e-mail.
10 Q   Okay. And did Attorney Schneider ask you to
11   provide opinions with respect to anyone other
12   than Dr. Fatoki?
13 A   Let me refer to the scope of work I was given.
14 Q   And just for our purposes, where -- where are
15   you looking to find the scope of work?
16 A   The first page of my Rule 26 report.
17 Q   Okay.
18 A   No. I was only asked to provide opinions
19   regarding the care of Ms. Freiwald by
20   Dr. Fatoki.
21 Q   Okay.
22 A   Now, of course, she was within a jail cell. By
23   necessity I have to look at the health care
24   that was delivered by the nurses who were
25   working in that jail as well.

Page 56

1 Q   Did your scope of work ever change in this
2   case?
3 A   No. I've been provided like -- I was first
4   asked to -- asked whether I agreed or disagreed
5   with the plaintiffs' expert reports. I've
6   since been asked do I agree or disagree with
7   their supplemental reports, and then do I agree
8   or disagree with the other defense expert
9   reports. So I guess to some extent, yes, they
10   change a little bit.
11 Q   Have you ever spoken with any of the attorneys
12   representing Brown County, Sheriff Gossage, or
13   Officer Peters?
14 A   I have not.
15 Q   Have you spoken with any of the attorneys
16   representing CCS, Nurse Jones, or Nurse
17   Blozinski?
18 A   I have not.
19 Q   Have you spoken with any of the parties in this
20   case?
21 A   I have not.
22 Q   Okay. Have you had any interaction with
23   Dr. Fatoki, be it e-mail, letters?
24 A   I have not.
25 Q   Okay. Prior to this case, did you know who

Page 57

1   Dr. Fatoki was?
2 A   In general I would say no. We do have an
3   annual meeting of correctional health care
4   physicians, and I may or may not have ever --
5 Q   Bumped into --
6 A   -- bumped into him, but I'm not aware of it.
7 Q   All right. Have you ever had your testimony
8   stricken or limited by a Court in any fashion?
9 A   Certainly not as it relates to correctional
10   health care.
11 Q   Okay. That tends to me to be a yes.
12 A   Okay. The third case on my case list -- let me
13   turn to it.
14 Q   State of Mississippi versus Cileste?
15 A   No, I'm sorry. It is the fourth, the next one.
16 Q   That's okay.
17 A   State of Mississippi versus Joshua Blunt. That
18   was a -- that is a criminal case involving
19   Mr. Blunt who left his infant in a car and the
20   child died of a hot -- in a hot car. He was an
21   indigent defendant. And I treated him for his
22   mental health condition after this happened,
23   and I was prepared to provide pro bono
24   testimony regarding his state of mind in that
25   he didn't intend to leave the baby in the car.

Page 58

1 Q   Okay.
2 A   And the Court ruled that what he told me after
3    the fact and because I was not an expert in
4    Forgotten Baby Syndrome or hot car deaths, that
5    I was not allowed to testify at his criminal
6    trial.
7 Q   Okay.  And was that as a result of what's
8    called a Daubert motion?
9 A   No.  It -- I mean, no, it was not.  It was just
10   a pretrial hearing about what all was going to
11   be allowed at his -- at his trial.  There was
12   ultimately no trial.  He took a plea.
13 Q   Okay.  With respect to being retained in this
14   case, did you work through a service?
15 A   No.
16 Q   Have you worked through a service in the -- an
17   expert service in the past?
18 A   No.
19 Q   How is it that people find you as a -- as an
20   expert?
21 A   Well, as you pointed out, I have a website
22   where my CV is available.  Most of my referrals
23   come from other attorneys -- from attorneys.
24   And I am listed in three expert witness
25   directories.

Page 59

1 Q   And all those are available on the internet,
2    those expert directories?
3 A   To the best of my knowledge.
4 Q   By --
5 A   Or paper.  I'm not certain about paper versus
6    the internet.
7 Q   And you have a biography that's listed on those
8    expert services?
9 A   Not services.  Directories.
10        I mean, in other words, there is a
11   directory of expert witnesses in which my
12   biography is listed.  I do not work for any
13   services, as I told you before, where they
14   retain cases on my behalf.
15 Q   Okay.  You pay to have your biography in a
16   directory?
17 A   That is correct.
18 Q   Have you ever worked with any of the attorneys
19   in this case?  And do you know the law firms
20   that are involved?
21 A   I believe that I do.
22        So I've never worked with any of the
23   attorneys involved in this case before.
24 Q   Okay.
25 A   I believe that I have been retained by the firm

Page 60

1    of Heyl Royster before.
2 Q   On behalf of -- on a CCS matter?
3 A   I don't recall.
4 Q   When was that?
5 A   Perhaps a year ago.  I don't recall exactly.
6 Q   Is that listed on your -- on your case log?
7 A   One moment.  If I am not mistaken -- and
8    this -- so this is -- I'm not going to say this
9    with 100 percent certainty.  I believe the case
10   is going to be E/O Clifton v. Champaign County,
11   Illinois.  And I believe further that I was
12   retained by Heyl Royster on behalf of the
13   Champaign County defendants.  It's possible CCS
14   was a defendant, but I don't believe I was
15   retained on their behalf.  And, again, I'm
16   saying that to the best of my recollection at
17   this moment.
18 Q   What attorney at Heyl Royster are you working
19   with on the Clifton matter?
20 A   The name escapes me at this moment.
21 Q   All right.  Is that a jail-related --
22 A   It is.
23 Q   And what is the issue in that case?
24        MR. SALEMI:  I'm going to make an
25   objection.  I'm going to let him answer, but I

Page 61

1    believe he provided a list of his testimonies.
2    I don't believe -- as required by federal
3    rules.  I don't know if the case he's
4    testifying about he's provided testimony in or
5    he's been disclosed in, so it's possible that
6    he's consulting in that case based on the
7    limited testimony he's provided about it so
8    far.  If it is -- depending on where the case
9    is venued and its status, he may have a
10   consultant privilege regarding his
11   consultations with counsel in that case that's
12   retained him.  He may not even be disclosed in
13   that case.
14        So with those conditions, I'm
15   willing to agree to allow him to provide some
16   limited answers at this point, but those are my
17   concerns right now.
18 BY MR. GAHNZ:
19 Q   You may answer the question.
20 A   Could you ask the question again, please?
21        I mean, ma'am, could you read it
22   back?  I'm sorry.
23 Q   It's easier for me just to ask it again.
24 A   Okay.
25 Q   What is the issue in that case, Clifton versus

Page 62

1   Champaign County?
2 **A   It was a jail death case. I don't recall**
3 **specifically the cause of death. And I have**
4 **provided some type of sworn testimony, so I**
5 **have been disclosed in all of these cases that**
6 **are on this list.**
7 Q   And that was going -- you foresaw my next
8 question. We're going to get done in a hurry.
9      So you gave a deposition in that
10 case?
11 **A   I believe that's correct.**
12 Q   Okay. And then --
13 **A   I can't -- I don't have -- I put down only --**
14 **only cases in which I provided sworn testimony,**
15 **so...**
16 Q   Okay. All right. Why don't we take a break.
17      THE VIDEOGRAPHER: We are off the
18 record at 10:49 a.m. This is the end of disc
19 number one in the deposition of Dr. Thomas
20 Fowlkes.
21      (Recess taken, 10:49 a.m. to 10:58 a.m.)
22      (Exhibit Nos. 204 and 205 were marked.)
23      THE VIDEOGRAPHER: We are back on
24 the record at 10:58 a.m. This is the beginning
25 of disc number two in the deposition of

Page 63

1   Dr. Thomas Fowlkes.
2 BY MR. GAHNZ:
3 Q   Okay, Doctor, while we were off the record, I
4 marked in your binder Exhibits 204 and
5 Exhibits 205. Will you take a look? They
6 should be your initial report as well as all
7 the attachments, which is your Rule 26 report,
8 correct?
9 **A   Correct.**
10 Q   And that is a 41-page document, the actual
11 report?
12 **A   That is correct.**
13 Q   And it's signed by you on page 41?
14 **A   That is correct.**
15 Q   And that's been marked as Exhibit 204, correct?
16 **A   That is correct.**
17 Q   All right. Then the next is Exhibit 205, which
18 is your supplemental report which you authored
19 several weeks ago?
20 **A   That's correct.**
21 Q   And that's an 11-page document with your
22 signature on the eleventh page, correct?
23 **A   That is correct.**
24 Q   All right. And that's 205, right?
25 **A   That is correct.**

Page 64

1 Q   And within these two documents are all of your
2 opinions, correct?
3 **A   They are a summary of my opinions in this**
4 **matter, yes. They're all the opinions that I**
5 **have at this moment.**
6 Q   Well, this is my one and only chance to ask you
7 about your opinions.
8      Are you going to testify about
9 things that are outside of these two reports?
10      MS. SCHNEIDER: Object to the form.
11 **THE WITNESS: Well, that depends on**
12 **what questions you ask me. I mean, this is a**
13 **summary of my opinions and this is all I intend**
14 **to offer, but if I am asked additional**
15 **questions, I may have additional opinions.**
16 BY MR. GAHNZ:
17 Q   Such as what?
18      MS. SCHNEIDER: Object to the form.
19 BY MR. GAHNZ:
20 Q   What additional opinions do you intend to
21 formulate in this case?
22      MS. SCHNEIDER: Object to the form.
23 Misstates his testimony.
24 **THE WITNESS: I don't intend to**
25 **formulate any other opinions, but I am going to**

Page 65

1 **ask -- answer the questions which I am asked.**
2 BY MR. GAHNZ:
3 Q   Do you intend to look at any more documents?
4 **A   If I am provided them, yes.**
5      MR. GAHNZ: Counsel, the rules are
6 pretty clear that his opinions need to be
7 contained within his report. If there's
8 additional opinions, are you going to
9 provide -- are you going to offer him again for
10 testimony?
11      MS. SCHNEIDER: He didn't say there
12 was going to be additional opinions. He said
13 the summary of his opinions are contained in
14 the reports and ask him about those opinions.
15 I think what he's saying is he can't anticipate
16 what he's going to be asked at the time of
17 trial. I don't intend to send him any more
18 materials unless -- you know, I probably will
19 provide him with additional depositions as they
20 come in, but I don't intend to ask him to
21 formulate new or additional opinions.
22 BY MR. GAHNZ:
23 Q   Have you had enough time since the time that
24 you were retained to review all of the
25 materials in this case?

Page 66

1  A   That have been provided to me, yes, I have.
2  Q   Have you had ample time to answer the questions
3      that were asked of you in the initial scope of
4      your retainer?
5  A   I have.
6  Q   All right.  Have you had ample time to provide
7      your supplemental report?
8  A   I have.
9  Q   And these are the opinions that are -- that you
10      hold are contained within these two reports,
11      correct?
12  A   At this time that is correct.  But you asked
13      about would I intend to review additional
14      documents.  And you'll note in my report that I
15      had asked for additional prior medical records;
16      I have not received them.  If I do receive
17      them, I will be glad to review them, and they
18      might or might not change my opinions.  If I'm
19      not provided them, I won't review them.
20  Q   Okay.  So with respect to your opinions,
21      they're not final because you don't have the
22      prior medical records that you want?
23          MS. SCHNEIDER:  Object to the form.
24      That misstates his testimony.
25          THE WITNESS:  I disagree.

Page 67

1  BY MR. GAHNZ:
2  Q   So you don't need the prior medical records to
3      formulate your opinions?
4  A   I have formulated my opinions based on the
5      information that has been provided to me up
6      until this point.
7  Q   Have you been provided with any prior medical
8      records?
9  A   Very limited.
10  Q   What prior medical records have you been
11      provided?
12  A   On page 2 of my report at the top it appears
13      that Ms. Freiwald received some of her prior
14      medical care at Bellin Health.
15  Q   Okay.
16  A   However, this is a summary of the five things
17      that were in there and the only five things
18      that were in there; one emergency room
19      department visit in 2013, one colonoscopy in
20      2013, another emergency department visit from
21      2013, one MRI, and one emergency department
22      visit from 11 of 2015.  But the primary care
23      records don't appear to be there.
24  Q   The records that you reviewed indicated that
25      there was no psychiatric care prior to 2016,

Page 68

1      correct?
2  A   I don't believe that's correct.
3  Q   When did she receive psychiatric care prior to
4      2016?
5  A   That wasn't the question.  The question you
6      asked me, as I understood it, was the records I
7      received indicated that she received no
8      psychiatric care prior to then.
9          And the reason I disagreed is I
10      believe the record didn't say whether she had
11      received, so no, we don't know whether she
12      received psychiatric care before 2016 or not.
13  Q   Would that make any difference to your opinions
14      as to whether or not she received psychiatric
15      care prior to 2016?
16  A   Well, since I haven't reviewed those records, I
17      don't know if it would make a difference to my
18      opinions or not.
19  Q   Well, my question was a little different than
20      that.
21          If she received any sort of
22      psychiatric care prior to 2016, would that have
23      any impact on your opinions?
24          MS. SCHNEIDER:  Object to the form.
25          THE WITNESS:  Well, I don't know

Page 69

1      what that -- they could or could not.  At this
2      moment I don't believe so.  I've formed my
3      opinions based upon the records that have been
4      given to me, so my opinions are what they are
5      based upon what I've been given.
6  BY MR. GAHNZ:
7  Q   Within these 50-odd pages of report have you
8      stated the basis or the bases for all of the
9      opinions that you hold in this case?
10  A   I believe that I've adequately summarized those
11      bases, yes.
12  Q   All right.  And to the extent that there's
13      factual inaccuracies in your report, would you
14      agree that that could impact your opinions?
15          MS. SCHNEIDER:  Object to the form.
16          THE WITNESS:  I don't know one way
17      or the other.  If you would like to point some
18      out, I can tell you whether it changes my
19      opinion or not.
20  BY MR. GAHNZ:
21  Q   Well, that was -- if you have some things in
22      here, in your report, that are factually
23      inaccurate, would that impact your opinions?
24          MS. SCHNEIDER:  Same objection.
25          THE WITNESS:  I don't know one way

1    or the other without looking -- without being
2    told new information.
3 BY MR. GAHNZ:
4  Q   Let's turn to page 17.  You wrote that "It is
5    unclear why Ms. Freiwald surrendered to BCJ" --
6        I'm assuming that's Brown County
7      Jail?
8  A   Yes.
9  Q   -- "on the evening of 10/27/16 without her
10    prescription medications."  Correct?
11  A   Correct.
12  Q   What information did you review to determine
13    the answer to that question?
14  A   Well, I reviewed the information in the
15    supplemental report and the deposition of her
16    son which made it somewhat more clear about why
17    she did that, but my -- this is -- this
18    statement is a little bit different, because I
19    don't know why she didn't bring her
20    prescription medications.  Her son and other
21    people, including her therapist, said that she
22    was suspecting to only be there one night, so
23    one can -- one can make a guess, but one does
24    not know for certain why she showed up without
25    her prescription medications, because it was

1    contained in the preregistration information
2    and --
3  Q   What was contained in the preregistration
4    information?
5  A   The instruction to bring prescription
6    medications.
7  Q   Okay.
8  A   And it told when and where to report.  So she
9    reported when and where as contained in those
10    instructions but did not bring prescription
11    medications.
12        But my next sentence was really the
13    point of that.  Even if she had been -- only
14    expected to be incarcerated one night, she
15    would have needed her prescription medications
16    for that night.  So even if it was her
17    expectation that she was only going to be there
18    one night, she still should have brought her
19    medications so she would have them that night.
20  Q   So -- and that's really the point that I wanted
21    to talk about.
22        How was she going to be able to take
23    her medications that night?
24  A   She wasn't.  She didn't bring them.
25  Q   Well, I understand that.  Assuming she had

1    brought her medications, how was she going to
2    be able to take them that evening?
3  A   Well, based on my experience in common practice
4    in a jail such as the Brown County Jail, it is
5    my expectation that had she brought her
6    medications, the security staff would have had
7    the nursing staff evaluate those medications
8    that night, possibly talk to a provider that
9    night to determine which medications would be
10    sent with her to Huber, and she would take it
11    to Huber.  That's the way it would normally
12    work.
13  Q   Okay.
14  A   But since she didn't have any medications,
15    there wasn't any way to do that.
16  Q   All right.  So No. 4 on that same page, you
17    indicate that "At Brown County Jail, as
18    essentially at every other jail, prescriptions
19    from the outside must be reviewed and approved
20    by the facility physician before they can be
21    dispensed to the patient."
22        That's different than the NCCHC
23    standard on that, isn't it?
24  A   I don't believe so.
25  Q   Do you -- what do you believe the NCCHC

1    standard is?
2  A   Well, if you would -- so --
3  Q   I'm going to ask you the question, and then
4    I'll go to the book.
5        What do you believe the NCCHC
6    standard is with respect --
7  A   I believe it's consistent with this statement.
8  Q   Okay.  And which standard are you referring to?
9  A   I would need to -- I will need to review my
10    copy of the NCCHC standards.  If I can look
11    them up.
12  Q   So if the standard J-D-02, essential -- is that
13    an essential standard of the NCCHC?
14  A   I'll take your word for it.
15  Q   If it provides that -- the following:
16    "Therefore, inmates being admitted who report
17    currently taking medications or who bring their
18    medications with them are to continue the
19    medications unless there is a clinical reason
20    to alter or discontinue it," would you agree
21    with that statement?
22  A   Well, number one, you're reading -- I would
23    need to see the whole policy, but that's not
24    inconsistent with this right here.
25  Q   Fair enough.  But now answer my question.

1        Do you agree with that statement?
2  A   I agree with that statement.
3            MS. SCHNEIDER:  Asked and answered.
4  BY MR. GAHNZ:
5  Q   And under -- what is a compliance indicator?
6  A   In general, a compliance indicator to NCCHC
7      standards is how to tell if the facility is
8      compliant with that standard or not.
9  Q   All right.  Under compliance indicator No. 9 on
10     J-D-02 it provides, "Inmates entering the
11     facility on verifiable prescription medication
12     continue to receive the medication in a timely
13     fashion."
14            Was Ms. Freiwald on prescription
15     medications that had been verified?
16 A   No.
17 Q   Okay.
18 A   She didn't bring them, so they couldn't be
19     verified.
20 Q   Slightly different question.
21 A   I don't believe so.
22 Q   All right.  Well, if we want to argue, we'll
23     get down -- we'll get down and be here till
24     tomorrow.
25            But at the time that Ms. Freiwald

1  entered the jail, was she on prescribed
2  medications?
3  A   It was my understanding from your --
4  Q   The question is, was she on --
5            MR. SALEMI:  Hold on.  Hold on.
6            MS. SCHNEIDER:  Yeah.
7            MR. SALEMI:  Yeah.  Objection.
8      You've got to allow him to --
9  BY MR. GAHNZ:
10 Q   Go ahead and answer.  Go ahead and answer.  I'm
11     sorry.
12            MR. SALEMI:  You've got to allow him
13     to answer.
14 BY MR. GAHNZ:
15 Q   I didn't mean to step on you.
16 A   That's okay.
17            MR. SALEMI:  Hold on.  Number two,
18     the video will show there's a pattern of
19     argumentative questions that's developing here,
20     so I object that it's argumentative, and I
21     object to form.  I think the last question was
22     compound, but you can answer if you can.
23            THE WITNESS:  Okay.  It was --
24            MS. SCHNEIDER:  Join.
25            THE WITNESS:  It was my

1      understanding that your last question asked was
2      she on verified medications.  And so she -- her
3      medications had not been verified by the jail.
4      I do agree that she had been prescribed
5      medications prior to coming to the jail.
6  BY MR. GAHNZ:
7  Q   And the medications that she was on were
8      verified by the jail?
9  A   Not that night.  They were provided -- they
10     were verified later after her son brought them.
11 Q   Okay.  So within that standard it talks about
12     the facility has several options to ensure that
13     the inmates admitted on prescribed medications
14     continue to receive their necessary drugs in a
15     timely manner.
16            Are you aware of that standard
17     within the NCCHC?
18            MS. SCHNEIDER:  Object to the form.
19            MR. SALEMI:  And I object to the
20     form in that counsel is not reading standards.
21     Counsel is reading additional information that
22     are attached to standards but not referencing
23     standards.  So I object to form.  It misstates
24     the NCCHC standards.
25            THE WITNESS:  I would like to be

1      able -- I would like to be able to review the
2      standard you're referring to.
3  BY MR. GAHNZ:
4  Q   Sure.  I wanted you to look at -- there's the
5      highlighted section at page 72, the last
6      paragraph under the discussion.
7            MR. SALEMI:  Can I see it first,
8      please?
9  BY MR. GAHNZ:
10 Q   So why don't you do this, Doctor.  Would you
11     read the last paragraph on page 72 into the
12     record?
13            MR. SALEMI:  And I'll renew my
14     objection that this is not an NCCHC standard.
15     It is in a section entitled Discussions, which
16     is a reference within the standards to an NCCHC
17     standard.  So I object to form.
18            MS. SCHNEIDER:  Join.
19            THE WITNESS:  So this is standard
20     J-D-02.  And the standard itself is listed on
21     the first page, the compliance indicators 1
22     through 11, several of which apply here.
23            And then what is the specific
24     paragraph you asked me to read?
25

Page 78

1  BY MR. GAHNZ:
2  Q   The last paragraph at the bottom of page 72.
3  A   Okay.  "The facility has several options to
4      ensure that inmates admitted on prescribed
5      medication continue to receive the necessary
6      drugs in a timely manner.  One protocol
7      requires the provider to be contacted for a
8      verbal order after health care staff have
9      verified the prescription by contacting the
10     community prescriber or pharmacy.  Another
11     authorizes the nurses to give the medications
12     based on the community prescriber's valid order
13     until the facility provider can see the inmate.
14     Some protocols allow the use of medication
15     brought into the facility if it is in original
16     pharmacy packaging and labeled as required and
17     staff verified the order with the community
18     prescriber or pharmacist."
19 Q   Okay.  Thank you.
20         So that discussion with respect to
21     the standard is different than what you stated
22     in No. 4, correct, is at essentially every
23     other jail prescriptions must be reviewed by
24     the -- by the jail doctor?
25         MS. SCHNEIDER:  Object to the form.

