UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF RUTH FREIWALD,
by Personal Representative Charles Freiwald, et al.,

                    Plaintiffs,

          v.                                                    Case No. 18-C-896

ADEYEMI FATOKI, et al.,

                    Defendants.

## DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

On November 2, 2016, Ruth Freiwald stepped into the path of a truck in an apparent suicide

attempt while on work release from a sentence she was serving at the Brown County Jail's Work

Release Center in Green Bay, Wisconsin. She died several days later. The personal representative

of Freiwald's estate and her children filed this lawsuit against Brown County; Correctional Officer

Dominic Peters, who booked Freiwald into the jail; Correct Care Solutions LLC (CCS), the

County's health care provider for jail inmates; and three of CCS's employees, Dr. Adeyemi Fatoki

and Nurses Jessica Jones and Emily Blozinski. Plaintiffs claim that Freiwald's death was caused

by the defendants' deliberate indifference to Freiwald's serious medical needs in violation of her

Eighth Amendment rights. The amended complaint also asserts state law claims for medical

negligence and wrongful death. Plaintiffs have settled their claims against Brown County and the

correctional officer who booked Freiwald into the jail, and those parties have been dismissed.

What remains are the claims against CCS and its employees. This court has jurisdiction over

Plaintiffs' § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367. The case is before the court on the motions of Dr. Fatoki, CCS, Nurse Jones, and Nurse Blozinski for summary judgment. For the reasons that follow, the motions for summary judgment will be denied.

## BACKGROUND

On February 8, 2016, almost nine months before her death, Ruth Freiwald attempted suicide by taking 90 prescription pills and cutting her wrists. When that didn't work, she drove her vehicle into the path of an on-coming semi-truck. CCS Proposed Findings of Fact (CPFOF) ¶ 1, Dkt. No. 86. Freiwald survived and was hospitalized for her injuries. She was later transferred to a psychiatric hospital, where she remained for several days. She was ultimately diagnosed with major depressive disorder, post-traumatic stress disorder (PTSD), and anxiety. She was prescribed psychotropic medication and underwent several months of intensive mental health counseling. *Id.* ¶ 2. As her condition improved, Freiwald enrolled in a medical technician program at Northeast Wisconsin Technical College (NWTC), got a job in the NWTC library and, according to her family, friends, and mental health providers, had made remarkable progress. Plaintiffs' Statement of Additional Facts (PSAF) ¶ 5.

In May 2016, the Brown County District Attorney issued a criminal complaint charging Freiwald with various offenses arising out of the February 8, 2016 events. CPFOF ¶ 3. On October 27, 2016, Freiwald pleaded no contest to operating a motor vehicle while under the influence of the pills she took and causing injury to the driver of the truck into whose path she had driven in violation of Wis. Stat. § 346.63(2)(a). Brown County's Proposed Findings of Fact (BCPFOF) ¶ 6, Dkt. No. 89; Decl. of Amy J. Doyle, Exs. 11 and 16, Dkt. Nos. 87-1 at 2 and 87-6 at 10. The Circuit Court for Brown County sentenced Freiwald to 45 days in jail with Huber (work release) privileges so she could attend school and continue working as a condition of a two-year term of

Case 1:18-cv-00896-WCG    Filed 11/16/20    Page 2 of 22    Document 134

probation.  BCPFOF ¶ 6; CPFOF ¶ 7.  The conditions imposed by the court included that Freiwald take all prescribed medications.  BCPFOF ¶ 8.