Page 79

1         THE WITNESS:  I do not believe it's
2      inconsistent.  And that is my opinion and it's
3      not changed.
4  BY MR. GAHNZ:
5  Q   Okay.  In Ms. Freiwald's case which of her
6      medications were not medically appropriate?
7         MS. SCHNEIDER:  Object to the form.
8         THE WITNESS:  So in this -- in this
9      No. 4 I'm not referencing Ms. Freiwald in
10     particular in this.  What I said was, there are
11     a number of reasons that it is prudent
12     prescribing practice that the provider -- that
13     the provider decide which medicines are to be
14     continued and which are not, and I provided
15     examples that may or may not apply in her case.
16         A very common example that I will
17     give that does not apply in this case but is a
18     very common reason is oftentimes patients are
19     not compliant with their medications and they
20     have been prescribed five different kind of
21     blood pressure medicines.  So it's not -- as an
22     example, it's not safe to continue all five
23     blood pressure medicines because they haven't
24     been compliant.  You would potentially harm the
25     patient with all those blood pressure medicines

Page 80

1      that they weren't taking them.  That is an
2      example of why it's prudent practice to discuss
3      with the provider.
4         Another example is that oftentimes
5      patients have received medications from outside
6      providers that are inappropriate or are not
7      necessary in a jail setting.  An example in
8      this case would be the Ambien that Ms. Freiwald
9      had been prescribed.  She neither brought it
10     nor would it have been -- should it have been
11     continued had she brought it.
12 BY MR. GAHNZ:
13 Q   All right.  So have you completed your answer?
14 A   I have.
15 Q   All right.  Motion to strike as nonresponsive.
16         My question, sir, was, were there
17     any medications that Ms. Freiwald was
18     prescribed that were medically inappropriate?
19         MS. SCHNEIDER:  Asked and answered
20     and object to the form.
21         THE WITNESS:  So she was on
22     medications, and they discussed those
23     medications with Dr. Fatoki.  He continued some
24     of those medications he did not continue others
25     with those medications.

Page 81

1  BY MR. GAHNZ:
2  Q   Have you completed your answer?
3  A   I have.
4  Q   Motion to strike as nonresponsive.  I'll ask
5      again.
6         Were any of the medications that
7      Ms. Freiwald was prescribed as she entered the
8      jail not medically appropriate?
9  A   Can you show me --
10        MS. SCHNEIDER:  Asked and answered
11     and --
12        THE WITNESS:  Can you show me where
13     that's my opinion?  I mean, I don't necessarily
14     have that opinion that they were inappropriate.
15     I believe that it was appropriate to not
16     continue some of them.  So there's a -- that's
17     a different -- that's different.
18 BY MR. GAHNZ:
19 Q   Sir, I'm just reading form your report.
20 A   Yes.  And I've told you that this is not --
21     these were examples of reasons that that's
22     prudent prescribing practice, not specific to
23     Ms. Freiwald.
24 Q   So I guess my -- my confusion is you added all
25     of this verbiage into your report.  And is it

1    your testimony that 4(A) does not apply to
2    Ms. Freiwald?
3  A    That is not my testimony whatsoever.
4  Q    Okay.  So then can you tell me which, if any,
5    of the prescriptions that she was prescribed as
6    she entered the jail were medically
7    inappropriate?
8            MS. SCHNEIDER:  Object to the form.
9            THE WITNESS:  First -- first of all,
10    this does not say that her medicines were
11    inappropriate.  That is not my opinion.
12            My opinion is that Dr. Fatoki's
13    prescribing practice was appropriate, and I
14    gave reasons why that was appropriate.  Some of
15    her medications were appropriately not
16    continued.  I am not phrasing them as
17    inappropriate medications; they were prescribed
18    by outside providers, and Dr. Fatoki did not
19    feel like they should be continued and I agree
20    with that.  You can call them inappropriate if
21    you would like.  I don't call them that.
22  BY MR. GAHNZ:
23  Q    Which of the medications that Ms. Freiwald was
24    prescribed as she entered the jail were
25    therapeutically duplicative?

1            MS. SCHNEIDER:  Object to the form.
2            THE WITNESS:  I am not aware of any.
3    Again, I told you that this is the reasons that
4    it is -- that nurses should not just
5    continue medications but should talk to a
6    provider.  The person may have two different
7    type of medications of one kind or another, and
8    those are duplicates and so only one should be
9    continued.
10            That is -- that is an example of
11    what I'm telling you that it's prescribing
12    practice or safe.
13  BY MR. GAHNZ:
14  Q    Were there any medications that Ms. Freiwald
15    was taking -- well, let me read it.  You wrote
16    "They may not be taking the medications as
17    prescribed."
18            Is there any indication that
19    Ms. Freiwald was taking any of her medications
20    other than as prescribed?
21  A    Yes.
22  Q    Which medications?
23  A    Just a minute.  So --
24  Q    I don't mean to -- I don't want to step on your
25    answer, so I'm going to ask you to tell us what

1    document you're referring to.
2  A    Okay.  I'm referring to a Bates stamp
3    HRVACCS12.
4  Q    Okay.  Go ahead.
5  A    So -- just one moment, please.
6            So as an example, the -- this sheet
7    has a list of when these prescriptions were
8    last filled.
9  Q    Okay.
10  A    Some of them are 30-day prescriptions, some of
11    them are 90-day prescriptions.
12  Q    Okay.
13  A    The clonazepam was last filled on 9/23.
14  Q    Okay.
15  A    So that's more than a month prior.  But she had
16    pills remaining, so that means that she's not
17    talking as prescribed on that.
18  Q    So the clonazepam was prescribed as a 30-day
19    renewal?
20  A    That's right.
21  Q    And it --
22  A    Well, it was a 30 -- yeah, that's right.
23            And -- like the gabapentin prescribed on 7/27
24    and was a -- was I believe -- I believe that
25    would be a 90-day.  So that's -- and there were

1    73 remaining.  So, in other words, that's more
2    than 90 days and 73 remaining, so not taking
3    that as prescribed.
4  Q    Okay.  The clonazepam, is it your understanding
5    that she was to -- what was your understanding
6    as to what she was to be taking, Ms. Freiwald?
7  A    The instructions on the bottle were one tablet
8    by mouth at night and half tablet as needed for
9    anxiety.
10  Q    Okay.  So as needed means that sometimes if you
11    don't feel like you have to take it, you
12    wouldn't necessarily take it?
13  A    That's correct.
14  Q    Okay.  All right.  Going back to your report,
15    you indicated that another reason why it's a
16    prudent policy to have the medications reviewed
17    is that some are not medically necessary.  At
18    4(B) at page 18, right?
19  A    And may not be safe within a jail environment.
20  Q    We'll get to that.  But were there any
21    medications that Ms. Freiwald was prescribed
22    when she got to the jail that were not
23    medically necessary?
24  A    There were some that were -- were
25    inappropriately prescribed, yes.

Page 86

1  Q   Which?
2  A   Gabapentin.
3  Q   Okay.
4  A   Clonazepam.
5  Q   Okay.
6  A   And then Ambien, although not -- it does not
7      fall in that category.  In other words, it's
8      not necessarily inappropriately prescribed, but
9      it would not be safe in a jail setting.
10 Q   So who prescribed her the clonazepam and the
11     gabapentin?
12 A   Well, the gabapentin I'm not certain about.
13 Q   Okay.
14 A   I don't believe -- the best that I can tell,
15     Nurse Practitioner Page did not prescribe that
16     medication but only listed it as a medication
17     she was on.  That's part of the medical records
18     I don't have.  I believe she probably received
19     it from Bellin Health.
20 Q   Do you know who Dr. Sheets is?
21 A   Yes.
22 Q   Did Dr. Sheets prescribe the clonazepam?
23 A   He did.
24 Q   And he's a psychiatrist?
25 A   To the best of my knowledge, he is.

Page 87

1  Q   And did he also prescribe the gabapentin?
2  A   I don't believe so.  In other words, it's
3      listed on -- as a medication that she's taking,
4      but I don't know whether -- he may have
5      refilled it.  I don't believe he was the person
6      that started it, but I don't even -- I'm not
7      certain that he even refilled it.
8  Q   Did Dr. Sheets violate the standard of care by
9      prescribing clonazepam?
10        MS. SCHNEIDER:  Object to the form.
11        THE WITNESS:  I believe it was
12     not -- not prudent of him to have restarted
13     that clonazepam, yes.  I mean, I don't know
14     whether it's a breach of the standard of care.
15     It's not a very safe prescribing practice.
16 BY MR. GAHNZ:
17 Q   All right.  Assume that Dr. Sheets also
18     prescribed the gabapentin.
19 A   Okay.
20 Q   Would he have violated the standard of care by
21     prescribing Ms. Freiwald gabapentin?
22        MS. SCHNEIDER:  Object to the form.
23        THE WITNESS:  I don't see any
24     rationale in his note for the -- for the reason
25     of that.  In other words, it was my

Page 88

1      understanding from some records that
2      Ms. Freiwald was originally prescribed
3      gabapentin for back pain, which is a non-FDA
4      indication, so an off-label indication.  That
5      does not mean it's a breach of the standard of
6      care, but it does mean that it's not an FDA
7      indication.  I'm not aware that Dr. Sheets was
8      a pain management doctor, but to the extent
9      that he provided it for back pain, yes, it
10     would probably be inappropriate for a
11     psychiatrist to prescribe gabapentin for
12     chronic pain.
13 BY MR. GAHNZ:
14 Q   All right.  Continuing on page 18 under No. 5.
15     You talk about the -- the sentencing order,
16     correct?
17 A   That's correct.
18 Q   And one of the things that you wrote was, "A
19     reasonable provider would interpret that to
20     mean all prescriptions which were currently
21     being prescribed by the prescriber responsible
22     for her care."  Correct?
23 A   That is correct.
24 Q   And by that, you mean the judge's order to take
25     all prescribed medications?

Page 89

1  A   Yes.
2  Q   Okay.  Is it your understanding that Huber
3      inmates are responsible for their own medical
4      care?
5  A   That is correct.  In general.  Not emergency
6      care, but in general, yes.
7  Q   Okay.  So in that circumstance, the prescriber
8      responsible for her care would have been either
9      the Nurse Practitioner Page or Dr. Sheets,
10     fair?
11        MR. SALEMI:  I'm sorry, what
12     circumstance?
13        MR. GAHNZ:  Under the circumstance
14     that she's responsible for her own medical
15     care.
16        MS. SCHNEIDER:  Object to the form.
17        MS. DOYLE:  I'll join.
18        THE WITNESS:  No, I believe in this
19     case Dr. Fatoki was the medical director at the
20     jail and would have the ultimate authority over
21     what medications would be taken by inmates even
22     if they were prescribed by outside prescribers.
23        So, in other words, yes, she would
24     go back potentially to Nurse Practitioner Page,
25     not Dr. Sheets.  Dr. Sheets hadn't seen her

1       since March and no longer worked there.  But
2       Nurse Practitioner Page could prescribe
3       whatever medications that she wanted to, but it
4       would be up to Dr. Fatoki whether it was
5       medically appropriate to continue those while
6       she was a Huber inmate.
7   BY MR. GAHNZ:
8   Q    And that's really what I'm driving at.  The
9       fact that Fatoki approved or disapproved the
10      medication didn't change whether it had been
11      prescribed?
12  A    That is correct.
13  Q    Okay.  So in order to comply with the Court's
14      order, Ms. Freiwald was required to take the
15      clonazepam and the gabapentin?
16          MS. SCHNEIDER:  Object to the form.
17          MS. DOYLE:  I'll join.
18          THE WITNESS:  I disagree.
19  BY MR. GAHNZ:
20  Q    And why is that?
21  A    Well, I can tell you from my own practice I
22      routinely receive patients with these court
23      orders to comply with their -- with their
24      prescribed medications.  I don't allow them to
25      take all the medications that they've

1       necessarily been prescribed.  I allow them to
2       take which ones are medically appropriate.
3           When they get out and when they go
4       back to their prescriber and they talk to the
5       Court about whether they do or don't take those
6       medications, in other words, this happens all
7       the time in my practice and in every other
8       practice.
9   Q    What happens all the time?
10  A    Inmates come to jail with prescriptions that
11      are not continued in jail for a variety of
12      reasons.  And those I listed in No. 4.
13  Q    Right.
14  A    So it would be dangerous to just blindly
15      continue all medications.  In other words, if a
16      person comes with five blood pressure medicines
17      and you take it literally that you should give
18      them all five of their blood pressure
19      medications and they haven't been taking them
20      and now they're in jail and you give them five
21      pills, they might be dead of low blood
22      pressure.
23          So it's only prudent for you to
24      review them and continue the ones that are
25      appropriate.  And that's what the Court's --

1       that is -- in my experience is what the Court's
2       intentions are.
3   Q    There's nothing in the sentencing transcript
4       that talks about which -- well, strike that
5       question.
6           The order, though, reads that
7       Ms. Freiwald was to take all prescribed
8       medications as a condition of her sentence?
9   A    You can -- if you want to show me the exact
10      wording --
11  Q    Why don't you turn to Exhibit 10.
12  A    I don't have Exhibit 10 I don't think.  I can
13      get it.
14  Q    Well --
15  A    What I'm saying is you read -- I accepted your
16      reading of what the exact language is.  My
17      interpretation of that language and I believe
18      any reasonable physician's interpretation is
19      that the judge is not telling the provider
20      exactly which medication to provide, but
21      instead is saying that the patient is to follow
22      their doctor's instructions.
23  Q    So Exhibit 10, page 2, Judgment of Conviction.
24      Do you see where it says take all prescribed
25      medications?

1   A    I do.
2   Q    All right.  And that's what the judge ordered?
3   A    And I told you my interpretation of that is --
4       is not a literal interpretation.
5   Q    Okay.
6   A    This order was also the one that was signed
7       after Ms. Freiwald's death.
8   Q    All right.  Have you completed your answer?
9   A    I have.
10  Q    Move to strike as nonresponsive.
11          Does the judgment of conviction read
12      "Take all prescribed medications"?
13          MS. SCHNEIDER:  Are you asking him
14      what the document says?  He can say what the
15      document says, but he's already told you his
16      interpretation of it.  Go ahead and answer.
17          THE WITNESS:  I agree that is the
18      words that are on that paper.
19  BY MR. GAHNZ:
20  Q    Thank you.
21          And that in this particular case did
22      not happen?
23          MS. SCHNEIDER:  Object.
24  BY MR. GAHNZ:
25  Q    Ms. Freiwald was -- did not take all prescribed

Page 94

1 medications while she was in jail?
2 A   I --
3         MS. SCHNEIDER: Object to the form.
4         MS. DOYLE: I'll join.
5         THE WITNESS: I'm sorry. I didn't
6 mean to jump on top.
7         My interpretation of this court
8 order is that Dr. Fatoki followed this court
9 order even though he wasn't aware of it. I
10 didn't see any evidence in the record that he
11 was aware of it. And these are common court
12 orders, and physicians who work in jails are
13 familiar with these type of court orders. And
14 my interpretation is that he followed the
15 spirit of this court order. Well, he -- it
16 wasn't ordered to him. So, in other words, it
17 wasn't ordered to him. It was ordered to
18 Ms. Freiwald.
19 BY MR. GAHNZ:
20 Q   Right. And that's my point.
21         And Ms. Freiwald did not take all of
22 the prescribed medications while she was at
23 Brown County Medical -- at Brown County Jail?
24         MS. SCHNEIDER: Object to the form.
25         MS. DOYLE: I'll join.

Page 95

1         MR. GAHNZ: Let me -- what's the
2 problem with the form of that question,
3 Counsel?
4         MS. SCHNEIDER: Because he's already
5 given you his interpretation of it. Your --
6         MR. GAHNZ: I understand. He
7 answered a different question. I'm sorry, I
8 didn't mean to argue with you. But I asked a
9 question, I'll listen to the answer.
10         MR. SALEMI: Could you read it
11 again, please?
12         (Last question read.)
13         MS. SCHNEIDER: Same objections. Go
14 ahead.
15         THE WITNESS: So my interpretation
16 of that order to Ms. Freiwald was that she
17 comply with her physicians by taking all the
18 medications that had been prescribed to her --
19 were being prescribed to her at that time.
20 While the time she was at the Huber center, her
21 responsible physician, the physician
22 responsible for her care, was Dr. Fatoki, and
23 she was given the medications that had been
24 prescribed and that had been approved by
25 Dr. Fatoki to take. She didn't take them the

Page 96

1 first few days because she didn't bring them in
2 with her, but she did take them starting on the
3 31st.
4 BY MR. GAHNZ:
5 Q   Did she take gabapentin at all while she was at
6 the Brown County jail?
7 A   I don't know that for certain. I know that she
8 was not provided it by the Brown County Jail.
9 Q   Did she take clonazepam while she was at the
10 Brown County Jail?
11 A   I know that she wasn't provided it by them. I
12 don't know whether she might have taken it when
13 she was out or not.
14 Q   And if she did take it while she was out, she
15 would be in violation of jail policy, correct?
16 A   I don't remember the exact policy, but yes,
17 most jails and I think the Huber center had a
18 policy that you weren't to take medications
19 which weren't prescribed, yes. I would be
20 surprised if they didn't, but I don't recall it
21 exactly.
22 Q   So I want to talk about Dr. Fatoki and his
23 decision to discontinue gabapentin and
24 clonazepam, okay? Are you with me?
25 A   I am. I would characterize it as his not

Page 97

1 continuing prescriptions from the outside
2 rather than discontinuing it, but yes, I
3 understand.
4 Q   What is the difference between not continuing
5 and discontinuing?
6 A   Well, with regard to the gabapentin as an
7 example, he didn't say we were not going to --
8 we were going to discontinue it and never give
9 it to her again. He said we're not going to
10 provide it right now until we determine --
11 until we get medical records and find out why
12 she was provided it. So he didn't say that he
13 was never giving it again. He just did not
14 continue it on his initial orders. Same with
15 the clonazepam.
16 Q   What records are you relying on for the
17 statement that Dr. Fatoki left open the
18 possibility of restarting either gabapentin or
19 clonazepam?
20 A   His testimony and the nurses -- the nurses'
21 testimony that he asked to get a release of
22 information and get her medical records.
23 Q   Is there any contemporaneous writing from
24 either a nurse or a doctor -- or Dr. Fatoki
25 specifically that indicates that these were

Page 98

1 temporary as opposed to permanent cessation of
2 gabapentin?
3 A   Well, number -- so two things.  First of all,
4   Dr. Fatoki was on the phone speaking with the
5   nurse.  So the nurse was documenting what
6   Dr. Fatoki's orders were.  Dr. Fatoki was not
7   documenting contemporaneously.  It was the
8   nurse that was documenting contemporaneously.
9         And yes -- so number two, it is a
10   normal custom and practice that one starts
11   medications when a person reports to jail and
12   makes changes as needed after that.  So
13   that's -- that is just the usual custom and
14   practice of correctional health care.
15 Q   Okay.
16 A   And then further, referring back to that same
17   page we were on before, so it's CCS12, the
18   nurse makes the notation "Send ROI."  So send
19   release of information.
20 Q   So from the notation "Send ROI," which is
21   release of information --
22 A   Correct.
23 Q   -- you are concluding that based on that
24   written record, that there was a possibility of
25   restarting these medications?

Page 99

1 A   Well, that and Dr. Fatoki's testimony that he
2   asked the nurse -- or that both he and the
3   nurse said that he asked to get the records to
4   find out why it was being prescribed.
5         So once he found out why it was
6   being prescribed, he might restart it or he
7   might leave it discontinued.
8 Q   Are you aware of CCS policy that requires a
9   doctor to give a written explanation if he
10   discontinues or doesn't approve a medication?
11 A   If you would like to show me the particular
12   policy, I will be glad to interpret it.  I
13   understand -- I hear what you're saying, and if
14   you want to show me that policy, I'll interpret
15   it.
16 Q   Well, I'm not asking you to interpret it.  I'm
17   asking you are you aware of such a policy,
18   whether it exists or not, sir?
19 A   I have reviewed the CCS policies, and I believe
20   I recall the language that you're describing as
21   part of an entire policy.  So if you want to
22   show it to me, I'll be glad to give you my
23   opinion on it.
24 Q   Let me ask you it this way:  In review of any
25   of the materials that you were provided in this

Page 100

1 case, did Dr. Fatoki provide any written
2   explanation as to why he did not approve the
3   continuation of gabapentin for Ruth Freiwald?
4         MS. SCHNEIDER:  Object to the form.
5         THE WITNESS:  Well, it is my
6   understanding that Dr. Fatoki was on the
7   telephone with the nurse and that therefore he
8   wouldn't be able to document anything until he
9   next came to the facility.  And he was next at
10   the facility after Ms. Freiwald had died and
11   did not provide any -- would not be -- it would
12   be normal not to write on a chart after a
13   person's death, so I don't think he had an
14   opportunity to provide that ex- -- explanation.
15 BY MR. GAHNZ:
16 Q   Have you finished your answer?
17 A   I have.
18 Q   All right.  My question, though, is a little
19   different.
20         Did you see any record where
21   Dr. Fatoki documented the reason that he did
22   not approve the continuation of gabapentin for
23   Ruth Freiwald?
24         MS. SCHNEIDER:  Asked and answered.
25         THE WITNESS:  I did not see that

Page 101

1 documentation nor any other documentation from
2   Dr. Fatoki prior to Ms. Freiwald's death.
3 BY MR. GAHNZ:
4 Q   Okay.  With respect to Dr. Fatoki's decision
5   not to approve the continued use of clonazepam,
6   did you see any written explanation as to his
7   reasons for that decision?
8 A   That is the same answer as the last one I just
9   gave, that I didn't see documentation of that
10   or anything else by Dr. Fatoki in the chart
11   prior to Ms. Freiwald's death.
12 Q   So when Dr.--
13 A   By the way, I need -- I need to correct
14   something.  I said before her death, but before
15   her suicide.  He was in the facility before she
16   died.
17 Q   Okay.  What assessment of Ruth Freiwald was
18   made by Dr. Fatoki?
19 A   A telephone assessment of her condition and
20   medications.
21 Q   All right.  When did he speak with her on the
22   telephone?
23 A   I don't believe he did.  He spoke with the
24   nurse.
25 Q   Okay.  So what is an assessment?