Freiwald reported to the main jail facility, formally known as the Brown County Detention Center, located at 3030 Curry Lane on the outskirts of Green Bay on Thursday, October 27, 2016, in the evening of the same day she was sentenced.  *Id.* ¶ 10.  Correctional Officer Dominic Peters booked Freiwald into the jail at 7:19 p.m.  *Id.* ¶¶ 11, 22.  Officer Peters noted that Freiwald did not bring any of her prescription medications with her when she reported to the jail.  *Id.* ¶ 12.  He went over with Freiwald the Booking Observation Report, which includes various questions regarding medical conditions, history of withdrawal, and medications.  *Id.* ¶¶ 25–26.    The Booking Observation Report indicated that Freiwald reported high blood pressure, depression, PTSD, and anxiety; that she had previously received psychiatric care; that she was currently seeing a mental health counselor; and that she was taking Clonazepam, Prozac, Lisinopril, plus two additional medications for her bad hip.  CPFOF ¶ 16.  Officer Peters also completed the Suicide Screening Questionnaire with Freiwald.  BCPFOF ¶ 27.  When asked whether she was thinking about hurting or killing herself, Freiwald responded, "no."  *Id.* ¶ 28.  Freiwald reported a prior attempted suicide on February 8, 2016, and this information was documented on the Questionnaire.  *Id.* ¶ 30.  Upon completion of the Suicide Screening Questionnaire, the Offender Management System (OMS) computer program generated a result of "suicide potential exists" for Freiwald.  *Id.* ¶ 39.  In accordance with the sentence imposed by the court and because Freiwald did not appear suicidal, Officer Peters approved Freiwald to report to the Huber or Work Release Center (WRC), which is located at a separate facility in downtown Green Bay, about a twenty-minute drive from the Detention Center.  *Id.* ¶¶ 48, 66.  There is no on-site Health Services Unit (HSU) at the WRC.

3

Booking Observation Reports and Suicide Screening Questionnaires are maintained in the Brown County OMS computer system, and both Brown County correctional officers and Brown County Jail medical and mental health personnel have access to them. *Id.* ¶ 49. Officer Peters believed that HSU would receive Freiwald's Booking Observation Report and Suicide Screening Questionnaire through the OMS system. *Id.* ¶ 51. A CCS nurse printed the Booking Observation Report on October 27, 2016. *Id.* ¶ 56. When Freiwald arrived at the WRC, she received a copy of the Huber law rules and regulations. *Id.* ¶ 68.

The following morning, Freiwald's son brought a bag containing her various medications to the Brown County Detention Center. *Id.* ¶ 77. One of those medications, Clonazepam or Klonopin is a benzodiazepine, a psychotropic medication. PSAF ¶ 79. The consensus in the medical community is that cold-turkey withdrawal from Clonazepam is dangerous and can result in death. *Id.* ¶ 80. The classic side effects of withdrawal from Klonopin/Clonazepam include headaches, sweating, fatigue, confusion, anxiety, depression, suicidal thoughts, among others. *Id.* ¶ 82. To avoid or minimize these adverse effects, patients who are being taken off benzodiazepines are generally weaned from the medication, slowly tapering them over a two-to-four month period. *Id.* ¶ 86.

Jail personnel counted and logged the medications and gave the Medication Verification Form to HSU to be verified by the nurses and reviewed by Dr. Fatoki. Fatoki Proposed Findings of Fact (FPFOF) ¶ 65, Dkt. No. 94. At approximately 5:00 p.m. later that day, Freiwald submitted an Inmate Request for Medical Care stating that she had a migraine headache due to her blood pressure medications being stopped and that her anxiety due to her PTSD would worsen if her blood pressure medication was withheld. BCPFOF ¶ 79. She also requested that her blood pressure be monitored. *Id.* Nurse Blozinski responded to the inmate request on October 29, 2016,

4

stating "next available appointment with HSU for BP check. Meds need to be reviewed with MD." *Id.* ¶ 81. At the time of this response, Blozinski had never met or seen Freiwald, had not seen the Suicide Screening Questionnaire, and was not aware that the court had ordered Freiwald to take all prescribed medication. CPFOF ¶ 30.

At 1:00 p.m. on Saturday, October 29, 2016, Nurse Jones called Dr. Fatoki to discuss Freiwald's medication. *Id.* ¶ 37. Nurse Jones only looked at the Booking Observation Report before calling Dr. Fatoki. *Id.* ¶ 38. She advised that Freiwald was on Lisinopril, Diclofenac, Fluoxetine (Prozac), Clonazepam, and Gabapentin. FPFOF ¶¶ 69, 74–76. Dr. Fatoki approved Freiwald's prescriptions for Diclofenac for pain, Lisinopril for blood pressure, and Fluoxetine (Prozac) for depression but did not approve the continuation of Freiwald's prescriptions for Gabapentin or Clonazepam. *Id.* ¶ 82; CPFOF ¶¶ 42–43, 46. Dr. Fatoki ordered the nurses to send a release of information to obtain Freiwald's medical records and to direct the officers to contact HSU with any withdrawal symptoms. FPFOF ¶¶ 83–84; CPFOF ¶¶ 43, 46. Before giving his order, Dr. Fatoki did not meet with or speak to Freiwald, did not review her medical records or speak to her doctors, did not review the police reports or complaint, was not aware that Freiwald had attempted suicide in February 2016 or that she had been placed in a mental facility, did not review any of the jail intake information or the Suicide Screening Questionnaire, and did not review the court minute sheet or know that the court ordered Freiwald to take prescribed medication. CPFOF ¶ 64. Nurse Jones charted the Medication Verification Report, reflecting Dr. Fatoki's orders. *Id.* ¶ 44. Nurse Jones never saw Freiwald in person and did not review the court's minute sheet. *Id.* ¶¶ 51–52.