1  A   A gathering of information.
2  Q   From whom?
3  A   From all sources --
4  Q   All right.
5  A   -- available.
6  Q   Was there any indication that Dr. Fatoki ever
7      saw Ruth Freiwald before he made the
8      determination to not approve her gabapentin?
9  A   No.  And -- and that would not be customary
10     practice.
11 Q   Was there any indication that he saw her before
12     he made the determination not to continue the
13     clonazepam?
14 A   No.  And that would not be standard practice.
15     It would not be standard practice to see a
16     person.
17 Q   So he didn't see her, he didn't talk to her on
18     the phone, correct?
19 A   Not to the best of my understanding.
20 Q   Did he review any medical records prior to
21     making his decision?
22 A   I believe he spoke with the nurse.  I don't --
23     I believe he reviewed what medical records that
24     the nurse had.
25 Q   How did he review the medical records that the

1      nurse had?
2  A   He reviewed them over the phone with her.  She
3      had the prescription -- this -- on page 12.
4      The prescriptions, the date, the pills left,
5      et cetera.
6  Q   And you're saying that's -- the document that
7      you're looking at is the medication
8      verification form, correct?
9  A   Well, there's other medical records as well.
10 Q   Well, that's my -- did the nurse go through any
11     of these records with Dr. Fatoki?
12 A   It's my recollection from their deposition
13     testimony that neither of them recall the
14     specifics of what they went over but that it
15     was their usual custom and practice to do so
16     and to provide whatever necessary information
17     was to make the decision.
18         So it's my understanding from their
19     deposition testimony they didn't recall the
20     specifics.
21 Q   Did they have any medical records for Ruth
22     Freiwald?
23 A   Yes.
24 Q   What medical records did they have of Ruth
25     Freiwald's?

1  A   The receiving -- the medical receiving
2      screening done by the correctional officer.
3  Q   So is it your position that a correctional
4      officer can create a medical record?
5          MS. SCHNEIDER:  Object to the form.
6          THE WITNESS:  Well, it's
7      information.  It's a jail chart, and it becomes
8      part of the medical record.  Yes, the receiving
9      screening is part of the medical record.
10 BY MR. GAHNZ:
11 Q   All right.  Other than the receiving screening
12     and the -- and the medication verification
13     form, what other information did Dr. Fatoki
14     have when he made the decision to not approve
15     the gabapentin and clonazepam?
16 A   Potentially the information that had been
17     recorded by Nurse Dennisen on the -- on that
18     receiving screening on the day before or from
19     a couple of days before.
20 Q   When you say "potentially" --
21 A   Well, that -- it was information that was
22     available to the nurse that was speaking to
23     Dr. Fatoki.
24 Q   Okay.
25 A   And the nurse and Dr. Fatoki don't recall the

1      specifics of the information exchanged, but it
2      would be their custom and practice to provide
3      any necessary information.  And since that was
4      available, it's quite likely that they did
5      discuss that information.
6  Q   Well, did Nurse Jones document any of the
7      reasons that Dr. Fatoki gave as to why he
8      wasn't going to approve clonazepam or
9      gabapentin?
10 A   What she documented on this form is that the
11     gabapentin was not approved by the physician
12     and to send a release of information.  What was
13     documented on the clonazepam was that it was
14     not approved by the physician, and the officers
15     were notified to contact HSU with any
16     withdrawal symptoms.
17 Q   So other than that information that you just
18     read to us, was there any other information as
19     to the thought process that Dr. Fatoki engaged
20     in when he determined not to continue the
21     gabapentin or the clonazepam?
22 A   His deposition testimony.
23 Q   All right.  And that was taken three years
24     after, right?
25 A   Something on that order, yes.

Page 106

1 Q　Okay. When Dr. Fatoki made the determination
2　to discontinue -- or to not continue the
3　gabapentin, did he know why Ruth Freiwald was
4　taking it?
5 A　I think the answer to that is certainly not,
6　and he was asking for a release of information
7　so he could find out.
8 Q　Did he know how long she had been taking it?
9 A　I don't see evidence of that.
10 Q　All right. Did he know who had prescribed it?
11 A　I don't believe that was recorded by -- on this
12　form, so I don't believe it was provided to
13　him.
14 Q　With respect to clonazepam, did Dr. Fatoki know
15　how long she had been on it?
16 A　I don't see evidence on this record that he
17　did.
18 Q　Did he know why she was on it?
19 A　I don't see a diagnosis recorded on here.
20 Q　Did Dr. Fatoki know prior to making his
21　determination to not continue the clonazepam
22　and the gabapentin that Ruth Freiwald had
23　attempted suicide in February of 2016?
24 A　I believe it was his deposition testimony that
25　he did not know that.

Page 107

1 Q　Did he know -- did Dr. Fatoki know that Ruth
2　Freiwald suffered from severe depression and
3　anxiety when he made a decision not to continue
4　the clonazepam and the gabapentin?
5 A　I believe it was his deposition testimony that
6　he knew that she had depression because she was
7　on fluoxetine which is an antidepressant. I
8　believe that -- clonazepam is quite often
9　prescribed for anxiety, so it would be -- not
10　be unreasonable that he made that conclusion,
11　but I don't recall what he said in his
12　deposition testimony about that.
13 Q　Okay. So at paragraph No. 12 you talk about
14　the sick call requests.
15 A　Excuse me, this is in my primary -- my report,
16　my Rule 26 report?
17 Q　Yeah, I'm sorry. I'm on page 20 of your
18　primary report.
19 A　I'm there.
20 Q　And at point 12 you indicated that "The
21　symptoms which Ms. Freiwald described over the
22　weekend in her sick call requests were
23　nonspecific and were not indicative of
24　benzodiazepine withdrawal."
25　　　Did I read that correctly first of

Page 108

1　all?
2 A　You did.
3 Q　Okay. What symptoms was Ms. Freiwald
4　describing over the weekend?
5 A　I thought I had perhaps put the sick call
6　requests in there, but I did not.
7　　　The symptoms that she was
8　describing -- there are two sick call requests.
9　They are HRVACCS18 and 17 in that order.
10 Q　Okay.
11 A　Would you like me to read her complaints?
12 Q　Rather than do that, is that the complaints
13　that you're referencing in paragraph 12 at
14　page 20?
15 A　I believe so, but just let me -- yes.
16 Q　What's the CIWA scale?
17 A　That is -- CIWA stands for Clinical Institute
18　Withdrawal Assessment Scale. And it is a
19　rating scale to rate the severity of primarily
20　alcohol withdrawal symptoms.
21 Q　Is it also used for benzodiazepine withdrawals
22　rating?
23 A　It's not designed for that use, and I don't use
24　it for that purpose.
25 Q　Okay.

Page 109

1 A　There is a -- there is a CIWA-B or
2　benzodiazepine that some people use, and some
3　people do use the CIWA score for
4　benzodiazepines. I do not because of the
5　nature of benzodiazepine withdrawal.
6 Q　Is the CIWA scale B a generally accepted tool
7　for assessing symptoms of benzodiazepine
8　withdrawal?
9　　　MS. SCHNEIDER: Object to the form.
10　　　THE WITNESS: I would not call it
11　generally accepted, and I do not use it in my
12　practice.
13 BY MR. GAHNZ:
14 Q　So because you don't use it, that's the basis
15　for your statement that it is not generally
16　accepted as a tool in the -- in assessing
17　benzodiazepine withdrawal?
18 A　Well, I guess -- so I'm an addiction medicine
19　physician, and I have 20 years of practice
20　detoxing people. And so if I don't use it,
21　it's not accepted by me, and I would not say it
22　is widely used or widely accepted. Those are
23　the reasons that I don't think it is generally
24　accepted. It is not a widely used tool.
25 Q　Are you aware of whether or not Brown County

Page 110

1  uses the CIWA assessment scale?
2  A  The CIWA assessment?  I didn't -- I believe I
3     reviewed the CCS detox protocols, and yes, I do
4     believe they use it.  They may even use the
5     benzo.
6        (Exhibit No. 206 was marked.)
7        THE WITNESS:  By the way, we can
8     answer this line of questioning, but at some
9     point I need to go to the restroom just
10    whenever we get to it.
11       MR. GAHNZ:  Let's do that.  Do you
12    want to break for lunch then too?
13       Let's go off the record.
14       THE VIDEOGRAPHER:  We are off the
15    record at 11:54 a.m.  This is the end of disc
16    number two in the deposition of Dr. Thomas
17    Fowlkes.
18       (Recess taken, 11:54 a.m. to 12:40 p.m.)
19       THE VIDEOGRAPHER:  We are back on
20    the record at 12:40 p.m.  This is the beginning
21    of disc number three in the deposition of
22    Dr. Thomas Fowlkes.
23 BY MR. GAHNZ:
24 Q  Doctor, before the break I had handed you
25    Exhibit 206, which is the CIWA assessment scale

Page 111

1     for benzodiazepines, correct?
2  A  Correct.
3  Q  And we had established prior to that this was a
4     scale that was used by Brown County in its
5     benzodiazepine withdrawal protocol?
6  A  I didn't -- I didn't agree that that is so.  I
7     don't doubt it, but I don't recall specifically
8     that Brown County and/or CCS uses this.  I
9     wouldn't doubt that they do.  I'm not disputing
10    you, I'm just not agreeing to it without --
11 Q  So for purposes of these questions, can we
12    assume that it is, in fact, something that is a
13    screening tool used by Brown County?
14 A  Certainly.
15 Q  Okay.
16 A  And are you making a distinction by Brown
17    County as opposed to the CCS providers at Brown
18    County or --
19 Q  I'm saying the CCS providers at Brown County.
20 A  Okay.
21 Q  I understand that you don't use this particular
22    scale in your -- in your practice, correct?
23 A  That is correct.
24 Q  All right.  Are you familiar with it however?
25 A  I am.

Page 112

1  Q  All right.  What are -- in the left-hand column
2     on the three pages what are -- what is the
3     purpose of those questions?
4  A  These are questions which are to be asked by
5     the rater, by the person who is filling out the
6     scale.  And then they are to -- on each
7     question they are to score an answer from zero
8     to 4 depending on the response of the person.
9        And these are all I believe -- these
10    are all questions.  What I mean by that is,
11    some scales -- some scales have observations as
12    well, but these are all questions and answers.
13 Q  Okay.  And then on page 3, depending on the
14    answer provided by the -- by the examinee, I
15    guess --
16 A  By the patient, yes.
17 Q  Patient.  Thank you.  -- will tell whether or
18    not there's any -- the level of withdrawal?
19 A  According to this scale.
20 Q  Okay.  And so do you know whether the questions
21    in the left-hand -- kind of the first column on
22    each of these three pages are asking about
23    symptoms that are related -- that are known
24    symptoms of benzodiazepine withdrawal?
25 A  Well, without stating the obvious, it's a scale

Page 113

1     for benzodiazepine withdrawal, and these are
2     questions that are felt to be related to
3     benzodiazepine withdrawal, yes.
4  Q  Do you take issue with any of the signs that
5     are listed in Exhibit 206?
6  A  I take issue with two things about this scale,
7     and I'll just tell them to you briefly.
8        Number one, many of these symptoms
9     are nonspecific, meaning that they are present
10    in a lot of other conditions besides
11    benzodiazepine withdrawal.  That's one problem
12    I have with them in general.
13 Q  Sure.
14 A  And the second is that the most dangerous
15    withdrawal symptom of benzodiazepine is
16    seizures --
17 Q  Okay.
18 A  -- which is unrelated to the severity of
19    symptoms.  So, in other words, this does not
20    predict who is or is not going to have a
21    seizure.  That is another problem I have with
22    the scale in general.
23 Q  Is there another assessment tool that is, in
24    your opinion, generally accepted by the medical
25    community to assess benzodiazepine withdrawal?

1 A   In my opinion, there is not. That is, there is
2    not a good assessment scale for
3    benzodiazepines -- or not a better. There's
4    not a better one. Some people use this. I do
5    not use it because I don't believe it is very
6    accurate.
7 Q   But as far as you're aware, there is no other
8    scale that's in existence with respect to
9    benzodiazepine withdrawal?
10 A   That would be better or in use more, no, that's
11    correct. You are correct.
12 Q   All right. Early on in your report you talk
13    about in the scope of your -- let me pull it up
14    here -- scope of report how Ms. Freiwald's past
15    medical history and mental health conditions
16    influenced these opinions.
17       And what was it about Ms. Freiwald's
18    past medical history that impacted -- or
19    influenced any of your opinions?
20 A   Well, this is my -- the scope of the work I was
21    doing. So I was provided this kind of thing
22    before I was -- in other words, to -- and there
23    is one that -- that I am usually asked and
24    might have been asked in this case and didn't
25    put here, an autopsy finding.

1       So, in other words, I'm usually
2    asked how does a person's past medical history,
3    their autopsy findings influence my opinions.
4    That's part of the scope of work.
5 Q   Okay.
6 A   So, in other words, it could be the autopsy
7    wasn't in question or, in other words, we know
8    what the cause of her death was, but that's not
9    always the case.
10 Q   Okay.
11 A   So I'm usually asked to opine about that.
12 Q   Okay. So then I guess I'll ask it more
13    broadly.
14       Was there anything about
15    Ms. Freiwald's past medical history that
16    influenced your opinions?
17 A   I would say yes in a general way. One of them
18    is that I have very limited past medical
19    records.
20 Q   Okay.
21 A   So I have -- I have very limited past medical
22    records.
23       Number two, I saw that she had had a
24    serious suicide attempt in February of 2016
25    while she was taking both clonazepam and

1    gabapentin.
2 Q   Okay.
3 A   So -- and, I mean, there are other such -- I
4    mean, and she had the psychiatric history that
5    she had. So, yes, those impacted my opinion.
6       She had very severe emotional
7    disregulation.
8 Q   And what do you base the severe emotional
9    disregulation conclusion on?
10 A   On the Prevea. Primarily on the Prevea. And I
11    may not be saying that correctly. Might be
12    some --
13 Q   P-R-E-V-E-A?
14 A   Correct. Prevea? Prevea? Whatever it's
15    pronounced. On those records.
16 Q   And those records are from the time frame of
17    March of 2016 through October of 2016?
18 A   Yes.
19 Q   Okay. Anything else that you base your
20    conclusion of emotional disregulation on?
21 A   Well, her suicide attempt in February was very
22    consistent with emotional disregulation. I
23    don't know that those -- that terminology was
24    used by the doctors who were caring for her at
25    that time.

1 Q   Will you define emotional disregulation for me,
2    please.
3 A   Emotional disregulation is a mental health
4    symptom or condition, it's a sign -- so, in
5    other words, it's not a diagnosis -- that -- in
6    the best way that I can describe it in
7    nonmedical terminology, it is the inability to
8    normally regulate one's emotions as people
9    without that condition can.
10       So, in other words, most -- it's an
11    inability to regulate normal emotions. The
12    emotions swing from -- wildly one way or the
13    other. It's often described as lacking
14    emotional skin or being an emotional burn
15    victim.
16       So, in other words, I can give you
17    an example. In normal day-to-day interactions
18    with people we have -- we speak, we say hello
19    or whatever. If I don't speak to you today,
20    you don't take that -- you know, you are able
21    to determine that I might be in a bad mood or
22    might not like you or some other such thing.
23       People with emotional disregulation
24    take those very small slights and become
25    severely agitated over them or they have wild

1 emotional swings over what would be to the rest
2 of us normal interactions.
3 Q   Is that a DSM diagnosis?
4 A   It is not a diagnosis, as I said.  It's not a
5     diagnosis.  It is present in conditions.  It is
6     a symptom that is present in conditions.
7 Q   All right.  Was that something that was known
8     to Dr. Fatoki in October of 2016?
9 A   I do not believe so.
10 Q   All right.  Additional -- the previous suicide,
11     were any of the -- well, first of all, was
12     the -- the fact that Ruth Freiwald had
13     attempted suicide known to Dr. Fatoki?
14 A   I believe he testified in his deposition he did
15     not know that.
16 Q   Okay.  And this may seem a little obvious, but
17     given the fact that he didn't know about the
18     previous suicide, it's also fair that he didn't
19     know the method by which she attempted suicide,
20     correct?
21 A   I believe that is correct.
22 Q   Okay.  So at page 22, the first sentence of the
23     first full paragraph --
24 A   Okay, I want to see which section this is.  I'm
25     sorry, this is just my general opinions

1     section.  Let me just make sure I'm -- okay.
2 Q   Okay.  So this is still part of 14, correct?
3 A   That is correct.  In my opinions about the care
4     rendered by Dr. Fatoki in that section.
5 Q   You're noted in that sentence that the BCJ
6     receiving screening did not show an acute
7     suicide risk.
8        What is an acute suicide risk?
9 A   No evidence of present suicidal ideation or
10     intent.  So, in other words, no evidence of --
11     present.
12 Q   What is nonacute suicidal?
13 A   A better terminology would be previous suicide
14     attempt or prior.  So prior suicidal actions,
15     which is what Ms. Fatoki [sic] had --
16 Q   I'm sorry?
17 A   Which is what she had.  She had a prior suicide
18     attempt, but no current ideation or intent.
19 Q   All right.  So pursuant to the NCCHC, would you
20     agree that at the point that Ms. Freiwald
21     checked into the Brown County Jail, she was a
22     nonacutely suicidal inmate?
23 A   I don't -- I don't know whether I would agree
24     with that language or not without reviewing the
25     policy.

1 Q   Okay.  So there's a definition at page 39
2     that -- of nonacutely suicidal.  And I think it
3     tracks with what you just told us.  So if you
4     could read that into the record, that would be
5     great.
6        MR. SALEMI:  Could we see it first,
7     please.  Thank you.
8        THE WITNESS:  Your instruction or
9     your question was for me to read that; is that
10     correct?
11 BY MR. GAHNZ:
12 Q   The definition of nonacutely suicidal, please.
13        MS. SCHNEIDER:  Can you just have
14     him identify the exact?  I don't know that we
15     did the number of them.
16 BY MR. GAHNZ:
17 Q   Sure.  If you would start by identifying which
18     standard we're looking at.
19 A   This is J-B-05, Suicide Prevention and
20     Intervention in the middle of page 39,
21     Definitions --
22        MR. SALEMI:  Doctor, before you do
23     that, could you read the cover, too, and what
24     year that is?
25        THE WITNESS:  Yes.  This is the

1     NCC -- NCCHC Standards for Health Services in
2     Jails.  This is the 2018 edition, which is not
3     the edition that I reviewed in this case.
4 BY MR. GAHNZ:
5 Q   Okay.
6 A   Well, it's not the -- it's not the edition that
7     was in place at this time, 2016.  That would be
8     the 2014 edition.
9 Q   Did they change the definition of nonacutely
10     suicidal?
11 A   I don't know without comparing them.  So this
12     is -- I mean --
13 Q   Fair enough.
14        MR. SALEMI:  And show a continuing
15     objection to you using the 2018 standards from
16     the NCCHC as irrelevant, but you can go ahead.
17        MS. SCHNEIDER:  I'll join.
18        THE WITNESS:  Okay.  So the edition
19     that I reviewed and the edition that was in
20     effect at this time was 2014.
21 BY MR. GAHNZ:
22 Q   All right.  Do you have that -- where is that
23     book?
24 A   Where is the book?
25 Q   Yes, sir.

Page 122

1 A   On my book shelf in my office.
2 Q   All right. So that's one of the documents that
3   is not part -- you did not bring that with you
4   to your deposition today?
5 A   That's not true.
6 Q   Okay. May I have it?
7 A   Yes. That's the documents.
8 Q   So this is the 2014 edition?
9 A   Amongst -- amongst a bunch of other documents.
10 Q   All right. Okay. So I'm going to show you --
11   and feel free to scroll up and down on my
12   computer, it's a touch screen, if you would
13   like -- the standard for nonacutely suicidal
14   inmate as of 2014. Is that what I have up on
15   the screen?
16 A   It is.
17 Q   And that's the set of standards that you relied
18   on, correct?
19 A   That is correct.
20 Q   All right. And so can you read that -- that
21   definition?
22 A   Okay.
23       MR. SALEMI: Which standard again?
24   What number?
25       THE WITNESS: I'll go to it. I'll

Page 123

1   tell you.
2 BY MR. GAHNZ:
3 Q   And I'll tell you it's much easier to use the
4   touch screen.
5 A   Okay. Oh, it's like literally the whole thing.
6   G -- I'm sorry. It's J-G-05, Suicide
7   Prevention Program.
8 Q   Okay.
9       MR. SALEMI: Thank you.
10       THE WITNESS: And it is on page 119.
11   "NCCHC's definition of nonacutely suicidal
12   (potential or inactive) inmates are those who
13   express current suicidal ideation, for
14   example, expressing a wish to die without a
15   specific threat or plan and/or have a recent
16   prior history of self-destructive behavior."
17 BY MR. GAHNZ:
18 Q   Based on that definition, was Ruth Freiwald a
19   nonacutely suicidal inmate when she checked
20   into the jail on October 27, 2016?
21 A   No, she didn't meet even that definition. So
22   she wasn't suicidal in that way at all no.
23 Q   And one of the things that it says is recent
24   suicide. "But demonstrate other concerning
25   behaviors" -- well, hang on a second. It says,

Page 124

1   "and/or have a recent prior history of
2   self-destructive behavior."
3       Did Ruth Freiwald have a recent
4   prior history of self-destructive behavior?
5 A   So I disagree that she met that definition of
6   nonacutely suicidal at all.
7 Q   Okay.
8 A   But so one can -- that is a -- I guess that is
9   a matter of judgment as whether -- as to
10   whether her suicide attempt six months prior
11   meets the definition of recent or not.
12 Q   Okay.
13 A   I would say not, but that's certainly subject
14   to argument.
15 Q   So reasonable minds could disagree?
16 A   On whether a six-month-ago suicide attempt was
17   recent or not, yes.
18 Q   And if one assumes that six months prior is
19   recent, would you agree that Ruth Freiwald was
20   a nonacutely suicidal inmate when she checked
21   in?
22 A   No. Because the first definition says like
23   present thoughts of suicide. She had no
24   present -- or no current suicidal ideation or
25   intent. Her screening was entirely negative

Page 125

1   for current.
2 Q   It says and, slash, or. Does that make a
3   difference to you? And I'll give it back to
4   you. I don't mean to --
5 A   I don't believe she met that criteria. I
6   mean -- because I would say in that -- in that
7   way -- and so the "or" would be a recent prior
8   history of self-destructive behavior. So, in
9   other words, I would interpret that to be I'm
10   not suicidal today, but yesterday I was -- you
11   know, I've just come from the hospital for a
12   suicide attempt. So something recent in -- my
13   definition of recent is not six months ago with
14   no current. No, I don't believe she meets that
15   definition.
16 Q   Now, you had a chance to look at all of the --
17   the treatment records, right?
18 A   All of the ones that were provided to me.
19 Q   Right. And you saw a bunch of them from Dawn
20   Vardis, right?
21 A   I saw a number of counseling sessions, yes.
22 Q   Right. She had almost 50 counseling sessions
23   between February and October, right?
24 A   I won't agree to that characterization of the
25   number. I don't -- because I don't know. I'm

1    not disagreeing with you. I'm simply saying
2    you say it's 50; I don't know the number.
3  Q  All right.
4  A  It was a number of them.
5  Q  So I guess to meet the definition of "recent"
6    in your mind, how much time between the event
7    and the check-in would be required?
8  A  Well, that wasn't the -- the question you asked
9    me before was did I think that she met --
10 Q  I understand.
11 A  -- NCCHC's definition of nonacutely suicidal.
12    And according to this definition here, I don't
13    believe that she did.
14 Q  And I absolutely understand that --
15 A  Okay.
16 Q  -- and we're on to the next question.
17 A  And would you please repeat that question?
18 Q  Sure.
19       In order to be in your mind a recent
20    suicide or self-destructive behavior, how much
21    time would you allow to lapse between the event
22    or the self-destructive behavior and the
23    check-in to jail?
24 A  In what context?
25 Q  In the context of meeting the definition that

1    we've been talking about, sir.
2       MS. SCHNEIDER: Object as vague and
3    overly broad, but go ahead.
4       THE WITNESS: Okay. Well, two
5    different things. So you're asking me now how
6    recent would it have to be in order to meet
7    this definition, which, again, has nothing to
8    do with the opinion that I have here in my
9    report about her not having current suicidal.
10    So she did not have current suicidal ideation
11    or intent.
12       She had a suicide attempt, a very
13    serious suicide attempt, approximately six
14    months prior. That is not recent in my
15    definition.
16 BY MR. GAHNZ:
17 Q  All right. Are you done with your answer?
18 A  Yes.
19 Q  Move to strike as nonresponsive.
20       The question is, how much time? A
21    week? A month? Two months? Three months? So
22    let me just finish the question. Had
23    Ms. Freiwald attempted suicide a month before
24    she was checked into jail, would that meet the
25    definition of nonacute suicide?