On Sunday, October 30, 2016, Blozinski placed the orders for Lisinopril, Diclofenac, and Fluoxetine into the electronic medical record system and packaged the medication to send to the

5

WRC for Freiwald. FPFOF ¶ 91. That same day, Freiwald submitted an Inmate Request for Medical Care, stating:

> I have been here since Thursday evening. My son brought my medicine into the main jail on Friday morning. Please I need my medication, my blood pressure is so high I have a migraine headache and am having a hard time thinking straight. I have four exams at school this week I have to be able to think clearly. I was ordered by the judge to take my medication as ordered. Please provide me with my medication that I gave to your workers. Please help. Thank you.

BCPFOF ¶ 83.

Nurse Blozinski responded to Freiwald's request on Monday, October 31, 2016, stating, "Meds sent down to WRC. HSU does not have judge's order at this time." *Id.* ¶ 84. Also on October 31, 2016, Freiwald received her first doses of the three approved medications, and Lt. Mitchell approved her request to attend classes or to work pursuant to a student job program at Northeast Wisconsin Technical College (NWTC). CPFOF ¶¶ 74, 76. Freiwald checked out of the WRC at approximately 11:17 a.m. to attend class or work at NWTC and checked back in at approximately 8:48 p.m. BCPFOF ¶ 86.

On Tuesday, November 1, 2016, Freiwald checked out of the WRC at 8:21 a.m. and checked back in at approximately 4:24 p.m. *Id.* ¶ 87. At approximately 10:00 p.m. that day, Freiwald was notified that her request for electronic monitoring was denied due to the nature of her crime. *Id.* ¶ 88. On Wednesday, November 2, 2016, Freiwald checked out of the WRC at approximately 6:20 a.m. on a pass to go to school or work at NWTC. *Id.* ¶ 89; CPFOF ¶ 80. At approximately 9:10 a.m., Freiwald stepped in front of a truck and was seriously injured. BCPFOF ¶ 90. She was transported to St. Vincent Hospital in Green Bay, Wisconsin and remained unconscious until the time of her death on November 6, 2016. *Id.*; FPFOF ¶ 99.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Dr. Fatoki

#### 1. Deliberate Indifference Claim

The Eighth Amendment proscribes cruel and unusual punishment. U.S. Const. amend. VIII. The Court has defined "cruel and unusual punishment" to include the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). In *Estelle v. Gamble*, the Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S.

7

97, 104 (1976) (internal citation omitted). "This is true," the Court continued, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05.

To prove a claim of deliberate indifference, the plaintiff must "establish that [she] suffered from 'an objectively serious medical condition' and that the 'defendant was deliberately indifferent to that condition.'" *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendant knew of, yet disregarded, an excessive risk to Freiwald's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 835, 837 (1994); *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted).

A medical professional is entitled to deference in treatment decisions but the deference accorded is not unlimited; it is not absolute immunity. A medical professional acting in a professional capacity may be held to have displayed deliberate indifference "if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). Deliberate indifference is not medical malpractice. *Estelle*, 429 U.S. at 106. At the same time, a successful plaintiff need not "show that he was literally ignored"

in his demands for medical treatment, and a defendant's showing that a plaintiff received "some" treatment does not resolve the issue conclusively if the treatment was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 653–54 (7th Cir. 2011) (emphasis in original) (internal quotation marks omitted). Finally, the Eighth Amendment "protects [an inmate] not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original).