1  A  So you're now -- you're now asking me
2    hypothetical questions, and it depends on the
3    circumstances of each case. So each case might
4    be different, in other words. In one person
5    vague suicidal ideation a month ago might be
6    recent. On the other hand, you know,
7    passing -- it depends on what you're talking
8    about. Was it a suicide attempt? How serious
9    was the suicide attempt? When was it? Those
10    hypotheticals are -- vary by case to case.
11       What I said was in this case it
12    wasn't recent in my definition; it was six
13    months before, and that's not recent. I
14    don't -- I can't give you a broad answer. If
15    it was a very serious suicide attempt a week
16    before, that would be recent.
17 Q  Okay. So we've now narrowed it down to a week?
18 A  That's right.
19 Q  All right. If Ruth Freiwald had attempted the
20    exact same type of suicide two weeks before she
21    checked in, would that meet the definition?
22 A  Well, now it depends on what amount of -- what
23    kind of treatment she has between now --
24    between now and then, none of which -- and the
25    most important factor is whether she's

1    currently suicidal, which she was not, and in
2    your hypothetical you haven't told me anything
3    differently about.
4  Q  If she's currently suicidal, doesn't that
5    change her to the acutely suicidal definition
6    as opposed to the nonacutely suicidal?
7  A  No. Because this says nonacutely suicidal,
8    in- -- there's something that's gotten in the
9    way -- inmates who express current suicidal
10    ideation without a specific threat or plan.
11    So, in other words, vague present suicidal
12    ideation, no intent or plan.
13 Q  All right. So --
14 A  So acutely suicidal is present ideation with --
15    with plan --
16 Q  Okay.
17 A  -- or intent.
18 Q  So you won't give -- if Ruth Freiwald had
19    attempted suicide in the exact same manner that
20    she did in February of 2016 two weeks before
21    she checked into the jail, you're not willing
22    to say that that's a recent suicide or
23    self-destructive behavior?
24 A  No. What I said was that when you go much
25    beyond a week or so, then it depends on the

Page 130

1  other circumstances, how serious the attempt
2  was, what treatment they have received in the
3  meantime, whether they were, you know, now
4  judged stable by another mental health
5  professional. All those kinds of factors come
6  into it which are all hypothetical and don't
7  apply in this case.
8  Q   Did anybody from Nurse Jones, Nurse Blozinski,
9     or Dr. Fatoki go through the analysis that you
10    just went through to determine whether or not
11    Ruth Freiwald was nonacutely suicidal when she
12    checked into the jail?
13          MR. SALEMI: Object to form.
14          MS. SCHNEIDER: Join.
15          THE WITNESS: So it was my
16    understanding that the suicide screening was
17    done by a correctional officer, and
18    Ms. Freiwald was allowed to go to the Huber
19    center. And so that was done on the night of
20    her intake, and those nurses that you just
21    described were not present on that night.
22  BY MR. GAHNZ:
23  Q   Same with Dr. Fatoki, correct?
24  A   Correct.
25  Q   And as far as you know -- well, let me back up.

Page 131

1              It's also true that neither
2     Dr. Fatoki, Nurse Jones, nor Nurse Blozinski
3     ever reviewed the suicide screening to make the
4     determination as to whether or not Ruth
5     Freiwald was either acutely or nonacutely
6     suicidal?
7  A   I believe that was their deposition testimony.
8  Q   All right. No. 15, your opinion is that
9     Ms. Freiwald's suicide on 11/2/2016 was neither
10    reasonably foreseeable nor preventable by
11    Dr. Fatoki or the CCS staff; is that correct?
12  A   That is correct.
13  Q   What is your basis for this opinion?
14  A   My basis for this opinion is that there is no
15    indication in the records that I reviewed that
16    either Dr. Fatoki or the CCS nurses were aware
17    of any suicidal ideation, any suicidal actions,
18    any suicidal statement, or any behaviors by
19    Ms. Freiwald which would indicate to them or to
20    reasonable providers that she was at risk of
21    suicide on that day.
22  Q   All right. What about at any time between her
23    entry into the jail and November 2nd?
24  A   That opinion still applies.
25  Q   All right. And --

Page 132

1  A   Or I should say that I have that opinion for
2     that whole period of time.
3  Q   Okay. I just wanted to make sure that we
4     were -- is there any other basis for that
5     opinion?
6  A   The records and the deposition testimony
7     that --
8  Q   Anything in specific that you can point us to?
9  A   Well, as a for instance, the -- Dr. Fatoki said
10    he -- he had no information that she was
11    suicidal; the nurses, the same thing, they had
12    no information that she was voicing suicidal
13    ideation or intent while she was at the Huber
14    center or anytime she was at the jail.
15  Q   All right. In looking at your 50-odd pages of
16    report I didn't see anything in there about
17    blood pressure monitoring. Did I miss that?
18  A   Did you -- first -- first of all, what do you
19    mean? Yes, I saw where the nurse who reviewed
20    her screening form said that -- noted that
21    Mrs. Freiwald was on blood pressure medicine
22    and said that she should have blood pressure
23    checks, yes.
24  Q   Is that anywhere in your 50-odd pages of your
25    report?

Page 133

1  A   Let's see. It was contained on that screening
2     form, on the notation by I believe it was Nurse
3     Dennisen.
4  Q   Okay.
5  A   And the copy that I have doesn't have the
6     handwritten part.
7  Q   Okay. So -- and that would have been part of
8     the information that was provided to you, was
9     that there had been an order for blood pressure
10    checks for three -- three straight days, right?
11  A   I don't know if one would classify that as an
12    order. I don't believe it was given by a
13    provider. I believe that there might -- I
14    believe that the nurses and perhaps
15    Dr. Fatoki -- although I don't believe he
16    commented on it directly -- was that -- that
17    there was sort of a standing policy or protocol
18    to check blood pressure medicine on people who
19    came into the jail but without their blood
20    pressure medicine. So that was a standard
21    practice of theirs.
22  Q   Were there any blood pressure checks that were
23    done on Ms. Freiwald?
24  A   No, because she didn't remain at the Brown
25    County Jail. She went to the Huber center

Case 1:18-cv-00896-WCG   Filed 03/04/20   Page 34 of 61   Document 109-18

Page 134

1   where there's not normally a nurse stationed.
2  Q   So should there have been blood pressure checks
3     done?
4  A   No.
5  Q   All right.  How come?
6  A   Well, number one, Ms. -- Ms. Freiwald didn't
7     bring her medication, so she wasn't on her
8     medications.  When her medications were
9     received, they were approved and started, and
10    the nurse over the weekend made an appointment
11    to assess Ms. Freiwald the next time that there
12    was nursing sick call there or something -- or
13    see a provider.  I forget the exact language.
14 Q   Where is that?
15 A   HRBACCS000018.
16 Q   Okay.
17 A   The response of the nurse on 10/29 was "Next
18    available appointment with HSU for blood
19    pressure check.  Meds to be reviewed with M.D."
20 Q   So do you know whether an appointment was
21    actually made?
22 A   I do not.
23 Q   Do you know when the next time HSU staff went
24    to the Huber facility?
25 A   I do not.

Page 135

1  Q   Is there any indication that a blood pressure
2     check of any sort was ever done?
3  A   There is not.
4  Q   If somebody had done a blood pressure check on
5     Ruth Freiwald, would you anticipate that there
6     would be a notation of that?
7  A   I -- I would believe that there would be, yes.
8  Q   All right.  Based on the medical slip that you
9     have in front of you, did that trigger any sort
10    of requirement for any HSU staff to go see
11    Ms. Freiwald?
12 A   No.
13 Q   How come?
14 A   Well, for one thing, this request was written
15    on 10/28 at 5:00 p.m., which I believe was
16    Friday at 5:00 p.m.  It was responded to the
17    next day.  And at that time they had
18    Ms. Freiwald's blood pressure medications which
19    they reviewed with Dr. Fatoki.  And he issued
20    the orders, and they sent them to the Huber
21    center the next day, on Sunday.  So they did
22    make a response.  Their -- I mean, their
23    response was starting her on her blood pressure
24    medicine.
25 Q   My question is a little bit different, that

Page 136

1     it's your opinion that the request for medical
2     care did not trigger a requirement by any HSU
3     staff to go see Ms. Freiwald?
4          MS. SCHNEIDER:  Asked and answered.
5          THE WITNESS:  That is correct, to go
6     see her in person.  They took action by
7     starting her on her blood pressure medicine,
8     which was appropriate.
9  BY MR. GAHNZ:
10 Q   All right.  And can you point to any standard
11    that supports that opinion?
12         MS. SCHNEIDER:  Object to the form,
13    but go ahead and answer it if you can.
14         THE WITNESS:  I don't think that I
15    can.  There aren't standards that address that
16    specific issue.  Sick call requests need to be
17    responded to, and hers was responded to.  There
18    are standards that say that, but that's the
19    only standard I could point.
20 BY MR. GAHNZ:
21 Q   And this is something that would fall within
22    nursing expertise, right?
23 A   No, I wouldn't say so.
24 Q   Okay.  Although a nurse has testified as to the
25    nursing standards that would apply to -- to

Page 137

1     that request, correct?
2  A   Well, I think it is an overall correctional
3     health care -- so delivery of care issue.  I
4     believe it's within that area of expertise.  A
5     nurse might well be able to opine about that,
6     yes.
7  Q   And Nurse Ward opined that upon receipt of the
8     October 28, 2016, medical request, that HSU
9     staff was required by nursing standards to go
10    see in person Ms. Freiwald.  Is that your -- is
11    that a fair recitation of one of her opinions?
12         MR. SALEMI:  I'll object to form,
13    yeah, asking him to characterize another
14    witness's opinions.  But you can if you can.
15         MS. SCHNEIDER:  And also just
16    objection.  He hasn't seen the actual testimony
17    of Nurse Ward.  But go ahead if you remember
18    the opinions from her report.
19         THE WITNESS:  I don't recall it word
20    for word.  I will take your word for it that --
21    I recall something very similar to that.  I
22    don't know that she had that very specific
23    opinion as you worded it, but I don't doubt
24    that she has that opinion.
25

1  BY MR. GAHNZ:
2  Q   All right.  And do you recall when you read her
3     reports that she cited to specific nursing
4     standards, right?
5  A   I recall she -- she had lots of opinions and --
6     yes, she cited lots of different standards.  I
7     might have commented about that specific one.
8     Just a moment.  If you could point me to that
9     specific opinion of hers within her report, I
10    could comment.
11 Q   No, I can't.  I'm just asking you whether or
12    not you're aware that she had cited to nursing
13    standards with respect to that report -- or to
14    that opinion.  And if you can't, that's fine.
15    I mean --
16 A   Well, if you'll give me just a moment, I will
17    review her report and see if I can find that
18    specific opinion and which standard.  I don't
19    recall which standard she applied.  That's what
20    I'm trying to determine.
21 Q   All right.  So would you defer to Nurse Ward's
22    nursing opinion with respect to whether or not
23    Blozinski and/or Jones or HSU was required to
24    see Ms. Freiwald after the -- receiving the
25    10/28 medical slip?

1  A   Absolutely not.
2  Q   Okay.  And same question with respect to
3     October 31st.  Was that also a request for
4     medical care?
5  A   The request was actually not made on
6     October the 31st.  It was made on October the
7     30th, Sunday.
8  Q   All right.  On October the 30th did anybody go
9     see Ms. Freiwald?
10 A   I believe that the nurses did not go to the
11    Huber center but instead sent her blood
12    pressure medications.  In fact, that's what's
13    documented.
14 Q   Is it your opinion that the
15    October 30th request did or did not require HSU
16    staff to go see Ms. Freiwald in person?
17 A   Did not.
18 Q   And your basis for -- for that opinion is what?
19 A   My more than 20 years of experience as a
20    correctional health care both provider and
21    administrator and medical director.
22 Q   It's not based on any particular nursing
23    expertise, though, correct?
24 A   I have substantial experience training,
25    supervising, writing protocols for and

1     overseeing the practice of nurses in a health
2     care setting.
3  Q   One of the things that you say at page 24 in
4     subsection B, 19(B) --
5  A   I'm there.
6  Q   -- was that "Ms. Freiwald was housed at a
7     remote location that normally has relatively
8     little interaction with the BCJ since inmates
9     at the Huber center go to outside providers."
10       Is that something that would have
11    been known to Dr. Fatoki on October 27, 2016?
12 A   What portion of that?
13 Q   The whole thing.
14 A   Well, number one, Dr. Fatoki was the medical
15    director of the Brown County Jail.  I don't
16    know -- I mean, one would make a logical
17    assumption that he knew how -- and, in fact, I
18    think he testified at his deposition that he
19    knew that Huber center inmates were to go to
20    outside providers.  He was also responsible for
21    authorizing what medicines would or wouldn't be
22    taken there, so yes, I think he was aware of
23    how health care was delivered at the Huber
24    center.
25 Q   And he was also aware that it was a remote

1     location?
2  A   Well, I can't speak for Dr. Fatoki, but, I
3     mean, I believe he should -- he was aware that
4     the Huber center was not located at the same
5     place as the Brown County Jail, yes.  I don't
6     know one way or the other, but it would seem
7     reasonable that he would know that.
8  Q   Okay.  Is high blood pressure a serious medical
9     condition?
10       MS. SCHNEIDER:  Object to the form;
11    vague and overly broad.
12       THE WITNESS:  It can or cannot be.
13    So it's not in every situation.
14 BY MR. GAHNZ:
15 Q   All right.  And what makes high blood pressure
16    a serious medical condition?
17 A   The extent of its control or lack of control
18    and the complications related thereto.
19 Q   Do you have an opinion as to whether or not
20    Ms. Freiwald's high blood pressure was a
21    serious medical condition?
22 A   I don't have any indication that it was.  In
23    other words, I have no evidence to show me that
24    it was a serious medical condition.  It
25    needed -- it was a chronic medical condition

Page 142

1    that needed treatment and was treated.
2  Q   Okay.
3  A   But I don't believe it was a serious medical
4      condition at the time she was at the Brown
5      County Jail.
6  Q   You indicated -- and I think we've covered
7      this, but I just want to make sure -- that you
8      believe that the gabapentin was prescribed off
9      label for chronic pain.
10         Have we gone through the entire
11     basis of that belief?
12 A   I think so. I will add, though, that it could
13     well have been prescribed for mood stabilizing
14     purposes or prescribed or continued by the
15     Prevea behavioral health care providers. In
16     other words, I'm not saying that they didn't
17     continue it because of its mood stabilizing
18     properties, but I don't believe it was
19     originally prescribed for that purpose. And I
20     certainly didn't see that it was prescribed for
21     seizures.
22 Q   All right. What is rebound anxiety?
23 A   Well, there are -- there are probably multiple
24     definitions. It depends on what circumstance.
25         In this type of scenario what I

Page 143

1      believe you're referring to would be the
2      presence of anxiety after stopping antianxiety
3      medications.
4  Q   Okay. Assume that that's what I'm talking
5      about.
6  A   Right. That's -- I mean, that's -- that would
7      be relevant to this case.
8  Q   And when does that happen?
9          MS. SCHNEIDER: Object to the form
10     as vague and overly broad depending on the
11     circumstances, but go ahead.
12         THE WITNESS: Exactly what she just
13     said. I can't tell you a specific time. I
14     mean, it depends on the circumstances.
15 BY MR. GAHNZ:
16 Q   Are you critical of Dr. Fatoki for abruptly
17     stopping the clonazepam?
18 A   Not in this circumstance.
19 Q   All right. How come?
20 A   Because, number one, clonazepam is one of the
21     longer-acting benzodiazepines, and it has a
22     property where essentially it -- you can
23     self-taper. In other words, it can taper
24     itself off.
25         Number two, this was a very low

Page 144

1      dose.
2          Number three, there was evidence in
3      the record that she was not taking it at the
4      dose -- at the dose that it had been
5      prescribed. So it was a low dose, and it was
6      appropriate to stop it suddenly with the --
7          Also, Dr. Fatoki didn't just stop it
8      suddenly. He asked for him to be notified if
9      there were signs of withdrawal, which did not
10     occur.
11 Q   Okay. There were no signs of withdrawal?
12 A   Well, he certainly wasn't notified of any signs
13     of withdrawal, and yes, there were no specific
14     signs of benzodiazepine withdrawal.
15 Q   Now, when you give testimony in cases like
16     this, do you use the same set of standards and
17     rigor that you do when you're presenting to
18     doctors at conventions and other times when you
19     give presentations?
20         MS. SCHNEIDER: Object to the form.
21         THE WITNESS: I'm not sure how to
22     answer that question. I mean, I -- I would say
23     that the preparation of a presentation no, does
24     not have the same degree of rigor as my
25     opinions here in this case. I mean, I teach --

Page 145

1      there's informal teaching, there's informal
2      lectures. So no, it doesn't have the same
3      rigor.
4  BY MR. GAHNZ:
5  Q   All right. Can you point me to any literature
6      that supports the contention that it is
7      appropriate to stop a patient's use of
8      clonazepam without a taper abruptly?
9  A   So I believe that what you're asking me doesn't
10     exist in the literature, in other words, that
11     it doesn't exist either way. There is no
12     literature that says this particular dose or
13     this particular length of prescribing or this
14     particular situation always requires tapering
15     or this other situation doesn't. So, in other
16     words, it's a case-by-case basis. It depends
17     on the length of time they've been prescribed
18     it, the dose they've been prescribed, and the
19     compliance with it. So there wouldn't be any
20     literature that would definitively set that
21     out.
22 Q   Well, you would agree with me that there's a
23     fair number of warnings not to stop clonazepam
24     abruptly?
25         MS. SCHNEIDER: Object to the form.

1          **THE WITNESS: It shouldn't --**
2          MR. SALEMI: Presents an incomplete
3    hypothetical. You can answer.
4          **THE WITNESS: It is generally a true**
5    **statement that benzodiazepines which have been**
6    **prescribed over a long period of time and in**
7    **high enough doses should not be stopped**
8    **suddenly, that is correct.**
9    BY MR. GAHNZ:
10   Q   And, in fact, that's -- you teach various
11      doctors not to abruptly stop benzodiazepines,
12      correct?
13   **A   There are safe tapering strategies, yes, that's**
14      **correct.**
15   Q   That wasn't my question though.
16          My question was, you teach --
17          MR. SALEMI: Can you read that
18      question again, please.
19          (Last question read.)
20   BY MR. GAHNZ:
21   Q   Can you answer that question, Doctor?
22   **A   Would you read back my answer?**
23          MR. SALEMI: Yeah, I'll ask that.
24      Would you please.
25          (Last answer read.)