Dr. Fatoki asserts that he did not have the requisite knowledge of a risk to Freiwald's health or safety to be deliberately indifferent when he discontinued her Gabapentin and Clonazepam. Dr. Fatoki only relied on the information provided to him by Nurse Jones in making his decision to discontinue Freiwald's Gabapentin and Clonazepam and requested an authorization for Freiwald's medical records. He did not have access to the jail's computer system to review Freiwald's inmate file, and he did not request that staff provide it to him. Absent a subjective awareness that Freiwald had a serious medical need, Fatoki argues, he cannot be found to have been deliberately indifferent in violation of the Eighth Amendment.

The mere fact that Gabapentin and Clonazepam had been prescribed for Freiwald by her psychiatrist, however, supports an inference that she had a serious medical need. As Dr. Fatoki was well aware, these are not over-the-counter medications that are available for the asking. Here, they were used to treat severe depression and anxiety, conditions that had previously manifested themselves in a suicide attempt. A reasonable jury could conclude that abruptly and indefinitely discontinuing medications of this type without seeing the patient or her medical records, and without even knowing why it was prescribed, shows indifference to the patient's serious medical needs.

9

Moreover, Plaintiffs' expert, Dr. John Geist, Emeritus Professor of Psychiatry at the University of Wisconsin School of Medicine and Public Health, has opined that abruptly discontinuing these prescriptions without knowing why they were prescribed and without closely monitoring the patient creates serious risks in itself and is such a substantial departure from accepted professional judgment, practice, or standards that it demonstrates he did not base the decision on such a judgment. Dr. Geist has also opined that the abrupt discontinuation of the medications was the proximate cause of Freiwald's suicide attempt on November 2, 2016, and her subsequent death from that attempt. Dkt. No. 108-20.

The question is not whether Dr. Fatoki knew that Freiwald was suicidal or was at imminent risk of committing suicide at the time he ordered her medications withheld. This is not a case where a guard is alleged to have failed to act in the face of an inmate trying to harm himself. *See, e.g.*, *Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006). Dr. Fatoki, and the nurses as well, are alleged to have been deliberately indifferent to Freiwald's serious medical needs, and it was that indifference that Plaintiffs allege led to her suicide. In a case like this, the plaintiff must show that the defendant was subjectively aware of the serious medical need, not the resulting suicide. Of course, in order to recover damages flowing from the suicide, Plaintiffs must then prove that Dr. Fatoki's deliberate indifference to that serious medical need caused the suicide.

To be sure, there may also be evidence that Dr. Fatoki's decision to discontinue these medications was not a departure from accepted professional judgment, practice, or standards. But that just creates an issue of fact for the jury to decide. Based upon the evidence in the record, Dr. Fatoki's motion for summary judgment on Plaintiffs' deliberate indifference claim must be denied.

## 2. Medical Malpractice Claim

Dr. Fatoki asserts that Plaintiffs cannot meet their burden of proof on their state law medical malpractice claim against him. Under Wisconsin law, "[m]edical malpractice cases require expert testimony to establish the standard of care." *Carney-Hayes v. N.W. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524. As noted, Plaintiffs have retained Dr. Greist, a psychiatrist, as their standard of care expert in this case. Dr. Fatoki does not challenge Dr. Greist's qualifications and concedes that he has experience with the medications at issue here. Instead, he contends that Dr. Greist is not qualified to offer an opinion regarding the standard of care in this case because he does not have experience in a jail or correctional setting.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case." *Lewis*, 561 F.3d at 705 (citation omitted). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Id.* The rule on expert testimony is liberal, however, and doubts about the usefulness of an expert's testimony are generally resolved in favor of admissibility. *Davis v. Duran*, 277 F.R.D. 362, 366

(N.D. Ill. 2011) (citing *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 298 (7th Cir. 1990); *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011)).

Dr. Fatoki's challenges to Dr. Greist's opinions go to weight, rather than admissibility. Whether Dr. Greist's opinions on the appropriate standard of care should be applied in this case can be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citation omitted)). Consequently, Dr. Fatoki's request that the court preclude Dr. Greist's opinions is denied.