1          MR. SALEMI: Thank you.
2    BY MR. GAHNZ:
3    Q   All right. So I'll move to strike as
4      nonresponsive.
5          The question is, you teach doctors
6    not to stop benzodiazepines abruptly, correct?
7          MS. SCHNEIDER: Asked and answered.
8          **THE WITNESS: So I you teach doctors**
9      **safe prescribing practices, which includes not**
10     **stopping benzodiazepines suddenly when they**
11     **have been prescribed in high doses over long**
12     **periods of time, yes, that's correct.**
13          (Exhibit No. 207 was marked.)
14   BY MR. GAHNZ:
15   Q   Doctor, I'm showing you what we've marked as
16      Exhibit 207. Do you recognize this document?
17   **A   I do.**
18   Q   What is this document?
19   **A   This is a printout from a PowerPoint**
20     **presentation on benzodiazepines. One thing**
21     **that I will say is that -- that I'm not certain**
22     **of is what date. I had given a very**
23     **similar-appearing presentation over a number**
24     **of -- at a number of times, so I'm not sure**
25     **what date this was from.**

1    Q   Well, that's what I was going to ask you is
2      when -- when was this?
3    **A   I don't know. I don't know where you obtained**
4      **it from, so I don't know which one it is.**
5    Q   Well, I can tell you that it's at least past
6      2016, because if you look at this Bachhuber
7      scale, B-A-C-H -- or Bachhuber scale,
8      B-A-C-H-H-U-B-E-R, it has a date of 2016 on it,
9      correct?
10   **A   Right. So it may be one of my more recent ones**
11     **from 2017 or '18. Since this incident.**
12          MR. SALEMI: I'm sorry, has this
13      been disclosed?
14          MR. GAHNZ: No.
15          MS. SCHNEIDER: Then show an
16      objection. We have document production demands
17      on -- just for the purposes of my making my
18      objection and moving on, I believe we have
19      document production demands -- although I'm a
20      little late to this case -- that would have
21      covered production of documents such as this.
22          MR. GAHNZ: How would I have
23      document -- how would I have the doctor's
24      documents in my possession? How would that be
25      a plaintiff's responsibility to provide

1    documents that were created by an expert in
2    this case? I'm allowed to use documents to
3    cross-examine the doctor. So you can make your
4    objection, but I'll tell you that I found it
5    when I was doing my research for this
6    deposition, and I don't think there's any
7    responsibility that I had to provide
8    cross-examination documents to the other side
9    prior to my cross-examination.
10          MR. SALEMI: Yeah, I disagree. I
11   think once you developed this document -- once
12   you acquired it, that it was subject to the
13   pending document production demands and you are
14   obligated to supplement your disclosures. And
15   my objection is that you failed to do so.
16          And I'm only doing that in a general
17   sense because as I sit here, I didn't draft the
18   document production demands in this case, I'm
19   not 100 percent positive that it is covered. I
20   believe the routine ones that myself and my
21   partner use it would have been covered, and so
22   I'm just making my objection.
23          MR. GAHNZ: So -- well, I'll
24   respond. One, my mental impressions and my
25   research are work product and aren't -- and

1    aren't subject to disclosure.  Two, it is
2    disclosed at this time, so -- which is prior to
3    trial, in the deposition.  So given when your
4    experts provided their reports, it would
5    absolutely be a timely supplement today in any
6    event.  But let's not waste a lot of record
7    time on this.  Let's move on.
8          MR. SALEMI:  That's fine with me.
9          MR. GAHNZ:  Okay.
10   BY MR. GAHNZ:
11   Q    All right.  So one of the things that you put
12        in this PowerPoint is that you have nothing to
13        disclose in that you are not the biggest
14        advocate for benzodiazepine.  That's at page 4.
15   A    **That's not exact.  I mean, you didn't exactly**
16        **state it correctly.  I don't have anything to**
17        **disclose except perhaps to say I am not the**
18        **biggest fan of benzodiazepines.**
19   Q    Thank you for that clarification.
20   A    **And there is a further disclosure that some of**
21        **these opinions presented in this presentation**
22        **are my own opinion as opposed to information**
23        **from the literature.**
24   Q    Fair enough.
25          And as you go through this

1    PowerPoint, you put in parentheses those
2    opinions that -- you say "my opinion"?
3    A    **I tried, yes.**
4    Q    Okay.  All right.
5    A    **That's right.**
6    Q    So I want to go to the benzodiazepines potency
7        page of the PowerPoint.  It's about -- these
8        pages unfortunately are not numbered, so
9        it's --
10   A    **Okay.**
11   Q    For your -- it looks like this.
12   A    **I'm familiar with it.  I'll try to get**
13        **to it.**
14          MS. SCHNEIDER:  How far into it
15        would you say it is?
16          MR. GAHNZ:  About halfway.
17          THE WITNESS:  I'm there.
18   BY MR. GAHNZ:
19   Q    What is the purpose of the Benzodiazepines
20        Potency slide?
21   A    **Well, certain -- the page before that actually**
22        **has the same information in -- this bigger --**
23        **it tells the pharmacokinetics of**
24        **benzodiazepines depend on their potency, their**
25        **onset of action, their duration of action,**

1    **their lipophilicity.  So the point is at**
2    **different characteristics that characterize how**
3    **benzodiazepines are handled by the body, how**
4    **they're metabolized and the effects on the**
5    **body.**
6    Q    Okay.  So the clonazepam dose that is shown
7        both on the pharmacokinetics properties of
8        benzodiazepine and the benzodiazepines' potency
9        page is .25 milligrams, correct?
10   A    **That's correct.**
11   Q    And is that because that's the standard dosage
12        for clonazepam?
13   A    **No.  It's -- it's the dose that's equivalent to**
14        **the standard that is used.  If you go to the**
15        **second page, it shows it better.**
16   Q    Okay.
17   A    **Valium 5 milligrams.  So, in other words, what**
18        **milligram is equivalent to 5 milligrams of**
19        **Valium for each of these benzodiazepines, not**
20        **that it's a standard dose.  It's just a**
21        **equi-- it's an equipotency table.**
22   Q    And what's it -- I'm sorry, you said what was
23        the drug that it was based off of?
24   A    **Valium, the top one.  Diazepam.**
25   Q    Okay.  And it's your understanding that -- or

1    what's your understanding as to the dosage that
2    Ms. Freiwald was receiving for clonazepam?
3    A    **I believe it was 1 milligram at nighttime and a**
4        **half a milligram as needed.  I don't know that**
5        **it had a particular hour instruction on there.**
6        **I don't believe that was written.  At least the**
7        **way -- I don't know if it was on the label, but**
8        **it wasn't written on the form.**
9          **So a dose of 1 milligram a day,**
10        **which is a relatively low dose.**
11   Q    And that would be equivalent to 20 milligrams
12        of Diazepam?
13   A    **That's correct.**
14   Q    Okay.  So a couple pages in past that, two
15        pages past that, you have a special note.
16        What -- what's going on on this page?
17   A    **Let me get to it.  Let me get to the page.**
18          **Special note non-- this page?**
19   Q    Yeah, the non-U.S. benzo.
20   A    **Okay.**
21          MS. SCHNEIDER:  Are you asking him
22        what his intent was in creating this slide for
23        this specific presentation?
24          MR. GAHNZ:  Right.
25          **THE WITNESS:  Okay.  It is that**

Page 154

1  there exists a benzodiazepine that's not
2  available in the United States.  It's called
3  flunitrazepam.  It goes by the brand name
4  Rohypnol in Mexico.  And it's sold as a
5  hypnotic or a sleep medication, but it's used
6  as a date rape drug.  It's called roofies.  So
7  it's -- this is a special case.  We can't
8  get -- we don't get it in America by the legal
9  market, but it's available on the street and
10  you have to watch out for it.  It causes severe
11  amnesia.
12  BY MR. GAHNZ:
13  Q    So down in the bottom right corner there's a
14     meme that reads:  "Rohypnol - When Traditional
15     Dating Methods Aren't Just Cutting It."
16          Is that something that you put into
17     this presentation?
18  A    Yes.
19  Q    And why?
20  A    Because I was trying to point out that roofies,
21     which are known as a date rape drug, are used
22     for these purposes.  So this -- for instance,
23     this is a -- just came off the internet.  It's
24     a guy holding an unresponsive female.  So
25     roofies will make a person unresponsive and

Page 155

1     subject to date rape.  It's a very serious
2     condition.
3  Q    Okay.  Going back about six or seven pages,
4     Long-Term Use of Benzodiazepine.
5          Tell me when you get to that slide.
6  A    Going back?  How far back?
7  Q    Towards the back of the page.  It looks like
8     this.
9          MS. SCHNEIDER:  Move --
10          THE WITNESS:  I went the other --
11     I'm sorry, I went the wrong way.
12  BY MR. GAHNZ:
13  Q    Toward the back of the document.
14  A    I'm sorry.  My apologies.
15          MS. SCHNEIDER:  What was it called
16     again?
17          MR. GAHNZ:  Long-Term Use of
18     Benzodiazepines.
19          THE WITNESS:  How many pages going
20     back?
21  BY MR. GAHNZ:
22  Q    Seven pages past the roofie meme.
23  A    Okay.  Okay.  I'm there.
24  Q    So long-term use is greater than eight to
25     twelve months?

Page 156

1  A    Correct.
2  Q    And who is Sadock, et al., 2009?
3  A    Well, it -- that is a literature reference.  I
4     don't know who Sadock is, but that's -- that's
5     a literature reference to an article or a
6     publication by Sadock from 2009.
7  Q    All right.  And the information that's
8     contained on this slide you derived from
9     reading this Sadock, et al. article?
10  A    That's what this is in -- I don't know -- I
11     can't say that.  I don't know whether it was an
12     article or chapter.  I don't recall at this
13     moment.  I don't have the reference list.
14     Let's see if the -- in the back.  No, it's
15     Sadock, et al. Kaplan and Sadock's
16     "Comprehensive Textbook of Psychiatry,"
17     9th edition, in 2009.
18  Q    And that's contained somewhere in the couple
19     pages where the references are?
20  A    It's where the references are.  So, yes, it's
21     what reference that is.
22  Q    Okay.  And so the question was, did you draw
23     the information contained in this PowerPoint
24     slide from this textbook?
25  A    Well, that's what that reference is.  I don't

Page 157

1     recall doing that, but that's what the
2     reference means, yes.
3  Q    Thank you.  All right.
4          So long-term use is greater than or
5     equal to eight to twelve months; is that right?
6  A    That's what this slide says, yes, and I agree
7     with that.
8  Q    Okay.  And Ms. Freiwald was on benzodiazepine
9     for -- benzodiazepines long term, correct?
10  A    That's not correct.
11  Q    That's not correct?
12  A    That's not correct.
13  Q    Okay.  What about that is incorrect?
14  A    Well, she was on benzodiazepines prior to her
15     suicide attempt in February.
16  Q    Right.
17  A    She had an overdose on benzodiazepines; they
18     were stopped.  She was detoxed, so she was no
19     longer on them, and then they were restarted in
20     March.
21  Q    Okay.
22  A    And so March to October is less than eight to
23     twelve months.  So she was not on long-term
24     benzos.
25  Q    All right.  Is there any documentation to show

Page 158

1   that the benzodiazepine was out of her system
2   prior to it being restarted in March?
3 **A   I am not aware of any documentation of that.**
4    **But based upon the time course, it would be my**
5    **opinion based on my practice and experience**
6    **they would have been out of her system.**
7 Q   You are a pharmacology expert?
8 **A   No. I'm a board-certified addiction medicine**
9    **doctor.**
10 Q   All right. Did you do any sort of
11    pharmacological evaluation to determinate -- to
12    determine whether or not the benzodiazepines
13    that Ms. Freiwald ingested in February of 2016
14    were out of her system prior to restarting her
15    on benzodiazepines?
16      MS. SCHNEIDER: Beyond his education
17    and experience?
18      **THE WITNESS: I never -- I never saw**
19    **Ms. Freiwald, I never did any tests on her.**
20    **And so I have no -- I didn't do any test to**
21    **determine anything about her blood -- drugs in**
22    **her system.**
23 BY MR. GAHNZ:
24 Q   All right. It says that -- that 90 percent of
25    people that have been on long-term use of

Page 159

1   benzodiazepine experience withdrawal symptoms
2   whether withdrawn slowly or rapidly; is that
3   correct?
4 **A   That is correct.**
5 Q   What is the percentage for people that have not
6   been on benzodiazepines long term?
7 **A   I don't -- I don't know it, but general term it**
8    **would depend on the specific length of time and**
9    **the specific dosing.**
10      **This is just discussing long-term**
11    **use greater than eight to twelve months.**
12 Q   Okay. All right. So if you go to Ways I Could
13    Impact My Practice.
14 **A   That's further back in the presentation, I**
15    **believe?**
16 Q   Yeah. It's about ten pages from the end.
17 **A   Okay. I'm there.**
18 Q   All right. So what is the purpose of this
19    slide? What are you telling practitioners?
20 **A   That there are clinical practice guidelines.**
21    **This is one example of them, but there are**
22    **clinical practice guidelines and that -- this**
23    **audience was a primary -- is a primary care**
24    **audience. So, in other words, that was the**
25    **main people that were the audience of this, and**

Page 160

1    **that they would do well, if they were going to**
2    **use benzodiazepines in their practice, to**
3    **follow these clinical guidelines about their**
4    **safe use.**
5 Q   All right. And you point them to a file within
6    the jpshealthnet.org, right?
7 **A   Yes. Simply as an example of one clinical**
8    **practice guideline.**
9 Q   All right. And that's one that you believe is
10    appropriate for physicians to use, correct?
11 **A   Yes. I believe I have snip-its from it further**
12    **over in the presentation.**
13      (Exhibit No. 208 was marked.)
14 BY MR. GAHNZ:
15 Q   All right. I'm going to show you what we've
16    marked as Exhibit No. 208. And I'm going to
17    ask you is this the document that you referred
18    treating physicians to?
19 **A   I don't recognize this as the exact document or**
20    **certainly not in this format.**
21    **You can tell if it's the same**
22    **document, because these are snips from it. So**
23    **if we find that snip, it will be the same**
24    **document, but I don't --**
25 Q   Why don't you look at the bottom, all right?

Page 161

1   Do you see where it says www.jpshealthnet.org.?
2 **A   I do.**
3 Q   Slash sites?
4 **A   Right.**
5 Q   Slash default?
6 **A   I see that.**
7 Q   Slash files, slash prescribe -- I want you to
8    compare Exhibit 208 to what is on the bottom --
9    what is on your Ways I Could Impact My Practice
10    slide.
11 **A   Okay.**
12 Q   Okay. Take a look at them, and then tell me if
13    this is the document that you referred the
14    physicians to look at.
15 **A   Well, this is cut off. On the bottom of mine**
16    **they're cut off. In addition to that, just**
17    **because it's from the same site -- I don't know**
18    **how often JPS does or does not update. So, in**
19    **other words, I -- you only asked me was this**
20    **the exact one I downloaded and referred people**
21    **to, and I don't know whether it is or not. It**
22    **looks generally familiar, I just don't know**
23    **it's exactly the same one.**
24 Q   Okay. Well, the title of this is "E-Resource
25    October 2014." Is that the same title that's

1    on your slide?
2 A  It appears to be.
3 Q  And the title is called "Prescribing and
4    Tapering Benzodiazepines."  Correct?
5 A  It appears to be.
6 Q  And it's from the jpshealthnet.org., correct?
7 A  It appears to be.
8 Q  I guess I'm confused by -- why we're having a
9    problem with you authenticating this document.
10   Is there some -- is there something that I can
11   do to convince you that this is, in fact, the
12   document that you sent the doctors to in your
13   PowerPoint presentation?
14        MS. SCHNEIDER:  Object to the form.
15        MR. SALEMI:  Yeah, I object.  He's
16   not required to authenticate the document.  All
17   he's required to do is testify to what he
18   knows.  You can answer.
19        THE WITNESS:  So before I did this
20   presentation, I went to this website, and I'm
21   quite sure at the time I printed it off.  I
22   don't recall it looking in this exact format is
23   what I'm telling you.  I'm not saying if it is
24   or is not the same exact information.  I don't
25   recall it looking in this same format.  I

1    didn't go to WebCash.  I went directly to a
2    website.  I don't know if this is the exact
3    information or not.
4        You can tell the information from
5    what I printed because I used -- if you will go
6    to the next few pages, there are snip-its or
7    these are -- I'm sorry, I don't -- I'm blanking
8    on the word. Captures.  Is that what you call
9    it?  Capture from the document.  These are
10   captures from this document.  So if you find
11   that exact capture in here, then it's probably
12   the same document.  Do you see this page right
13   here?  It's a capture.  So I just don't know.
14 Q  All right.  So go --
15 A  It may well be.
16 Q  Let's go a couple pages in.
17 A  Okay.
18 Q  So you have a long-term use discontinuation
19   letter.
20 A  That's correct.
21 Q  All right.  And there is a long-term use
22   discontinuation letter contained within the --
23   at 11 of 13 of Exhibit 208, correct?
24 A  Let's go look at it.  Yes.
25        And so as an example -- I'm not

1    trying to be argumentative, I promise you.  Do
2    you see at the top long-term discontinuation
3    use letter?  On my slide.  On my slide right
4    here.
5 Q  Yes.
6 A  Do you see how it's underlined?
7 Q  Yes.
8 A  Okay.  Do you see how it's not underlined over
9    there. So it's not a capture of the same exact
10   document.  And this is -- this is a capture of
11   a document.  It might be the same information.
12   I'm just saying this -- this document right
13   here is not the same document, because the one
14   I -- the one I snipped from has an underline
15   under that.
16 Q  All right.
17 A  So I don't know if it's all the same
18   information or it's not.  I just don't know one
19   way or the other.
20 Q  All right.
21 A  And -- well, that's all I can -- that's the
22   best I can answer you.
23 Q  All right.  So let's look at 208.
24 A  Okay.  That's this document right here.
25 Q  In the first paragraph it provides "There are

1    just as many risks involved with abrupt
2    withdrawal of benzodiazepines as there are for
3    using them for long-term use."
4        Would you agree with that statement?
5 A  I would.
6 Q  Then on the right side on that same page
7    there's a number of bullet points that talk
8    about tapering benzodiazepines; is that
9    correct?
10 A  That's correct.
11 Q  All right.  And the first bullet point says
12   that "You should attempt to decrease frequency
13   and dosage for long-term users versus
14   discontinuation."  Correct?
15 A  That is what it says.
16 Q  And you would agree with that?
17 A  Well, in a primary care setting, yes.
18 Q  In what settings would you disagree with that?
19 A  In a jail setting -- in a jail setting in a
20   person who had not been using a high dose for a
21   long period of time I would disagree with that.
22 Q  So in every other circumstance you would agree
23   with it, or are there other circumstances that
24   you would disagree with it as well?
25 A  There might well be other times I would

Page 166

1    disagree with it as well.
2 Q   But sitting here today, the only example that
3    you can think of is that somebody that hasn't
4    been on benzodiazepines long term and is in
5    jail?
6 A   So another -- so another scenario in which I
7    would recommend discontinuation is -- versus,
8    you know, that I would recommend getting a
9    person off of it is people with a history of
10   substance use. You've come to -- you know, you
11   have substance use, you're in my facility, then
12   I would -- I would get you off of them. I
13   wouldn't -- I would not just decrease the
14   frequency and the dosage in a person who had
15   had a suicide attempt with benzodiazepines.
16         MR. GAHNZ: I'm sorry, what was the
17   last part of that answer?
18         (Last part of answer read.)
19 BY MR. GAHNZ:
20 Q   In that circumstance would you take any
21   precautions with that patient?
22 A   Yes.
23         MS. SCHNEIDER: I'm just going to
24   object as vague and overly broad. Go ahead.
25         THE WITNESS: Depending on the

Page 167

1    circumstances, I might well taper that
2    benzodiazepine off and/or monitor them for
3    signs of benzodiazepine withdrawal.
4 BY MR. GAHNZ:
5 Q   Okay. In this case there was no tapering,
6    correct, in Ms. Freiwald's case?
7 A   That is correct.
8 Q   It also states that you should expect anxiety,
9    insomnia, and resistance. Do you agree with
10   that statement?
11         MR. SALEMI: I'll object to the
12   form. Presents an incomplete hypothetical.
13   It's irrelevant to the facts of the case. You
14   can answer.
15         MS. SCHNEIDER: Join.
16         THE WITNESS: I agree that that is
17   contained in this bullet point, yes.
18 BY MR. GAHNZ:
19 Q   Okay. And would you expect that anxiety --
20   well, let me rephrase. Let me back up.
21         Would you expect that a patient
22   being tapered off of benzodiazepine slowly
23   would have increased anxiety?
24 A   Yes.
25         MR. SALEMI: Same objections.

Page 168

1          MS. SCHNEIDER: Join.
2 BY MR. GAHNZ:
3 Q   Would you expect that a person being abruptly
4    taken off of a benzodiazepine would have
5    increased anxiety?
6          MR. SALEMI: Same objections.
7          MS. SCHNEIDER: Join.
8          THE WITNESS: You did a thing, so I
9    would expect both of them to have increased
10   anxiety, not necessarily more in the second
11   scenario.
12 BY MR. GAHNZ:
13 Q   Okay. So the mere fact of being taken off of
14   benzodiazepine either gradually or abruptly is
15   going to increase a person's anxiety?
16         MR. SALEMI: Same objections.
17         MS. SCHNEIDER: Join.
18         THE WITNESS: No. You rephrased the
19   second one doing that would have a causation.
20   The first way you asked me was would I expect a
21   person who had been tapered off or was being
22   tapered off to have increased anxiety. So
23   those are two different questions, a matter of
24   causation.
25

Page 169

1 BY MR. GAHNZ:
2 Q   Well, let me back up and see if I can ask the
3    question.
4          Does being tapered off of a
5    benzodiazepine increase a person's anxiety?
6          MR. SALEMI: Same objections.
7          MS. SCHNEIDER: Join.
8          THE WITNESS: It's not designed to,
9    but I would expect the person to have increased
10   anxiety. So tapering is not designed to
11   increase anxiety or it's the not the purpose of
12   it, but people who are -- who are getting off
13   benzodiazepines, whether being tapered or
14   whether being withdrawn -- whether it's stopped
15   suddenly, are going to have increased anxiety,
16   just like people in jail are going to have
17   increased anxiety. So those are --
18 BY MR. GAHNZ:
19 Q   So would you expect that a person who is taken
20   off of a benzodiazepine abrupt- -- well, let me
21   rephrase the question.
22         Does being taken off of a
23   benzodiazepine abruptly increase a person's
24   anxiety?
25         MR. SALEMI: Same objections.