Dr. Fatoki also asserts that Plaintiffs' medical malpractice claim must be dismissed because they cannot prove causation in this case. "A claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages. In short, a claim for medical malpractice requires a negligent act or omission that causes an injury." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Under Wisconsin law, "[c]ausation is a question of fact, and whether causation exists is frequently an inference the trier of fact draws from the circumstances." *Johnson v. Neuville*, 226 Wis. 2d 365, 378–79, 595 N.W.2d 100 (Ct. App. 1999) (citing *Jagmin v. Simonds Abrasive Co.*, 61 Wis. 2d 60, 82, 211 N.W.2d 810, 822 (1973)). A reasonable jury could find, based on the evidence in the record, that Dr. Fatoki's conduct amounted to medical malpractice

12

and that his medical malpractice was a substantial factor in causing Freiwald's injuries. Accordingly, Dr. Fatoki's motion will be denied on this basis.

### 3. Wrongful Death Claim

Plaintiffs assert that Dr. Fatoki's medical malpractice caused Freiwald's wrongful death. Under Wisconsin law, "[o]nly minor children and minor siblings, plus the spouse and parents of the patient," are eligible to bring a medical malpractice wrongful death claim. *Lornson v. Siddiqui*, 2007 WI 92, ¶ 18, 302 Wis. 2d 519, 735 N.W.2d 55 (2007). As a result, Plaintiffs' wrongful death claim against Dr. Fatoki based upon medical malpractice is dismissed as to all but Freiwald's minor child.

## B. Nurses Jones and Blozinski and CCS

### 1. Deliberate Indifference Claim against Defendant Nurses

Plaintiffs assert that Nurses Jones and Blozinski were deliberately indifferent in three ways: (1) they failed to provide Freiwald with her court-ordered prescription medication; (2) they failed to properly respond to her repeated requests for medical care; and (3) they failed to adequately monitor her in light of the decision to withhold her medications. "Nurses may generally defer to instructions given by physicians, 'but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient.'" *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010)). Here, Plaintiffs have adduced evidence that both Nurse Jones and Nurse Blozinski knew of the risks associated with the abrupt termination of a patient's prescription for Clonazepam. PSAF ¶ 85. Not only did both profess to some knowledge of those effects, Plaintiffs have offered evidence that this information was generally known in the medical community and

the County provided specific training concerning those effects. *Id.* ¶¶ 80–81. Yet, neither took steps to see that Freiwald was closely monitored after Dr. Fatoki ordered the medication withheld.

Nurse Jones is the director of nursing at the Brown County Detention Center and was responsible for providing Dr. Fatoki the information needed to make informed decisions about inmate care. The evidence suggests she made no effort to determine Freiwald's history and why she had been prescribed psychotropic medications so that Dr. Fatoki would have such information before deciding to withhold it from her. There is evidence that Dr. Fatoki directed Nurse Jones to contact the officers at the WRC and have them monitor Freiwald for Clonazepam withdrawal symptoms. FPFOF ¶ 84. There is no evidence, however, that any such call was made. PSAF ¶ 111. There is also evidence, moreover, that even if such directions had been given, it would not have helped since "withdrawal from benzodiazepines needed to be medically supervised and not delegated to jail staff." *Id.* ¶ 112. Nurse Jones made no effort to see that the HSU staff monitored Freiwald's medical condition over the period of time she knew Freiwald would likely experience withdrawal symptoms.

Similarly, Nurse Blozinski, a licensed practical nurse, was aware of the dangers of Clonazepam withdrawal but failed to take effective action in response to Freiwald's requests for medical care on October 28 when Freiwald reported "headache due to blood pressure meds being stopped." FPFOF ¶ 66. Freiwald also reported "my anxiety due to PTSD will get worse if that is withheld" and asked to have her blood pressure monitored. *Id.* Nurse Blozinski responded the next day that she would be set up for the next appointment with HSU for blood pressure checks and that her medication would be reviewed with the medical doctor. *Id.* at ¶ 67. Had she checked the electronic medical log, Nurse Blozinski would have seen that another nurse had entered an

14

order for her blood pressure to be checked daily when she first arrived at the jail, but it had still not been checked even once.