1          MS. SCHNEIDER: Same objection --
2     join.
3          **THE WITNESS: Well, anxiety can be**
4     **one of the benzodiazepine withdrawal symptoms,**
5     **so it would depend on the dose and the length**
6     **of time the person had been on whether one**
7     **would expect it. Given a high enough dose and**
8     **a long enough term, yes, one would expect it.**
9     **Given a low enough dose and a low -- a short**
10    **enough term one would not expect it.**
11    BY MR. GAHNZ:
12    Q    Okay. And Ms. Freiwald, is it your opinion
13         that her anxiety increased because of being
14         taken off of it abruptly by Dr. Fatoki?
15    A    **It is my opinion that that is not the case.**
16    Q    All right. So her anxiety -- do you have an
17         opinion as to whether Ms. Freiwald's anxiety
18         increased while she was in jail?
19    A    **I would use the term that her emotional**
20         **disregulation continued to have problems. She**
21         **had problems with emotional disregulation that**
22         **is experienced by the person as anxiety. So,**
23         **yes, I agree that she felt more anxious while**
24         **she was in jail most specifically related to**
25         **her not getting out like she thought she was**

1     going to after one night.
2     Q    So in your opinion, is there any relation to
3          Ms. Freiwald's increased anxiety and the
4          cessation of the clonazepam?
5          MS. SCHNEIDER: Object to the form.
6          **THE WITNESS: It is much more likely**
7     **to be related to her circumstances and not**
8     **getting out than -- than it is to withdrawal --**
9     **withdrawal from benzodiazepines.**
10    BY MR. GAHNZ:
11    Q    And I'll move to strike as nonresponsive.
12         My question was, is it your opinion
13         that the abrupt cessation of clonazepam had no
14         role in Ms. Freiwald's increased anxiety?
15         MS. SCHNEIDER: Object to the form.
16         **THE WITNESS: Well, my answer --**
17    **you -- I mean, it's responsive or it's not**
18    **responsive. It was -- her increased anxiety**
19    **and increased emotional disregulation were much**
20    **more likely related to her underlying**
21    **psychiatric condition and her being in jail and**
22    **not getting out than due to any benzodiazepine**
23    **withdrawal.**
24    BY MR. GAHNZ:
25    Q    I understand that answer. My question is a yes

1     or no question, and that's why I'm really
2     struggling here.
3          Is this a -- is this a question that
4     you can answer yes or no?
5     A    **I don't --**
6          MR. SALEMI: I'm sorry, could you
7     read it again, please, the question and the
8     answer as well?
9          (Last question and answer read.)
10         MR. SALEMI: Thank you. Is there a
11    question pending? Did I cut one off or --
12         MR. GAHNZ: You did.
13         MR. SALEMI: Okay. Do you want her
14    to repeat that and then I can state my
15    objections?
16         MR. GAHNZ: Yes, please.
17         MR. SALEMI: Would you?
18         (Last question read.)
19         MR. SALEMI: I think there's more to
20    it.
21         MS. SCHNEIDER: I'm going to object
22    as asked and answered, but go ahead.
23         MR. SALEMI: Well, wait a sec
24    though.
25         (Requested portion read.)

1          MR. SALEMI: Thank you.
2          So we're back on the record. I have
3     an objection. Go ahead if you can.
4          MS. SCHNEIDER: My objection is it's
5     asked and answered and he's explained it, but
6     go ahead.
7          MR. SALEMI: I agree. And I object
8     to the form, and I object to directing the
9     witness to answer the question yes or no. I
10    don't believe that the answer has to be in the
11    form of yes or no. I believe the answer was
12    reasonable, and it's been asked and answered.
13         So those are my objections, but go
14    ahead.
15    BY MR. GAHNZ:
16    Q    Just so the record is clear, I move to strike
17         that last answer as nonresponsive and ask the
18         doctor are you able to answer that question yes
19         or no?
20         MS. SCHNEIDER: Same objections.
21         **THE WITNESS: I've given you the**
22    **best answer that I can.**
23    BY MR. GAHNZ:
24    Q    Okay. Same question with respect to
25         gabapentin. Is it your opinion that

1    Ms. Freiwald's increased anxiety was in no way
2    related to the sudden cessation of gabapentin?
3  A   That is correct.  That is my opinion.
4  Q   Okay.  Going back to Exhibit 208.  Are you with
5    me?
6  A   I am.
7  Q   All right.  One of the bullet points a little
8    bit farther down says, "The use of gabapentin
9    can be helpful in speeding up the tapering
10   process."  Correct?
11 A   That is what that bullet point says.
12 Q   You would agree with that?
13 A   I would not.
14          MR. SALEMI:  And show an objection,
15   again, to form and foundation.  It presents an
16   incomplete hypothetical.  There's no context in
17   equating what's in Exhibit No. 207 to the
18   length of time taking and the dosage of
19   benzodiazepine which the deceased was on --
20          MR. GAHNZ:  Counsel, at this --
21          MR. SALEMI:  -- that the deceased
22   was on in this case.
23          MS. SCHNEIDER:  Join.
24          MR. SALEMI:  And I would like to
25   show a continuing, but I just don't --

1          MR. GAHNZ:  Your objection is to the
2    form of the question.  The editorializing is
3    starting to be problematic to the point of
4    going to the judge.  Coaching the witness on
5    the record is never acceptable.  If you have an
6    objection to the form of the question, that's
7    fine.  You realize, of course, that all of
8    your -- all of your objections are preserved
9    regardless of whether this is a video
10   deposition or not.  So I will ask you very
11   nicely to please stop coaching the witness.
12          MR. SALEMI:  And I'll indicate for
13   the record that in no way am I coaching the
14   witness.  Your characterization is either
15   mis-- either willfully or unintentionally
16   misinformed.  My objections are absolutely
17   appropriate.  And my objection in regard to the
18   use of this document in this hypothetical is
19   exactly the type of form objection that I'm
20   obligated to make in order to make sure I
21   preserve the issue.  If you don't want me to
22   detail my objections to form, I guess I could
23   just make an objection to form if you'll agree
24   that you're not going to require any statement
25   from me in regard to how in form your question

1    is wrong and my objection will be preserved,
2    I'm fine with that.
3          MS. SCHNEIDER:  I'm going to join in
4    the objection.
5  BY MR. GAHNZ:
6  Q   One of the things that --
7          I'm sorry, is everybody done?
8          MS. SCHNEIDER:  Um-hmm.
9  BY MR. GAHNZ:
10 Q   It indicates in this document that abrupt
11   withdrawal is not recommended.  Would you agree
12   with that?
13 A   Would you point to that?
14 Q   Sure.  It's the second-to-last bullet point on
15   the first page of Exhibit 208.
16          MS. SCHNEIDER:  I'm just going to
17   object to the form, vague and overly broad, but
18   go ahead.
19          THE WITNESS:  Well, this document
20   speaks for itself, and I believe you did read
21   that language correctly.
22          Do I agree with every clinical
23   statement of this practice guideline, no.  And
24   abrupt withdrawal is not recommended in
25   cases -- I would add additional language in

1    cases in which long-term use and high doses
2    have been provided.
3          And it goes on to say there's a risk
4    of seizures and/or delirium that increases with
5    abrupt withdrawal.  Those did not occur in this
6    case.
7  BY MR. GAHNZ:
8  Q   All right.  At page 23.
9  A   Of what document, please?
10 Q   Your report.  I'm sorry.  Are you ready?
11 A   I am.
12 Q   Under A, 19(A), you write that "Ms. Freiwald
13   failed to bring her medication with her when
14   she self surrendered.  Had she done so, her
15   medications would have more likely than not
16   been available to her prior to the weekend."
17          What is your basis for that?
18 A   My basis for that is that inmates which are
19   reporting -- who are reporting to the Huber
20   center were instructed to bring their
21   prescription medications with them when they
22   reported to the main Brown County Jail.  Had
23   she done so, usual custom and practice would
24   have been to verify and continue or discontinue
25   those medicines at that time, and she would

1  have had them from that night.
2         The problem was she went to another
3  facility, so she and the medicines were at two
4  different facilities.  They had to be verified
5  and then couriered, and a weekend intervened.
6  So had those -- had she brought them with her,
7  she likely would have had them by at the very
8  least the next day, which would have been
9  Friday.
10 Q   And is there -- when on Friday would she have
11     had them?
12 A   I have no idea.
13 Q   Okay.  What time did she check into the jail on
14     Thursday?
15 A   7:41 p.m.
16 Q   Okay.  And so how would the medications have
17     gotten from the jail to the work release center
18     between 7:41 p.m. and the next morning?
19 A   So I'm -- number one, I don't have any specific
20     information.  I can tell you the usual and
21     customary practice at a jail like the Brown
22     County Jail would be that her medications were
23     reviewed and approved or disapproved that night
24     and sent with her.  She took her -- all her
25     possessions with her.  She was transported by

1  the friend who brought her.  And they likely
2  would have gone with her.  Or might have been
3  made up -- I believe the nurses at the Brown
4  County Jail put those onto a -- a card, for
5  lack of a better term, the punch-out card, and
6  made an MAR.  So they might have been sent the
7  next day.
8         But in any event, they either would
9  have been sent with her that night or sent the
10 next day.
11 Q   Okay.  Turn to page 30 of your report, please.
12     Are you with me there?
13 A   I am.
14 Q   All right.  You are at that point commenting on
15     Dr. Greist's opinions, correct?
16 A   In the top of this page, yes.  In the bottom
17     it's Nurse Ward.
18 Q   Right.  D.  We're at page 30, subsection D, as
19     in David.
20 A   Yes.  I'm going to verify that it is
21     Dr. Greist.  I believe it is.  Yes, that is
22     correct.
23 Q   Okay.  And one of the things that you're
24     commenting on is the list of symptoms that
25     Dr. Greist attributes to discontinuation of

1  clonazepam, correct?
2  A   Correct.
3  Q   And you're critical of that list in that
4      they're mostly nonspecific and can be found in
5      a number of other conditions including anxiety?
6  A   I don't know if I would characterize it as
7      critical of that list.  I make the comment that
8      it's not specific, and I disagree that those
9      are -- to the extent that Dr. Greist opined
10     that those symptoms were specific to
11     benzodiazepine withdrawal, I disagree.  They
12     are not.
13        And by the way, I would like a
14     restroom break at some point.
15        MR. GAHNZ:  All right.  Why don't we
16     take that now.
17        THE WITNESS:  Okay.
18        THE VIDEOGRAPHER:  We are off the
19     record at 2:08 p.m.  This is the end of disc
20     number three in the deposition of Dr. Thomas
21     Fowlkes.
22     (Recess taken, 2:08 p.m. to 2:18 p.m.)
23        THE VIDEOGRAPHER:  We are back on
24     the record at 2:18 p.m.  This is the beginning
25     of disc number four in the deposition of

1  Dr. Thomas Fowlkes.
2  BY MR. GAHNZ:
3  Q   Are you ready?
4  A   I am.
5  Q   All right.  This morning we were talking about
6      cases where you've testified, and one of the
7      questions that I asked you was whether you had
8      testified about anything related to
9      benzodiazepine withdrawal.  And I believe your
10     statement was no, that you had not.
11        Do you remember that testimony?
12 A   Or at least that it wasn't a central issue.
13 Q   Wasn't a central issue.  Okay.
14 A   That I -- and I probably I -- I think -- I should
15     have, if I didn't, qualified to say to the best
16     my recollection.
17 Q   Okay.  Fair enough.
18        Do you remember that you were named
19     as an expert witness on behalf of the Estate of
20     Cynthia Mixon?  That's one of the -- that's one
21     of the cases that's listed on your --
22 A   Yes, I do recall that.
23 Q   Okay.  And do you recall that you provided a
24     report in that case?
25 A   I do.

Page 182

1  Q   You provided a deposition in that case?
2  A   I did.
3  Q   And you also provided an affidavit in support
4      of the -- or you provided an affidavit in that
5      case, right?
6  A   I can't -- I can't agree or disagree to that.
7      I -- I mean, if you say I did, you probably
8      have it and I probably did, but I don't recall
9      that at this moment.
10 Q   You have been down this road before.  All
11     right.  So let's turn --
12 A   I --
13 Q   I'm sorry.
14 A   I should say and it was my recollection that
15     Ms. Mixon -- I was retained on behalf of the
16     plaintiff in that case.  Ms. Mixon died of
17     withdrawal in the jail, and it was my
18     recollection that the primary drug was
19     heroin -- or, I'm sorry, opiates of some kind.
20     That is my recollection of that case.
21 Q   Okay.  At page 20 -- page 30.  Maria is going
22     to kill me if I go back ten pages.
23         On page 30 of your report,
24     subsection D, you talk about the clinically
25     significant symptoms of benzodiazepine

Page 183

1      withdrawal, correct?
2  A   That's correct.
3  Q   And those are hallucinations, delirium,
4      seizures, and autonomic hyperactivity, correct?
5  A   Correct.
6  Q   What is autonomic hyperactivity?
7  A   In simple terms or to explain it as succinctly
8      as I can, that would be a catecholamine-like
9      reaction, fight or flight reaction.  You may
10     have heard of that.  So increased blood
11     pressure, increased heart rate, sweating,
12     potentially increased temperature.  So, in
13     other words, over- -- overreaction of
14     catecholamines.
15         (Exhibit No. 209 was marked.)
16 BY MR. GAHNZ:
17 Q   All right.  Doctor, I'm showing you what we've
18     marked as Exhibit 209.  And this is an
19     affidavit of Dr. Thomas Fowlkes, correct?
20 A   It appears to be so.
21 Q   And if you turn to page 9 of that affidavit,
22     you swore under oath on January 24, 2019,
23     correct?
24 A   I'm looking for a date.  January.  Yes, that is
25     correct.

Page 184

1  Q   All right.  And this was something that you
2      presented to the Court in support of your
3      opinions in Ms. Mixon's case, correct?
4  A   Generally, that is correct.  I don't recall
5      what the specific purpose of this affidavit is.
6      I mean, in other words, that's not my -- I
7      didn't -- I don't know what it was in support
8      of specifically.  In support of something, a
9      motion or something.
10 Q   Fair enough.
11         But in any event, this is sworn
12     testimony that you gave in Ms. Mixon's case?
13 A   That is correct.
14 Q   All right.  And your testimony was that
15     Ms. Mixon died of withdrawal, specifically
16     benzodiazepine and/or opiate withdrawal in
17     paragraph 3, correct?
18 A   That is the case.
19 Q   Okay.  So when you said that you hadn't
20     testified with respect to the effects of
21     benzodiazepine withdrawal, that was inaccurate?
22         MS. SCHNEIDER:  Object to the form.
23     I think that misstates his testimony.  But go
24     ahead.
25         THE WITNESS:  So it was my testimony

Page 185

1      previously and it remains my testimony
2      previously that I didn't think that that was a
3      central issue.  Many of my cases involve
4      withdrawal from substances.  Most of them are
5      opiate withdrawal.  And it was my recollection
6      that this -- this was primarily related to
7      opiate withdrawal.
8          As your -- as my memory is now being
9      refreshed, she had a seizure, and seizures are
10     not usually caused by opiate withdrawal.  So my
11     opinion was that because her death was due to a
12     seizure, it was more likely related to the
13     benzo withdrawal than opiate withdrawal.
14 Q   And that was a central issue in the case was
15     how did she die, right?
16         MS. SCHNEIDER:  Object to the form.
17         THE WITNESS:  Yes, how -- the cause
18     of her death was a central issue in this case.
19         MS. SCHNEIDER:  What exhibit number
20     was that again?  209.
21 BY MR. GAHNZ:
22 Q   At page 4 under C you wrote, "I developed the
23     opinion that Ms. Mixon was suffering from
24     benzodiazepine and opiate withdrawal because
25     those disorders follow a predictable course."

1    Correct?
2  A   Correct.
3  Q   And since we're only dealing with
4    benzodiazepines, we won't talk about opiates.
5    But if you go to page 5 --
6  A   Okay.
7  Q   -- under No. 2 it provides "Benzodiazepine
8    withdrawal develops within a few days of
9    stopping benzodiazepines. The most prominent
10    symptom of benzodiazepine withdrawal is rebound
11    anxiety." Correct? You wrote that?
12  A   You've read it correctly so far.
13  Q   On page 30 of your report -- have you got that
14    handy?
15  A   I do.
16  Q   -- do you list rebound anxiety as one of the
17    clinically significant symptoms of
18    benzodiazepine withdrawal?
19  A   On page -- on page 30 you said? I was
20    commenting on Dr. Greist's list of symptoms. I
21    wasn't creating a list of symptoms.
22  Q   Did you write "The clinically significant
23    symptoms of benzodiazepine withdrawal are
24    hallucinations, delirium, seizures, and
25    autonomic hyperactivity"?

1  A   So those are two different statements though.
2    This says the most prominent, and this
3    statement on page 30 says the clinically
4    significant.
5         So rebound anxiety is not usually
6    clinically significant. The clinically
7    significant ones are when one has
8    hallucinations, delirium, seizures, and
9    autonomic hyperactivity.
10         Those statements are not
11    inconsistent at all.
12  Q   So when you're testifying for the plaintiff,
13    you listed rebound anxiety as a symptom of
14    rebound anxiety -- or of benzodiazepine
15    withdrawal, correct?
16  A   Well, you didn't read the whole paragraph. You
17    didn't read the last sentence of that
18    paragraph.
19  Q   "When death occurs in the setting of
20    benzodiazepine withdrawal, it is most often
21    secondary to seizures."
22  A   Yes.
23  Q   Okay. So my question is, when you were
24    testifying on behalf of the plaintiff, you
25    listed rebound anxiety as a symptom of

1    benzodiazepine withdrawal, correct?
2  A   I listed it as a most prominent symptom, not a
3    clinically significant symptom. This other
4    sentence has clinically significant symptoms.
5  Q   Did you list rebound anxiety as a symptom of
6    benzodiazepine withdrawal anywhere in your
7    50-odd pages of report for the defendants in
8    this case?
9  A   Well, in the -- in the sentence just before
10    that I said, "The symptoms are mostly
11    nonspecific and can be found in a number of
12    conditions including anxiety."
13         And I believe if I turn to Dr.-- let
14    me turn to Dr. Greist's report and see
15    whether -- I was commenting on his description
16    of symptoms. Let me see where it's listed.
17    Page 20 of his report. Yes, he lists anxiety.
18    It doesn't use the specific word "rebound" in
19    there. I believe the word -- the word
20    "rebound" I don't believe is in that paragraph.
21    I don't know whether it's anywhere within my
22    report; you would have to do a word search to
23    see that. It is in the presentation that you
24    provided.
25  Q   All right. And under Roman numeral III on that

1    same page --
2  A   Now we're on Exhibit 209 or my report?
3  Q   We're back on your affidavit.
4  A   Oh, my affidavit. Okay. Which number or which
5    page?
6  Q   Page 5, Roman numeral III or I-I-I.
7  A   Okay.
8  Q   You indicate that "the symptoms of
9    benzodiazepine withdrawal are summarized in the
10    Clinical Institute Withdrawal Assessment -
11    Benzodiazepine CIWA-B." Correct?
12  A   Correct.
13  Q   And that is a document that we showed you as
14    Exhibit 206 in your exhibit earlier, correct?
15  A   Correct.
16  Q   All right. And your testimony I believe was
17    that you don't rely on the CIWA scale in your
18    practice.
19  A   That was not my testimony. My testimony was
20    that I do not use the CIWA-B assessment scale.
21    So I use the CIWA scale regularly. I don't use
22    the CIWA-B, because it has mostly nonspecific
23    symptoms and it doesn't predict clinical
24    severity.
25  Q   But you asked the Court to rely on the CIWA-B

Page 190

1   scale as stating the signs and symptoms of
2   benzodiazepine withdrawal in your sworn
3   testimony when you were testifying on behalf of
4   the plaintiff.
5         MS. SCHNEIDER: Object to the form.
6         THE WITNESS: The sentence speaks
7   for itself. I said the symptoms are summarized
8   in that -- in that document, yes.
9   BY MR. GAHNZ:
10  Q   Okay.
11  A   And went on to say I was familiar with them
12      and...
13  Q   Now, going back to your report at page 30 you
14      indicate that the -- again, "The clinically
15      significant symptoms of benzodiazepine
16      withdrawal are hallucinations."
17           Is that contained anywhere in the
18      sworn testimony that you gave on behalf of the
19      plaintiff?
20  A   You mean in the Mixon case?
21  Q   Yes.
22  A   Well, that wasn't -- that wasn't an issue in
23      that case. As I recall, Ms. Mixon died
24      suddenly due to a seizure. And she was not
25      having hallucinations or delirium. That was

Page 191

1   not part of her -- she was -- my recollection
2   of Ms. Mixon's case is that she was suffering
3   from opiate withdrawal, so that was what her
4   symptoms were, and that she suddenly died of a
5   seizure. And because it was a seizure, it was
6   not likely related to the opiate withdrawal,
7   but may well have been related to
8   benzodiazepine withdrawal which she had also
9   been taking prior to coming to jail.
10  Q   Do you tell the Court in Exhibit 209 that a
11      clinically significant symptom of
12      benzodiazepine withdrawal is hallucination?
13        MS. SCHNEIDER: Asked and answered.
14        THE WITNESS: Do I tell -- so number
15      one, I would have to read this document to see
16      exactly what I told the Court in this case.
17  BY MR. GAHNZ:
18  Q   Go ahead.
19  A   Okay.
20  Q   Why don't we go off the record.
21        THE VIDEOGRAPHER: We are off the
22      record at 2:31 p.m.
23        (Pause in proceedings.)
24        THE VIDEOGRAPHER: We are back on
25      the record at 2:33 p.m.