On Sunday, October 30, Freiwald again sent a request for medical care to the HSU staff, noting that she had been there since Thursday evening and her son had brought her medications to the jail on Friday morning. Freiwald continued, "I need my medication, my blood pressure is so high I have a migraine headache and I am having a hard time thinking straight." PSAF ¶ 129. Freiwald explained that she had four exams that week and that the judge had ordered her to take her medications as prescribed. She concluded, "Please provide me with my medications that I gave to your workers." *Id.* Again, Nurse Blozinski did not discuss Freiwald's request with Dr. Fatoki or attempt to see Freiwald herself. The following day she wrote on the request that meds, meaning those Dr. Fatoki had approved, were sent to the WRC and advised Freiwald that HSU did not have the judge's order. *Id.*

Plaintiffs' nursing expert, Suzanne L. Ward, a registered nurse with more than 46 years of experience as a practicing nurse, including 10 years of clinical service in jails, prisons, and forensic mental health treatment institutions, reviewed the records and depositions of Nurses Jones and Blozinski and issued reports totaling some 92 pages. Based upon her review of the entire record, Ward has opined not only that both defendant nurses breached the standard of care for nursing in Wisconsin, but that their "actions, failures to act, and refusals to act cannot have been the result of the exercises of professional nursing judgment." Dkt. No. 109-6 at 2, 15. Their breaches, according to Ward, "were reflective of a widespread practice and custom of knowing indifference toward the serious medical needs of patients, generally, and knowing indifference toward the serious medical needs of Ruth Freiwald, specifically." *Id.* According to Ward, "Nurse Blozinski's knowing failure and refusal to assess, evaluate or monitor Ruth Freiwald, a patient who was

15

expressing clinical concerns of high blood pressure, headache, difficulty concentrating, and who was expressing concerns about not receiving court-ordered medication on two occasions in written requests was not the exercise of professional nursing judgment." *Id.* at 9. Ward likewise opines that Nurse Jones' knowing disregard of Ruth Freiwald's serious medical condition "was so egregious as to not have been the result of professional nursing judgment." *Id.* at 41.

Based on this evidence, which is disputed to be sure, the court cannot conclude that either of the defendant nurses is entitled to judgment as a matter of law on Plaintiffs' Eighth Amendment claims of deliberate indifference. Their motions for summary judgment on those claims is therefore denied.

### 2. *Monell* Claim against CCS

Plaintiffs assert a claim under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), against CCS. A plaintiff may base *Monell* liability on "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007); *see also King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). This is a direct form of liability "not founded on a theory of vicarious liability or respondeat superior that holds a municipality responsible for the misdeeds of its employees." *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (citation omitted). To be liable for an unconstitutional policy, "[t]he municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). And although CCS is not a municipality, "a private corporation that has

contracted to provide essential government services is subject to at least the same rules that apply to public entities." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (citing *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir. 2014)). The court will address each theory of liability in turn.

Plaintiffs claim that Freiwald's Eighth Amendment rights were violated as a result of a Brown County policy with which CCS acted in accordance. Brown County Jail Huber Law Rules and Regulations governs all Huber inmates and is written into the County's contract with CCS. The policy states, in part, that "[a]ll Huber inmates are responsible for their own medical care as well as any and all medical costs incurred. All medical care must be cleared through staff from the Health Services Unit." Dkt. No. 81-1 at 3. But while the policy states that Huber inmates are responsible for their own medical care, it also prohibits Huber inmates from taking prescription medications or seeking medical care on their own without prior authorization from HSU. The Rules and Regulations provide, in relevant part, that "[a]ll prescription and non-prescription medication must be turned in to a Correctional Officer. You may not use any prescription or non-prescription drugs without authorization by staff from the Health Services Unit." *Id.* at 1.

Based on the evidence before the court, a reasonable jury could conclude that CCS's implementation of the policy resulted in a violation of Freiwald's constitutional rights. On the one hand, the policy advises that Huber inmates are responsible for their own medical care, but CCS staff prevented Freiwald from following her offsite doctor's treatment plan and taking her prescribed medications. Freiwald's son brought a bag of medication bottles to the main Brown County Jail, and jail staff logged the medications and submitted a Medication Verification Form to HSU to be verified by the nurses and reviewed by Dr. Fatoki. Without examining Freiwald or understanding why her outside provider prescribed certain medications, Dr. Fatoki immediately

discontinued Gabapentin and Clonazepam and ordered the nurses to send a release of information to obtain Freiwald's medical records from her outside providers. Although Freiwald requested her medications, indicated she had a migraine headache and had a hard time thinking clearly without them, and stated that she was ordered by the state court to take her medication as ordered, she only received the medications approved by Dr. Fatoki and was not examined by HSU staff. Once her medications were received by the jail, Freiwald no longer had control over them and she could not access her prescribed medications or her outside providers without approval from HSU staff. In the meantime, Freiwald's condition continued to deteriorate, allegedly resulting in her death.