Page 192

1   BY MR. GAHNZ:
2   Q   Do you have the question in mind, Doctor?
3   A   I do.
4           So after refreshing my memory of
5       this affidavit, Ms. Mixon was not suffering
6       from hallucinations, and it was not something
7       that was included in my affidavit.
8   Q   Do you list delirium as a significant symptom
9       of benzodiazepine withdrawal in your affidavit
10      to the Court?
11  A   Ms. Mixon was not suffering from delirium, and
12      it was not something that was included in my
13      report.
14  Q   Do you list autonomic hyperactivity in your
15      affidavit to the Court?
16  A   I believe I did discuss that. I don't know if
17      that exact terminology or some other synonym
18      was described, but yes.
19  Q   Okay. At page 7 of your affidavit. Are you
20      there?
21  A   I am.
22  Q   About midway through paragraph 6 you write, "In
23      addition to classic signs of benzodiazepine
24      withdrawal including headache; fatigue; loss of
25      appetite; flushing or feeling of burning in the

Page 193

1   face, hands, or feet; and anxiety (such as a
2   description that one's heart was about to
3   bust), these are well known withdrawal
4   symptoms."
5           Did I read that correctly, first of
6   all?
7   A   You did.
8   Q   Okay. Do any of those classic signs of
9       benzodiazepine withdrawal appear in your report
10      for the defendants in this case as part of
11      your -- not somebody else saying it, but did
12      you list those as classic signs of
13      benzodiazepine withdrawal?
14  A   As classic signs or just --
15  Q   Or at all.
16  A   Just a minute.
17           So what I say in my report --
18  Q   Which page and paragraph are you referring to,
19      sir?
20  A   I'm on No. 20, opinions 11 and 12. And then on
21      23, No. 17. On page 23, No. 17, "It's my
22      opinion that Ms. Freiwald was not suffering
23      from clinically significant withdrawal
24      symptoms."
25  Q   Okay. Do you -- other than at page 30, do you

Page 194

1  list what you think the clinically significant
2  signs of benzodiazepine withdrawal are?
3  A  **Well, I try not to be redundant. I mean, I**
4  **listed them at page 30. The clinically**
5  **significant signs of benzodiazepine withdrawal**
6  **are delirium and seizures.**
7  Q  Do you list -- do you inform us as the
8  plaintiffs' counsel that you believe that the
9  classic signs of benzodiazepine withdrawal
10  include headache? Did you tell the plaintiffs
11  that in your report on behalf of the defendants
12  in this case?
13  A  **Not --**
14      MS. SCHNEIDER: Well, I'm just going
15  to object. I think there's two questions out
16  there. But do you understand what he's asking?
17      **THE WITNESS: Yes.**
18  BY MR. GAHNZ:
19  Q  I'll start over.
20      Anywhere in your report that you did
21  on behalf of the defendants in Ms. Freiwald's
22  case --
23  A  **So we're talking about this present case, not**
24  **this affidavit anymore? In this present case?**
25  Q  Yeah.

Page 195

1  A  **Okay.**
2  Q  -- do you inform the reader that a classic sign
3  of benzodiazepine withdrawal is headache?
4  A  **I don't believe it's in my report.**
5  Q  All right. Do you inform the reader that a
6  classic sign of benzodiazepine withdrawal is
7  fatigue?
8  A  **I don't believe it's -- I -- so that is amongst**
9  **the symptoms. That is a very nonspecific**
10  **symptom, and I believe it is misleading to say**
11  **that it is amongst the classic signs.**
12  Q  So when you did the affidavit for the Court,
13  were you misleading the Court?
14      MS. SCHNEIDER: Object to the form.
15      **THE WITNESS: These are two**
16  **different patients with two different sets of**
17  **symptoms. And Ms. Mixon was suffering from**
18  **significant opiate withdrawal and then suddenly**
19  **died of a seizure.**
20  BY MR. GAHNZ:
21  Q  Okay.
22  A  **Which is different than Ms. Freiwald who never**
23  **had any specific signs or symptoms of**
24  **benzodiazepine withdrawal. She had nonspecific**
25  **signs and symptoms which were consistent with a**

Page 196

1  **number of things. They are consistent with**
2  **benzodiazepine withdrawal; they're also**
3  **consistent with anxiety, emotional**
4  **disregulation, and a number of other things.**
5      **So she did not have classic**
6  **benzodiazepine withdrawal symptoms.**
7  Q  And I'll move to strike as nonresponsive.
8      Did you inform the reader of your
9  report in the Freiwald case that a classic sign
10  of benzodiazepine withdrawal is fatigue?
11      MS. SCHNEIDER: Asked and answered.
12      **THE WITNESS: I've already provided**
13  **you my answer to that. Would you like me to**
14  **say it again?**
15  BY MR. GAHNZ:
16  Q  Yes, please.
17  A  **I don't believe it's in my report.**
18  Q  Okay. Thank you.
19      Did you tell the reader of your
20  report in the Freiwald case that loss of
21  appetite was a classic sign of benzodiazepine
22  withdrawal?
23  A  **I don't believe it -- I don't believe I did,**
24  **and I don't believe it's clinically relevant in**
25  **this case.**

Page 197

1  Q  Did you tell the reader of your report in this
2  case that flushing or feeling of burning in the
3  face, hands, or feet was a classic sign of
4  benzodiazepine withdrawal?
5  A  **I don't recall that being a feature of this**
6  **case or clinically significant in this case and**
7  **not an important portion.**
8  Q  Regardless of whether it was relevant, did you
9  include it in your report as a classic sign of
10  benzodiazepine withdrawal?
11      MS. SCHNEIDER: Asked and answered.
12      **THE WITNESS: No. I try to -- I try**
13  **to include only relevant symptoms.**
14  BY MR. GAHNZ:
15  Q  Okay. So let's examine that for just a minute.
16  At page 30 --
17  A  **Of my report?**
18  Q  Yep. -- you tell the reader that the
19  clinically significant symptoms of
20  benzodiazepine withdrawal are hallucinations.
21  That's one of the things that you
22  tell the reader?
23  A  **That is correct.**
24  Q  There was no hallucinations in this case,
25  right?

1  A   That is correct.

2  Q   Okay.  But you included hallucinations when you

3      were an expert for the defendant but not when

4      you were an expert for the plaintiff, true?

5  A   No, not true.

6  Q   We've already discussed whether or not

7      hallucinations was contained in your affidavit

8      to the Court, and you said it was not, correct?

9  A   I don't believe that either Ms. Mixon or

10     Ms. Freiwald were suffering from

11     hallucinations.  I don't believe that's

12     relevant to the -- what I -- what I am saying

13     in this sentence is I am telling you what are

14     the dangerous symptoms -- or the specific

15     symptoms of benzodiazepine withdrawal:

16     Hallucinations, which can be part of delirium;

17     seizures; and autonomic hyperactivity.  We

18     don't have any evidence in this case that

19     Ms. Freiwald had any of those conditions.

20  Q   But you didn't tell us about all the classic

21     signs that we've just gone through in

22     paragraph 6 of your affidavit?

23         MS. SCHNEIDER:  Asked and answered.

24         MR. SALEMI:  Object to the form.

25         THE WITNESS:  I don't know how to --

1      I don't know how to go about telling you any

2      more clearly.

3  BY MR. GAHNZ:

4  Q   All right.  So the last one here is, did you

5      inform the reader in the Freiwald matter or

6      anybody reading your report that a classic sign

7      of benzodiazepine withdrawal is anxiety such as

8      a description that one's heart was about to

9      bust?

10  A   Well, we talked about Ms. Freiwald having

11     anxiety.  I mean, we -- that's discussed in

12     here and that it's a nonspecific symptom of

13     benzodiazepine withdrawal or other.  It's not

14     specific to that though.

15  Q   Okay.  Continuing on on page 8 of your

16     affidavit.  You write "A reasonable provider

17     would then inquire about Ms. Mixon's prior

18     prescriptions and drug usage.  A reasonable

19     provider would have determined that she was on

20     multiple drugs which cause multiple" -- "which

21     cause physical dependence and which are

22     dangerous if stopped abruptly."

23         Which drugs are you referring to as

24     being dangerous if stopped abruptly?

25  A   Well, specifically in her case, high doses

1      of -- I believe it was multiple different

2      categories of drugs, but specifically I know

3      she was on high doses of opiates, and she was

4      on high doses of benzodiazepines.  And both of

5      them are dangerous if stopped abruptly.  And,

6      in fact, it killed her in this case.

7  Q   The abrupt cessation of benzodiazepines killed

8      her?

9  A   The abrupt cessation of opiates caused her to

10     be very sick with opiate withdrawal, and then

11     she suddenly died of a seizure which was likely

12     related to benzodiazepine withdrawal.  And she

13     had no medical treatment and died in this case.

14     I'm sorry, I should -- let me stop my answer.

15  Q   Paragraph 7 of your affidavit that you provided

16     when you were hired as a plaintiff's expert

17     provides, "A reasonable medical professional

18     who encountered Ms. Mixon at any point after

19     she began to exhibit symptoms on Wednesday

20     evening would have at a minimum treated the

21     withdrawal" -- "Ms. Mixon's withdrawal

22     symptoms.  He/she would have given symptomatic

23     treatment for Ms. Mixon's vomiting and diarrhea

24     and would have ensured she was taking in

25     adequate fluids and would have begun a

1      benzodiazepine taper."  Is that correct?

2  A   That is correct.

3  Q   And that was required in that case?

4  A   That is correct.

5  Q   And not required in this case?

6  A   That is correct.

7  Q   Okay.

8  A   Because of the difference in the -- the dosing

9      and the length of time they had been on it.  If

10     I remember correctly, Mrs. Mixon was obtaining

11     large quantities of illicit substances.

12  Q   Turn to page 32.  Are you there?

13  A   I am.

14  Q   Under paragraph A you write, "It is my opinion

15     that each of the CCS nursing staff acted within

16     with the appropriate scope of practice and

17     exercised appropriate professional nursing

18     judgment."

19         What is the -- tell me what nursing

20     judgment was exercised by Jessica Jones with

21     respect to Ruth Freiwald.

22  A   So what I said -- what you didn't read was

23     31 -- at the bottom of page 31, No. 5.  She had

24     a very -- Nurse Ward in her initial report had

25     a very long, multiple pages, maybe more than a

1  dozen pages of the reason that the nurses did
2  all three of those things, act outside their
3  scope of practice, did not exercise appropriate
4  nursing judgment, and did not act within the
5  standard of care.  So there were multiple
6  pages.
7        And rather -- because I was not
8  retained for the purposes of opining on each
9  one of those actions, I just generally said
10 that having read those things I disagreed that
11 the nurses did any of those three things, acted
12 outside their scope of practice, did not use
13 appropriate professional nursing judgment, and
14 acted within the standard of care.
15 Q  Okay.
16 A  Now, to your question specifically about Nurse
17    Jones, your question was what did she do to --
18 Q  Exercise appropriate professional nursing
19    judgment.
20 A  She reviewed the medications which had been
21    provided by Ms. Freiwald's son and the
22    verifications that had been performed at the
23    pharmacy.  She took that information, she spoke
24    with Dr. Fatoki on the phone, relayed
25    information to him, received instructions from

1     him, and carried out those instructions.
2     That's all professional nursing judgment.
3  Q  Anything else?
4  A  Not that I can think of at this moment.
5  Q  Okay.  You indicate at page 32 under E that
6     "Ms. Freiwald failed to bring her medications
7     when she self surrendered as instructed in the
8     preregistration information."
9        As I read your report -- I'm not
10    sure exactly where it is -- I thought I saw
11    somewhere that it was your understanding that
12    Ms. Freiwald didn't have to go to jail on the
13    27th.  Is that -- am I stating that correctly,
14    or am I misreading that?
15 A  You're misreading that.
16 Q  Okay.  So she did have to report to jail on the
17    27th?
18 A  Well, it was my understanding of reading the
19    transcript of the sentencing hearing that --
20    that actually it was her attorney that had
21    suggested that she self report that evening.
22    So it was -- I mean Ms. Freiwald's attorney.
23    She might not have wanted to go to jail that
24    night, but it was her own attorney that
25    suggested that she self surrender that night.

1  Q  And the Court, in fact, ordered her to jail on
2     October 27th?
3  A  Yes, that is my understanding.
4  Q  All right.  So she didn't have a choice as to
5     whether to go to jail?
6  A  No, that was -- that's correct.
7  Q  All right.  I just wanted to make sure we were
8     clear on that.
9        In your opinion are the nurses in
10    this case bound by the NCCHC policies that were
11    in effect in 2016?
12       MR. SALEMI:  Object to form.
13       THE WITNESS:  The answer to your
14    question cannot be answered with a simple yes
15    or no, but the answer is no.  You just said
16    bound.  So NCCHC is a nonprofit accreditation
17    agency that sets out standards for health
18    services in jails that represent best practices
19    in jails.  So they don't set standards of care,
20    so nurses cannot be bound by them to set a
21    standard of care.
22 BY MR. GAHNZ:
23 Q  Can they --
24 A  Nurses or doctors or anyone else.
25 Q  I'm sorry.  I didn't mean to step on your

1     answer.
2  A  That's okay.  I was just saying those standards
3     don't establish a standard of care.
4  Q  Okay.  What if the CCS through contract agrees
5     to be bound by those standards?  Would that
6     change your answer?
7  A  No.  Or likewise, they may have policies, and
8     they I think do have policies that are
9     consistent with those standards.  So -- but
10    then your question may be -- your next question
11    might be are they bound to follow every policy.
12    And so a policy violation or not following
13    every policy does not indicate a breach of the
14    standard of care.  Those are two different
15    things.
16 Q  So the fact that there's a -- well, have you
17    seen the contract?
18 A  I that it was provided as part of discovery,
19    yes.
20 Q  All right.  And would you agree with me that in
21    the scope of services that CCS agreed to
22    provide to Brown County, they agreed that they
23    would -- well --
24 A  I'll accept your characterization.
25 Q  Well, I don't want to give a characterization

1   because I'll get an objection. I'll give you a
2   reading.
3       All right. Showing you what had
4   previously been marked as Exhibit 61. Okay.
5   I've highlighted the conditions of performance
6   and compensation. And just take a look at
7   that.
8 A  Okay.
9 Q  Okay. So based on -- based on the contract
10   language entered into between CCS and Brown
11   County, does that change your opinion as to
12   whether or not CCS was required to follow the
13   standards set forth in the NCCHC?
14 A  I thought your -- you just said CCS. And I
15   thought before you said the nurses were they
16   bound to follow the policies. I mean, those
17   are two different questions I guess.
18 Q  Fair enough.
19 A  Which is your -- which is your --
20 Q  Let's start with the nurses.
21 A  Okay. So because NCCHC policies -- I'm sorry,
22   because NCCHC standards don't set a standard of
23   care, then the nurses are not bound -- that
24   does not determine their compliance with the
25   standard of care.

1 Q  And what about Dr. Fatoki?
2 A  Same answer.
3 Q  What about CCS?
4 A  Well, they have agreed to endeavor to provide
5   care that is consistent with those policies,
6   so -- but evidence in one case that their
7   practices or policies weren't consistent with
8   every single one of those sentences in that
9   book would not indicate a breach of the
10   standard of care.
11      And more specifically, as it relates
12   to the Huber center, not even all of the
13   policies could apply, because it was a
14   different environment; the inmates were free to
15   come and go during the daytime, et cetera.
16 Q  Was Ms. Freiwald ever told that she needed to
17   go to her own doctor for a blood pressure
18   check?
19 A  That information was contained in the Huber
20   preregistration instructions. So I can't say
21   for certain that she or her attorney were
22   provided with those. There is about five pages
23   worth of instructions. And she reported at the
24   right time and to the right place, so I believe
25   more likely than not she did receive those

1   instructions, and yes, she was told she would
2   receive care from her primary providers.
3 Q  Did Ms. Freiwald have a known serious medical
4   condition when she entered Brown County Jail?
5      MS. SCHNEIDER: Object to the form.
6      MS. DOYLE: I'll join.
7      THE WITNESS: I do not believe she
8   did.
9 BY MR. GAHNZ:
10 Q  Why is that?
11 A  Well, I don't believe that she had a medical
12   condition which qualified as a serious medical
13   condition, number one.
14 Q  Okay.
15 A  So she was not suicidal. She had chronic
16   hypertension. She had no other urgent medical
17   conditions. So she didn't have them. And to
18   the extent that she -- to the extent that she
19   did have any unknown ones, they were not known
20   to the providers.
21 Q  The fact that she had attempted suicide in
22   February in your opinion is not a serious
23   medical condition?
24      MS. SCHNEIDER: Object to the form
25   and foundation.

1      THE WITNESS: Well, I was going --
2      MS. DOYLE: I'll join.
3      THE WITNESS: Well, I was going to
4   say -- I was going to -- I'm not about to be
5   smart-alecky.
6      That sounds like a legal conclusion
7   whether -- I do not consider her conditions or
8   her suicide six months before to be an active
9   medical condition which required urgent action.
10   So, in other words, she did not need to be on
11   suicide watch. But whether the Court
12   determines that to be a serious medical
13   condition or not is something for the Court to
14   decide, not for me.
15 BY MR. GAHNZ:
16 Q  So that's outside your area of expertise?
17 A  No, I didn't say that. I believe that's more a
18   legal term of art than a medical term.
19 Q  All right. At page 35 of your report under the
20   first paragraph with the three dots you
21   indicate that she took a near-fatal dose of
22   clonazepam. What's your basis for that?
23 A  That she went unconscious and woke up and
24   hadn't died. I mean -- I mean, she took -- she
25   took enough. She took nine. On the face of it

1    that's a near fatal amount.  Number two, she
2    passed out or went to sleep, and when she
3    awoke, she had not died.  So I know that she
4    didn't die from it, but it was an amount that
5    could have killed her.
6  Q   Okay.  At pages 37, 38, 39 of your report, are
7    these all of the data and facts that you
8    considered in forming your opinions?
9  A   For my -- for my original --
10        MS. SCHNEIDER:  I'm just going to
11    object as to the word "facts," because I think
12    the rest of the -- there's facts in the rest of
13    the report.  But to the extent it's the
14    documents, you can go ahead and answer.
15        THE WITNESS:  Would you mind reading
16    the question again, please, ma'am?
17        (Last question read.)
18        THE WITNESS:  Well, I believe these
19    were the documents that I was provided at the
20    time of my original Rule 26 report.  Of course,
21    I also relied upon my experience, training, my
22    20 years of practice of correctional medicine
23    in forming my opinions, and I was provided
24    additional materials for my supplemental report
25    which are listed on that report.

1  BY MR. GAHNZ:
2  Q   So leaving aside your -- well, leaving aside
3    the supplemental report for the time being, are
4    there facts or data that you considered by this
5    witness that are not included within your -- in
6    drafting your initial report which are not
7    included in this report?
8  A   You said something about a witness.  I'm sorry,
9    I just missed.  Can you restate the question?
10    Maybe I misunderstood.
11  Q   That's okay.
12        Is there anything that you
13    considered in coming to the conclusions that
14    you came to in your initial report that is not
15    listed on the pages 37, 38, and 39 of that
16    report?
17  A   Not that I'm aware of at this moment.  As I
18    just told you, I also drew upon my training,
19    experience, and expertise, but I'm not aware of
20    any other data I was provided or any other
21    facts which I considered.  I am not aware of
22    any other data or facts --
23  Q   Okay.
24  A   -- or documents.
25  Q   All right.  Why don't you pull up Exhibit 205.

1    That is your supplemental report, correct?
2  A   That is correct.
3  Q   All right.  And at pages 1 and 2 this lists the
4    items that you reviewed in addition to those
5    that are shown at the end of your initial
6    report, correct?
7  A   That is correct.
8  Q   Is there anything else that's not included on
9    either pages 37, 38, 39 of your initial report
10    and/or pages 1 and 2 of your supplemental
11    report that you reviewed in connection with
12    your testimony?
13  A   Yes.
14  Q   What?
15  A   Since my supplemental report, I have also been
16    prescribed -- provided with the County
17    defendant expert reports which were not
18    previously provided to me.
19  Q   Okay.
20  A   And those are three in number.  I can tell
21    you -- do you want me to tell you who they are?
22  Q   Yes, please.
23  A   Mr. Hayes; Mr. Carter, I believe; and
24    Dr. Robbins.
25  Q   So at page 5 of your supplemental report -- are

1    you with me?
2  A   I am.
3  Q   Item No. 6.
4        Did you do any independent
5    investigation before you came to the conclusion
6    that you agreed with Dr. Daniel that
7    clonazepam, which was prescribed at a higher
8    dose than she was prescribed in October of
9    2016, was stopped abruptly and not tapered
10    after her February 2016 suicide attempt without
11    significant withdrawal symptoms?
12  A   I don't know what your definition of
13    "independent research or something like that"
14    is.  However, I will tell you what I did, which
15    was read his opinion, went back and rereviewed
16    the records that I had and confirmed that that
17    was, in fact, the case.  So I guess that's
18    independent research.
19  Q   Did you review Dr. Greist's testimony?
20  A   I did review Dr. Greist's testimony.
21  Q   With respect to your conclusion -- or your
22    agreement with Dr. Daniel?
23  A   If -- I probably did, but I don't recall -- I
24    don't recall what you're referring to at this
25    moment if you --

Page 214

1  Q   Do you recall Dr. Greist's testimony with
2      respect to the February cessation of
3      benzodiazepine?
4  A   Well, there are a number of experts, and so I
5      don't know that I recall Dr. Greist's separate
6      from the others.  So if you want to point me to
7      it, I'll be glad to look at it, but no, I don't
8      recall exactly what his opinion was.
9  Q   Do you know what happened to Ms. Freiwald after
10     they took her off of the benzodiazepine in
11     February of 2016?
12 A   Yes.
13 Q   What?
14 A   Well, she was discharged -- so she was kept in
15     the hospital for two days; she was then sent to
16     a psychiatric facility.  When she was
17     transferred to the psychiatric facility, the
18     clonazepam was not continued.  It was not
19     continued at the psychiatric facility either.
20     She was discharged from that facility.
21         Approximately two weeks later she
22     went to the emergency department with chest
23     pain and anxiety, and an emergency department
24     physician began another benzodiazepine, Ativan,
25     in a small dose.  And she ultimately went to

Page 215

1      Dr. Sheets at Prevea in March, and he stopped
2      that other benzodiazepine, Ativan, and
3      restarted her clonazepam.
4  Q   Doctor, I want you to assume for me that
5      Ms. Freiwald was continued on the clonazepam
6      and gabapentin from October 28th when the meds
7      arrived at the jail through November 2nd.  Do
8      you have an opinion as to whether she would
9      have stepped in front of the truck on
10     November 2nd had she been continued on those
11     medications?
12         MS. SCHNEIDER:  Just going to object
13     to the form, incomplete hypothetical, but go
14     ahead.
15         THE WITNESS:  So you are -- you're
16     asking me a hypothetical question.  We don't
17     know all of the circumstances, but you're --
18     but based upon what you just said, I believe
19     that even had she been continued on those
20     medications, she would have done -- done the
21     suicidal act which she did in February -- just
22     like she did in February while she was on those
23     medications.  So, yes, I do have an opinion
24     that she would have.
25