In short, a jury could conclude that CCS adopted a policy of indefinitely cutting off medication prescribed for serious chronic medical conditions without first conducting some sort of examination of the inmate to determine the reason the medication was prescribed and assess whether the medication could be safely discontinued, and that the implementation of this policy by CCS staff resulted in Freiwald being denied medical care for her medical and mental health needs and the medication she required. Stated differently, on this record, CCS's "cut off medication first and ask questions later" policy could be found to have caused or been the moving force behind the constitutional violation. The evidence adduced by Plaintiffs is sufficient to support a *Monell* claim against CCS. *See, e.g.*, *Glisson*, 849 F.3d at 379–82. Accordingly, CCS's motion for summary judgment will be denied on this basis.

### 3. Negligence Claims

Plaintiffs have also asserted negligence and wrongful death claims under Wisconsin law against the nurses and CCS under the theory of respondeat superior. CCS and the defendant nurses assert that these claims must be dismissed because Plaintiffs cannot prove the defendant nurses breached a duty of care in this case or that any act or omission by the nurses was the proximate

18

cause of Freiwald's suicide. Under Wisconsin law, nurses owe a professional duty of care to their patients. *See Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 172 N.W.2d 427 (1969). Construing all facts in favor of Plaintiffs, as the court is required to do at this stage, Plaintiffs have created a material dispute of fact as to whether Nurses Jones and Blozinski breached their duty of care in this case and were the proximate cause of Freiwald's death. The same evidence that precludes granting summary judgment in their favor on Plaintiffs' Eighth Amendment claim for deliberate indifference to Freiwald's serious medical needs likewise precludes summary judgment in their favor on Plaintiffs' negligence claims. And because under the doctrine of respondeat superior, an employer is vicariously liable for the negligent acts of its employees while they are acting within the scope of their employment, *Shannon v. City of Milwaukee*, 94 Wis. 2d 374, 370, 289 N.W.2d 564 (1980), the claim against CCS survives as well. Accordingly, summary judgment is denied with respect to Plaintiffs' negligence claims against CCS and the defendant nurses.

### 4. Wrongful Death Claim

Plaintiffs have asserted wrongful death claims against CCS, Nurse Jones, and Nurse Blozinski. The defendants assert that they are entitled to summary judgment to the extent this claim is brought by those Plaintiffs who are Freiwald's adult children and are seeking damages for loss of society and companionship. The defendants cite *Lornson v. Siddiqui*, 302 Wis. 2d 519, 735 N.W.2d 55 (2007), and *Czapinski v. St. Francis Hospital Inc.*, 2000 WI 80, 236 Wis. 2d 316, 613 N.W.2d 120, for the proposition that adult children cannot assert wrongful death suits for medical malpractice under Chapter 655 of the Wisconsin Statutes. Plaintiffs assert that Wisconsin law does not bar Freiwald's adult children from bringing loss of society and companionship claims against these defendants because they are not a "health care provider" or "health care provider employee" as defined by Chapter 655. *See* Wis. Stat. § 655.002(1). The defendants do not dispute

that they are not a health care provider or health care provider employee or that Plaintiffs' wrongful death action is governed by Wis. Stat. § 895.04. Instead, they assert that Plaintiffs' claims are time-barred under Wis. Stat. § 893.80.