Page 216

1  BY MR. GAHNZ:
2  Q   Assume all the other facts of the case are the
3      same, she's not continued on her clonazepam,
4      she's not continued on her gabapentin, but
5      she's taken to the main jail for benzodiazepine
6      withdrawal protocol.  Would she have stepped in
7      front of the truck on November 2nd, 2016?
8          MS. SCHNEIDER:  Incomplete
9      hypothetical, but go ahead if you can answer.
10         THE WITNESS:  So that -- that almost
11     is an impossible question to answer.
12     Obviously, if she were taken to the main jail
13     and put on suicide watch, for instance, in a
14     suicide smock, she would not have been out in
15     order to be able to step in front of a truck,
16     so she couldn't have stepped in front of a
17     truck.  I believe her condition, her mental
18     condition, would have been much worse, however,
19     if you follow -- if you follow my answer.  I
20     mean --
21 BY MR. GAHNZ:
22 Q   I do follow your answer.  But I'm asking if she
23     would have been brought back to the jail and
24     put on the benzodiazepine withdrawal protocol
25     that Brown County Jail had in place, would she

Page 217

1      have stepped in front of the truck on
2      November 2nd?  Do you have an opinion as to
3      that?
4          MS. SCHNEIDER:  Asked and answered.
5          THE WITNESS:  That is the same
6      question you just -- if she was at the Brown
7      County Jail, she wouldn't have been allowed to
8      have Huber privileges, and therefore she
9      couldn't have stepped in front of a truck.
10 BY MR. GAHNZ:
11 Q   Okay.
12 A   However, the judge had ordered that.  And I
13     believe her mental condition -- it might well
14     have been below the standard of care to say
15     that she couldn't go and do what the judge
16     ordered and allow her to have Huber privileges.
17     That would have made her worse.
18 Q   Assume for me that all other facts of the case
19     being the same but that either Nurse Jones or
20     Nurse Blozinski had responded to the medical
21     atten- -- medical slip on 10/28 by going out to
22     the Huber facility and assessing Ms. Freiwald.
23         Would they have been able to notice
24     withdrawal signs as of the 28th?
25 A   Well, one problem with your hypothetical is I

Page 218

1 don't believe they received the medical request
2 forms on the 28th. So that's one problem with
3 your hypothetical.
4 Q Okay. So if they received on the 29th -- the
5 form on the 28th, if they got it on the
6 29th and had seen her that day --
7 A I'm not even sure that -- I'm not sure exactly
8 whether both of them arrived on the same day.
9 I think they responded to -- hold on just a
10 moment.
11 One is responded to on the 29th, and
12 one of them on the 31st, which -- but it was
13 really late on Sunday night. I mean, if you
14 follow what I'm saying, not on the Monday day,
15 but really on the Sunday night shift.
16 Q Right. And what we know that -- is that that's
17 when the slip was returned to Ms. Freiwald,
18 correct?
19 A That's when it was responded to by the nurses.
20 Q All right. So we know that they had the slips
21 in their possession on the 29th and on the
22 31st, correct?
23 A That's correct.
24 Q All right. So the hypothetical, then, is
25 assuming all other facts are the same, had

Page 219

1 Nurse Jones or Nurse Blozinski gone to the work
2 release center on October 29th, would they have
3 noticed withdrawal signs of benzodiazepine in
4 Ms. Freiwald?
5 MR. SALEMI: Show objection, form,
6 incomplete hypothetical, assumes facts not in
7 evidence.
8 MS. SCHNEIDER: Join.
9 THE WITNESS: My opinion is that had
10 they -- had they seen Ms. Freiwald on that
11 date, they would not have, because my opinion
12 is that she did not have clinically significant
13 withdrawal signs and symptoms, so they couldn't
14 have seen them.
15 BY MR. GAHNZ:
16 Q Same hypothetical with respect to October 31st.
17 Would the -- either Nurse Jones or Nurse
18 Blozinski have noticed withdrawal signs had
19 they gone out to the work release center --
20 MR. SALEMI: Same objections.
21 BY MR. GAHNZ:
22 Q -- to see Ms. Freiwald?
23 MR. SALEMI: Same objections.
24 MS. SCHNEIDER: Join.
25 THE WITNESS: Same answer as before.

Page 220

1 I don't believe she had clinically significant
2 withdrawal symptoms.
3 MR. GAHNZ: Why don't we take a
4 five-minute break. I think I'm just about
5 done. I just want to review my notes and see
6 if there's anything else that I want to cover.
7 THE VIDEOGRAPHER: We are off the
8 record at 3:12 p.m.
9 (Recess taken, 3:12 p.m. to 3:20 p.m.)
10 THE VIDEOGRAPHER: We are back on
11 the record at 3:20 p.m.
12 BY MR. GAHNZ:
13 Q Doctor, I'm going to show you what we've
14 previously marked as Exhibit 46. Is this one
15 of the policies from CCS that you reviewed in
16 coming to your conclusions in this case?
17 A It is.
18 Q All right. Was Brown County Jail a facility
19 where CCS provided mental health services?
20 A I believe -- it is my understanding that the
21 mental health professionals work for a
22 different entity, not CCS. I wasn't asked to
23 specifically review that contract, and I'm not
24 100 percent certain that I know the answer to
25 that.

Page 221

1 Q Did you review this policy, Exhibit 46, as part
2 of your -- in order to form the opinions that
3 you have in this case?
4 A I did. As I sit here today, I'm not intimately
5 familiar with the details of it. I reviewed it
6 a while -- a while ago, so I'm not familiar
7 with all the details of it at this time.
8 Q All right. I'm going to turn back to what had
9 been previously marked as Exhibit 66 and show
10 you Article 2 within the scope of services.
11 Do you see where the contract
12 requires CCS to provide psychiatric services?
13 A Tell me which number again. I'm not --
14 Q I'll highlight it.
15 A I'm --
16 Q No, I'm sorry. It's ridiculously small print.
17 A I wasn't trying to be difficult. I forgot -- I
18 forgot what you were --
19 Yes, there were -- there was
20 separate mental health providers, but they
21 were, I guess, provided by CCS. I agree with
22 that assessment.
23 Q Okay. So now with that preliminary out of the
24 way, you would agree that the policy under
25 Exhibit 46 applied to Brown County?

Page 222

1       MR. SALEMI:  Object to form.
2       MS. SCHNEIDER:  Join.
3       MS. DOYLE:  Yeah, I'll join too.
4       **THE WITNESS:  So I was not -- I did**
5   **review the CCS policies.  Obviously, I was**
6   **mainly reviewing them as it related to**
7   **Dr. Fatoki, because that was on whose behalf I**
8   **was retained.**
9   BY MR. GAHNZ:
10  Q   Sure.
11  A   **It was my understanding that this policy is a**
12      **general CCS policy and/or -- and are**
13      **potentially made specific to each facility.  I**
14      **do believe -- what I can't remember and what**
15      **I'm not sure of, was John Bosch a site person**
16      **or a CCS person.  If he's a CCS person, then I**
17      **don't know if it's specific to Brown County.**
18      **If John Bosch is a Brown County person, then**
19      **yes, it has been made specific to Brown County.**
20      **And I don't know the answer to that question.**
21  Q   Okay.  Leaving that aside, the suicide
22      prevention program has a number of components,
23      correct?
24  A   **That is correct.**
25  Q   And at 3.3 the CCS policy requires staff to

Page 223

1   perform Focus Screening at intake and ongoing
2   monitoring to identify potentially suicidal
3   inmates throughout the inmate's incarceration,
4   correct?
5   A   **That is what that says.**
6   Q   And that's CCS staff?
7   A   **It doesn't say that.**
8   Q   Is there anything in the documents that you saw
9       that would allow Brown County staff to take
10      that role of doing the suicide screening?
11  A   **Well, number one, it's standard procedure in**
12      **many jails, if not most jails, in America that**
13      **your initial screening, including your initial**
14      **suicide assessment, is performed by a trained**
15      **correctional officer, not by health care staff.**
16  Q   And I appreciate that, but is there anything in
17      the CCS policy, Exhibit 46, or the contract
18      between CCS and Brown County that allows a jail
19      staff person to perform the suicide screening?
20      MS. SCHNEIDER:  I'm just going to
21      object, form and foundation.
22      **THE WITNESS:  The answer is I don't**
23      **know.  I do not know.  I haven't reviewed the**
24      **contract or the policy in that detail recently**
25      **to be able to give you an answer.  I'm sorry.**

Page 224

1   BY MR. GAHNZ:
2   Q   Okay.  That's fair enough.
3       Do you see under 3.8, Nonacutely
4       Suicidal Inmate?  We talked about that
5       definition before, correct?
6   A   **We did.  And I said that I did not believe that**
7       **applied to Ms. Freiwald.**
8   Q   Right.  Because you thought that it wasn't
9       recent?
10  A   **And she was not expressing current suicidal**
11      **ideation.**
12  Q   Okay.  So a little bit farther back in this
13      policy one of the things -- at page CCS83.
14  A   **Okay.**
15  Q   One of the things that is done is that the --
16      there is to be training that zero to seven days
17      after admission is a high risk period, correct,
18      for suicides?
19  A   **That is listed as one of the high risk periods**
20      **in 5.1.2.**
21  Q   And another one is that -- after the receipt of
22      bad news.
23      Would you consider in this case the
24      receipt of bad news that Ms. Freiwald is going
25      to have to stay in jail and not get the

Page 225

1   electronic monitoring?
2       MR. SALEMI:  Object to the form;
3   presumes an incomplete hypothetical.
4       MS. SCHNEIDER:  Join.
5       **THE WITNESS:  Well, presuming --**
6   **presuming that that is bad news for a moment --**
7   **me -- I'm sorry, I'm telling you back a**
8   **hypothetical.**
9       **But if you presume that is bad news,**
10  **there's no information in the record that**
11  **indicates that anybody at the Brown County Jail**
12  **or CCS staff or Dr. Fatoki knew that, knew that**
13  **she had -- that she was expecting to go home**
14  **after one night or received bad news that she**
15  **was going to have to stay.  As far as the**
16  **information in the record only suggested that**
17  **she was sentenced to 45 days.  All of that**
18  **other information came out from other people**
19  **and after the fact.**
20  BY MR. GAHNZ:
21  Q   Elsewhere in your report you're indicating that
22      the triggering event was more likely the fact
23      that she had learned that she wasn't going to
24      get out of jail; is that correct?
25  A   **That is correct.**

1  Q   All right. So would you consider based on your
2      report that this was bad news that Ms. Freiwald
3      had received?
4  A   I didn't characterize it one way or the other.
5      But as I said, if you presume it is bad news, I
6      don't see any evidence that anybody else at the
7      Brown County Jail or CCS or Dr. Fatoki knew
8      about that.
9  Q   Well, do people normally commit suicide after
10     receiving good news?
11         MS. SCHNEIDER:  Object to the form.
12         MR. SALEMI:  It sounds
13     argumentative, and it's an incomplete
14     hypothetical.
15         THE WITNESS:  I don't know how to
16     provide an answer to that.
17 BY MR. GAHNZ:
18 Q   All right. Another high risk is "inmates with
19     mental illness, including depression or bipolar
20     disorder."
21         Did Ms. Freiwald have depression?
22 A   She did.
23 Q   Okay. "Inmates who have a personal history of
24     suicide attempts, especially when those have
25     occurred while incarcerated."

1         Did Ms. Freiwald have a history of
2      suicide attempt?
3  A   She did have that, but not while incarcerated.
4  Q   Under 5.2.1 it provides that "Potential suicide
5      risk is initially evaluated through observation
6      and interview questions during the receiving
7      screening."
8         Did anybody at CCS do that?
9  A   She had a thorough suicide screening.
10 Q   Did anybody at CCS do that screening?
11 A   I believe it was performed by the trained
12     correctional officers.
13 Q   Did anybody at CCS review that screening at any
14     point during her incarceration?
15 A   So it was my understanding that the nurse only
16     received the receiving screening after
17     Ms. Freiwald had been transferred to the Huber
18     center. And so the -- I believe that all of
19     the nurses testified that they did not review
20     those receiving screenings typically that
21     were -- I'm sorry, not the receiving
22     screenings -- the suicide screenings that were
23     done.
24 Q   Right. The receiving screening is a different
25     document than the suicide screening?

1  A   That's correct. They're two different
2      documents. So I misspoke.
3  Q   That's okay.
4  A   The nurses -- the nurses said that they did not
5      review the suicide screening of the -- that
6      were done by the correctional officer.
7  Q   At 5.41 they talk about evaluation and
8      treatment, correct?
9  A   That's correct.
10 Q   What is a QMHP?
11 A   Qualified mental health professional.
12 Q   And that person is to determine the level of
13     suicide risk and level of supervision needed;
14     is that correct?
15 A   Well, not for every inmate. I mean, this is --
16     this is one step in a process. So one would
17     have to identify a risk of suicide such that
18     some process would have been started. So, no,
19     a QMHP does not see every inmate.
20 Q   And in Ms. Freiwald's case she was identified
21     as a suicide potential?
22 A   I don't believe that is the case. I believe --
23     I believe that's what the form -- the computer
24     said that, but I don't believe that -- based on
25     the responses that she provided, that she was

1      at suicide risk.
2  Q   So who other than the form -- well, back up.
3         The -- did anybody evaluate the
4      suicide risk evaluation to determine whether or
5      not Ms. Freiwald was a suicide risk?
6  A   I believe the trained correctional officer did.
7  Q   Anybody -- but nobody from CCS, correct?
8  A   I'm not aware of it if they did.
9  Q   And the -- at least based on the information in
10     the offender management system, she was
11     identified as a potential suicide?
12         MS. DOYLE:  I'm going to object to
13     form.
14         MR. SALEMI:  Yeah, object to form.
15     Misstates the evidence.
16         MS. SCHNEIDER:  Join.
17         MS. DOYLE:  I'll join that too.
18         THE WITNESS:  So I believe the
19     answers that she provided did not show that she
20     was at risk for suicide. I understand that the
21     computer generated that wording at the top, but
22     I don't believe that was generated by a person.
23 BY MR. GAHNZ:
24 Q   Okay. You were not there to say, "Brown
25     County, based on these answers, Ruth Freiwald

Page 230

1    is not a suicide risk." Fair enough?
2  A   I only reviewed her responses in hindsight.
3  Q   And the only information that was out there was
4    what the computer had said with respect to the
5    risk of suicide based on the answers to the
6    questions, correct?
7  A   No. I mean, I disagree with that. What
8    information was out there was what Ms. Freiwald
9    said in response to the questions.
10 Q   Okay. At page 87 of that same standard -- CCS
11    policy, do you see under 5.63 at the -- at the
12    bottom of the page the listing of the who is
13    considered a high risk patient? It starts the
14    last sentence there, "High risk patients
15    include," colon?
16 A   Yes.
17 Q   Okay. And so "Admitted to jail on suicide
18    watch directly from an inpatient psychiatric
19    unit or inpatient medical stay due to suicide
20    attempt in the community."
21       That was not Ms. Freiwald, correct?
22 A   That is correct.
23 Q   "Placed on suicide watch due to making a
24    suicide attempt in jail."
25       That was not Ms. Freiwald, correct?

Page 231

1  A   That's correct.
2  Q   "Documented suicide attempt within the prior 12
3    months."
4       That was, in fact, Ms. Freiwald,
5    correct?
6  A   She did meet that criteria, yes.
7  Q   Okay. And was anything done by any employee of
8    CCS with respect to the fact that Ms. Freiwald
9    was a high risk for suicide based on their
10    policies?
11       MR. SALEMI: Hold on. Could you
12    read that one again, please?
13       (Last question read.)
14       MR. SALEMI: Object to form.
15       MS. SCHNEIDER: Join.
16       MR. SALEMI: Assumes facts not in
17    evidence.
18       THE WITNESS: I'm sorry, I need to
19    review a document.
20 BY MR. GAHNZ:
21 Q   That's okay.
22 A   What I was reviewing just now was HRVACCS3.
23 Q   Which -- what's the title of that document?
24 A   Booking Observation Report. The medical
25    screening.

Page 232

1  Q   Okay.
2  A   The medical screening -- just one moment,
3    please. I wanted to see -- it has no mention
4    of her prior suicide attempt. So, in other
5    words, it's not in that document.
6  Q   Sure.
7  A   It was only in response to the questions on the
8    suicide screening.
9  Q   Okay.
10 A   And I'm not aware that any CCS employee was
11    aware of the answers to that. That was -- that
12    was taken by and acted on by the correctional
13    officer.
14 Q   Fair enough. But based on the -- on the policy
15    that CCS had in place, you would agree that
16    Ms. Freiwald was considered a high risk for
17    suicide?
18 A   I agree that she met one of those criteria on
19    that. I don't necessarily agree that she
20    was -- met the cri- -- that she was a high risk
21    for suicide. And she was not even at that
22    facility. She had been transferred to another
23    facility.
24 Q   She was still in the custody of Brown County,
25    correct?

Page 233

1  A   She was.
2  Q   Under 3.8.
3  A   This is still on this Exhibit 46?
4  Q   Right. Page 82.
5  A   Okay. Okay. You said 3 point which?
6  Q   3.8.
7  A   8. Okay.
8  Q   Nonacutely Suicidal Inmates, which is, in
9    parenthetical, individuals who express current
10    suicidal ideation without a specific threat or
11    plan, have a recent history of self-destructive
12    behavior, or deny suicidal ideation but
13    demonstrate other concerning behavior
14    indicating the potential for self-injury, are
15    placed on watch and monitored on a staggered
16    schedule with no more than 15 minutes between
17    checks.
18       Did that -- was that the policy that
19    Brown County had in place with respect to
20    nonacutely suicidal inmates?
21 A   I believe that it is.
22 Q   And was that done on -- for Ms. Freiwald?
23 A   No, I don't believe Ms. Freiwald met that
24    criteria, that definition there, and I don't
25    believe that it either was done or should have

Page 234

1   been done.
2 Q   Okay. Even though based on CCS policy, she was
3   a high risk of suicide because she had
4   attempted a suicide within the 12 months prior
5   to her incarceration?
6   MS. SCHNEIDER: Object to the form.
7 It misstates his prior testimony.
8   MR. SALEMI: I join.
9   THE WITNESS: That's your
10 characterization of it. I said that she met
11 one criteria. I did not agree that she was at
12 high risk of suicide.
13 BY MR. GAHNZ:
14 Q   Well, my question wasn't whether you thought
15   she was at high risk of suicide.
16 A   Okay --
17 Q   My question was, did she meet the definition
18   set forth by CCS as a high risk for suicide?
19   MR. SALEMI: Object to form. That
20 wasn't the question.
21   MS. SCHNEIDER: Join.
22 BY MR. GAHNZ:
23 Q   Well, that is the question now.
24   Can you answer that question, sir?
25   And, again, it's at --

Page 235

1 A   I'm going to go over to it.
2   My read -- it's on 87, at the bottom
3 of 87 and at the top of 88. "High risk
4 patients include," and then it has certain --
5 it has five bullets. Four of them do not
6 apply. One of them, documented suicide attempt
7 in the prior 12 months, does apply in her case
8 in hindsight. I don't agree that either CCS --
9 that any of the employees knew that or that she
10 was or should have been put in that category
11 even had they known that. It says include. It
12 doesn't say must. That's just examples.
13 Q   Okay. Based on CCS Policy No. OPS-100-G05, did
14 Ms. Freiwald meet the definition of a high risk
15 for suicide inmate?
16   MR. SALEMI: Object to form.
17   THE WITNESS: I don't believe so.
18 This is not giving a definition. It just
19 says -- giving examples of who could be high
20 risk patients. So I don't believe she was high
21 risk. And she met one criteria, and that
22 criteria the CCS employees didn't know anything
23 about, so no, I don't believe that that
24 qualifies her as a high risk patient.
25   MR. GAHNZ: All right. We're done

Page 236

1 unless somebody else has more questions.
2   MS. SCHNEIDER: I just have one
3 clarification.
4   EXAMINATION
5 BY MS. SCHNEIDER:
6 Q   Doctor, you were asked a lot of questions about
7   Exhibit 209, which was your affidavit in the
8   Mixon case. Were the -- can you tell us
9   whether or not the circumstances in the Mixon
10   case were similar to the circumstances in the
11   Freiwald case?
12 A   No. They're entirely different.
13 Q   And did you adequately summarize the
14   differences between that case and this case
15   earlier in your deposition, or is there
16   something you would like to add to that?
17 A   Well, I think I did summarize it, but I will
18 say that they were entirely different in that,
19 number one, that jail had no medical staff at
20 all. And Ms. Mixon was very sick with opiate
21 withdrawal including severe vomiting and
22 diarrhea for a number of days before she
23 suddenly died of a seizure. So I think those
24 are entirely different circumstances than this
25 case.

Page 237

1   MS. SCHNEIDER: Okay. Thank you.
2   THE VIDEOGRAPHER: This is the end
3 of today's deposition of Dr. Thomas Fowlkes.
4 We are off the record at 3:42 p.m. This is the
5 end of disc number four.
6   MR. GAHNZ: We're going to copy 203
7 and provide you with a copy to add to the
8 original. Exhibits 204 and 205 which were
9 contained within Exhibit 203 have been taken
10 out and marked separately for ease of reference
11 down the line. Those will be copied as
12 Exhibits 204 and 205 and not included in 203.
13   Maria is going to take control of
14 Exhibit 203 and return it to Dr. Fowlkes after
15 copying.
16   Is that correct, everybody?
17   MS. SCHNEIDER: That's correct. And
18 the rest of the exhibits will go with the court
19 reporter.
20   THE WITNESS: Yes. And I have one
21 more comment on the record. What about reading
22 and signing?
23   MR. GAHNZ: That's not a Wisconsin
24 thing.
25   (Discussion off the record.)

Page 238

```
 1   STATE OF WISCONSIN   )
                          ) SS:
 2   COUNTY OF MILWAUKEE  )

 3

 4            I, Sarah A. Hart, RPR, RMR, CRR and

 5       Notary Public in and for the State of

 6       Wisconsin, do hereby certify that the preceding

 7       deposition was recorded by me and reduced to

 8       writing under my personal direction.

 9            I further certify that I am not a

10       relative or employee or attorney or counsel of

11       any of the parties, or a relative or employee

12       of such attorney or counsel, or financially

13       interested directly or indirectly in this

14       action.

15            In witness whereof, I have hereunder

16       set my hand and affixed my seal of office on

17       this 31st day of January, 2020.

18

19

20

21

            _____
22              SARAH A. HART, RPR/RMR/CRR

23              Notary Public
            In and for the State of Wisconsin
24

    My commission expires October 9, 2023.
25
```

Case 1:18-cv-00896-WCG   Filed 03/04/20   Page 61 of 61   Document 109-18