Wisconsin Statute section 893.80 governs claims against governmental bodies or officers, agents, or employees. Section 893.80(1) provides that no action may be brought against governmental bodies, officers, agents, or employees, unless a claim is filed with the governmental body and is disallowed. *See* Wis. Stat. § 893.80(1)(a)–(b). Section 893.80(1g) states, "No action on a claim under this section against any defendant fire company, corporation, subdivision or agency nor against any defendant officer, official, agent or employee, may be brought after 6 months from the date of service of the notice of disallowance, and the notice of disallowance shall contain a statement to that effect." Wis. Stat. § 893.80(1g). The defendants assert that CCS and its employees were agents within the meaning of the statute and that Plaintiffs filed the instant lawsuit more than six months after the notice of disallowance was served. The Wisconsin Supreme Court has recognized that a private contractor may be an "agent" of a governmental entity when the contractor shows that "the governmental entity . . . had the right to control the tasks performed by the contractor with 'reasonably precise specifications' and the contractor . . . followed those specifications." *Showers Appraisals, LLC v. Musson Bros.*, 2013 WI 79, ¶ 37, 350 Wis. 2d 509, 835 N.W.2d 226. CCS has not made this showing, here. Accordingly, Wisconsin's three-year statute of limitations, rather than section 893.80(1g)'s six-month statute of limitations, applies in this case. *See* Wis. Stat. § 893.54. In short, Plaintiffs' claims against these defendants are timely, and the court will turn to whether Freiwald's adult children are entitled to bring a wrongful death action against them.

"The right to bring a wrongful death action is strictly limited to those parties designated by the legislature under Wis. Stat. § 895.04." *Bowen v. Am. Family Ins. Co.*, 2012 WI App 29, ¶ 11, 340 Wis. 2d 232, 811 N.W.2d 887 (citing *Steinbarth v. Johannes*, 144 Wis. 2d 159, 163–64, 423 N.W.2d 540 (1988)). Section 895.04 of the Wisconsin Statutes provides that an action for wrongful death "may be brought by the personal representative of the deceased person or by the person to whom the amount recovered belongs." Wis. Stat. § 895.04(1). The statute establishes a hierarchy of claimants that governs who "the person to whom the amount recovered belongs" is. *See* § 895.04(2). The statute explains that, if the deceased leaves surviving a spouse or domestic partner and minor children, the court shall:

> determine the amount, if any, to be set aside for the protection of such children after considering the age of such children, the amount involved, the capacity and integrity of the surviving spouse or surviving domestic partner, and any other facts or information it may have or receive, and such amount may be impressed by creation of an appropriate lien in favor of such children or otherwise protected as circumstances may warrant, but such amount shall not be in excess of 50 percent of the net amount received after deduction of costs of collection.

*Id.* If the deceased does not leave behind minor children, "the amount recovered shall belong and be paid to the spouse or domestic partner," and if no spouse or domestic partner survives, the amount recovered belongs "to the deceased's lineal heirs as determined by [Wis. Stat. § 852.01]." *Id.* Under the hierarchy established in Wis. Stat. § 852.01, if the deceased spouse or domestic partner does not survive, the deceased's next lineal heirs are her children. Wis. Stat. § 852.01(1)(a), (b).

Freiwald had one minor child but did not have a surviving spouse or domestic partner. The court therefore concludes that, based on the language of the statute, Freiwald's adult children, as lineal heirs, have the right to bring a wrongful death action, along with Freiwald's minor child, against these defendants. And because her adult children are entitled to bring a wrongful death

action, they are permitted by statute to recover for loss of society and companionship for the wrongful death of their parent. *See* Wis. Stat. § 895.04(4) ("Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $500,000 per occurrence in the case of a deceased minor, or $350,000 per occurrence in the case of a deceased adult, for loss of society and companionship may be awarded to the spouse, children or parents of the deceased, or to the siblings of the deceased, if the siblings were minors at the time of the death."); *see also Pierce v. Am. Family Mut. Ins. Co.*, 2007 WI App 152, ¶ 7, 303 Wis. 2d 726, 736 N.W.2d 247 ("[T]he unambiguous language of § 895.04(4) allows an adult child to recover for loss of society and companionship for the wrongful death of a parent."). Accordingly, these defendants are not entitled to summary judgment on Plaintiffs' wrongful death claim.

## CONCLUSION

For the foregoing reasons, Dr. Fatoki's motion for summary judgment (Dkt. No. 90) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Dr. Fatoki's motion is partially granted with respect to Plaintiffs' wrongful death claim and denied in all other respects. Plaintiffs' wrongful death claim against Dr. Fatoki based upon medical malpractice is dismissed as to as to all but Freiwald's minor child. The motion for summary judgment of CCS, Nurse Jones, and Nurse Blozinski (Dkt. No. 76) is **DENIED** in its entirety. The Clerk is directed to set the matter for a telephone conference to address further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 16th day of November, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

22